```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION

 3   UNITED STATES OF AMERICA      *  NO. 3:09-cr-210-B
                                   *
 4        Plaintiff,               *
                                   *
 5            vs.                  *
                                   *
 6   JESSE WILLIAM McGRAW          *
                                   *  Dallas, Texas
 7        Defendants              *  July 1, 2009

 8

 9                 PRELIMINARY & DETENTION HEARING
                   BEFORE HON. WM. F. SANDERSON
10                       U. S. MAGISTRATE
                            (Redacted)

11   APPEARANCES:

12   For Plaintiff:             MS. CANDINA S. HEATH
                                U. S. Attorney's Office
13                              1100 Commerce St., Third Fl.
                                Dallas, TX 75242
14                              213/659-8634

15   For Defendant:            MR. JOHN M. NICHOLSON
                                Federal Public Defenders Ofc.
16                              525 Griffin St., Ste. 629
                                Dallas, TX. 75202
17                              214/767-2746

18   Court Transcriber:        MS. BETTY TATE
                                3101 Townbluff Dr., #923
19                              Plano, Texas 75075
                                972-5996-9442
20

21   Proceedings recorded by electronic sound recording;

22   transcript produced by transcription service.

23

24

25
```

1                          **P-R-O-C-E-E-D-I-N-G-S**

2

3              **THE COURT:**  The final matter we have on the

4    docket here this afternoon is United States vs. Jessie

5    William McGraw.  This is in Docket No. 3:09-MJ-207, and the

6    record will reflect that previously upon Mr. McGraw's

7    initial appearance the Government filed a motion for

8    detention.  At that same occasion I did appoint the Federal

9    Public Defender to represent him, and I've scheduled a

10   preliminary hearing, as well as a hearing on the

11   Government's motion for detention for this afternoon at this

12   hour.

13              Is the Government ready to proceed at this time?

14              **MS. HEATH:**  Yes, Your Honor.

15              **THE COURT:**  All right.  Is the defendant ready to

16   proceed?

17              **MR. NICHOLSON:**  Yes, Your Honor.

18              **THE COURT:**  All right.  And then who would be –

19   and Mr. McGraw, you may go ahead and come around here and

20   have a seat at counsel table, and who will be Government's

21   first witness on the issue of probable cause?

22              **MS. HEATH:**  Your Honor, would you like to hear

23   both the probable cause and the detention issues at the same

24   time?

25              **THE COURT:**  Well, probably the better course

1  would be let's have the Government present its case on the

2  preliminary hearing and, of course, I will take into account

3  anything that is related in the course of the preliminary

4  hearing.  If I do find probable cause as I determine whether

5  bond should be granted or denied in reviewing the

6  Government's motion for detention, but to the extent

7  possible, let's segregate the two.

8        **MS. HEATH**:  Yes, Your Honor.

9        **THE COURT**:  On the issue of probable cause who

10  will be the Government's first witness?

11        **MS. HEATH**:  Special Agent Allyn Lynd.

12        **THE COURT**:  All right.  Mr. Lynd, if you will

13  come around here and stand for one moment and raise your

14  right hand.

15                    (Witness Sworn)

16        **THE COURT**:  Please have a seat here at the

17  witness stand, and once you're comfortably seated if you'll

18  state your name for the record and how you're employed.

19        **THE WITNESS**:  My name is Special Agent Allyn

20  Lynd, A-l-l-y-n  L-y-n-d.  I'm currently a Special Agent

21  with the Dallas Division of the Federal Bureau of

22  Investigation.  I've been employed with that division for

23  about twelve years and have been on the Cyber Crime Squad

24  for about the past eleven.

25        **THE COURT**:  All right, thank you.

1

2                    **ALLYN LYND, Called by Plaintiff (Sworn)**

3

4                             **DIRECT EXAMINATION**

5

6    **BY MS. HEATH:**

7    Q     Agent Lynd, are you one of the case agents on the

8    Jessie McGraw case?

9    A     I am, ma'am.

10   Q     And as of June 25th and 26th, 2009 you knew of Mr.

11   McGraw as being a security guard employed by the United

12   Protective Services Company; is that correct?

13   A     Actually I think it was June 24th in the late evening,

14   but yes, ma'am.

15   Q     You also discovered that as a security guard he was

16   assigned to work security at the Carroll Clinic; is that

17   correct?

18   A     Yes, ma'am.

19   Q     And the address of the Carroll Clinic is 9301 N.

20   Central Expressway in Dallas, Texas?

21   A     Yes, ma'am.

22   Q     Now, you received information about Mr. McGraw from a

23   Lieutenant with the Attorney General's Office?

24   A     From him and a cooperating witness and also from our

25   Jackson office.

1  Q     And from the different sources of information

2  regarding Mr. McGraw, did the FBI proceed to corroborate

3  that information?

4  A     We did, ma'am.

5  Q     Was part of the corroboration of that information

6  viewing certain videos and postings and screen shots that

7  appeared on different forms and websites on the internet?

8  A     Yes, ma'am.

9  Q     And if you could please explain what types of websites

10  and forms you reviewed?

11  A     Well, primarily what I reviewed was something called

12  YouTube and Myspace Videos.  In these basically somebody can

13  upload to the website, those websites which are free to the

14  public, videos that they have created or they copy or that

15  they have ownership over in some manner.  These videos are

16  usually – indicates in YouTube either some clips from a

17  movie they really like or it's maybe a home video shot with

18  their own camera or something like that.

19  Q     The information that you received about Mr. McGraw

20  concerned what with regard to the Carroll Clinic?

21  A     That Mr. McGraw, using the name Ghost/Exodus, had

22  basically gained unauthorized access, which means he had

23  control over and had access to a computer, or computers, at

24  the Carroll Clinic that controlled the heating, ventilation

25  and air conditioning system, five-unit system that kept the

1   environment of that building under control, and that he had

2   in addition compromised other computers in that building.

3   The initial information we had was – included that those

4   computers were there but not particularly what those

5   computers did.

6           During our confirmation of what those computers

7   did, we found out that they included computers that handled

8   patient records and patients in processing, including both

9   the health records and financial information for those

10  patients.

11  Q    And you said you proceeded to confirm what these

12  computers did.  Did you actually go to the building housing

13  the Carroll Clinic on Central Expressway?

14  A    On two occasions, both on the 25th and on the 26th – I'm

15  sorry, 24th and the 25th.

16  Q    And when you went to the Carroll Clinic were you

17  guided by the images that you viewed that was hosted by

18  Ghost/Exodus of various travels though the building?

19  A    We were.  One of the videos has him in front of a –

20  for lack of a better term, guard desk in the lobby, and we

21  could recognize that as we came in by a variety of factors.

22  We could also see hallways he traveled in that we were able

23  to recognize based on the description of the hallway, the

24  way that the hallway looked, paintings on the walls.  We

25  also showed those videos to property management and to the

1  tenants of the hallway in question, and they recognized the

2  facility also.

3  Q    And you said you were able to identify the particular

4  computers that were reflected in these videos; is that

5  correct?

6  A    Yes, ma'am.  One particular computer, for example, you

7  can see in the video that left-hand upper corner of the

8  computer has a code on it, and I don't remember what that

9  code is off the top of my head, but I believe it's in the

10 complaint, and you can also see a pink flamingo sitting on

11 the top of the computer.  You can also recognize the room or

12 cubicle that it's housed in, based on things on the walls,

13 decorations, posters, et cetera, and that was easy to

14 identify based on that.

15 Q    And do we have two of the videos here to show today?

16 A    We do, ma'am.

17 Q    And in these videos, especially the one where he is

18 traveling through the building, do you actually see his

19 face?

20 A    You do.

21 Q    So is there any question that the person you saw in

22 the video is the defendant, Jessie McGraw, in the courtroom

23 today?

24 A    No, ma'am, and in addition to, based on the video, he

25 provided a statement after the arrest in an interview with

1   myself and some of the other agents on the squad in which he

2   admitted to it.

3   Q      Back during the investigation when you determined that

4   the person, Jessie McGraw, known as Ghost/Exodus, had

5   compromised computers at Carroll Clinic, what did you do

6   with regard to determining what he had done to those

7   computers?

8   A      Well, we made an image for ourselves so the forensic

9   lab could look at that image and that forensic process has

10  not been completed, and we alerted the owners of that

11  equipment, the true owners to the issue and the danger, and

12  they began their forensic examination, and we have a report

13  of their forensic examination and they were relying on what

14  they assessed and not what we've assessed.

15  Q      With regard to what they assessed was there any

16  similarity in what was represented on the videos as to what

17  was being done to the computers and what codes or commands

18  or programs were placed on the computers is what you found?

19  A      They were able to identify and confirm that the

20  procedures that were observed on the videos, for example,

21  had been indeed done to those computers.

22  Q      With regard to the computers that controlled the

23  heating, ventilation and air conditioning systems at the

24  Carroll Clinic, did anybody at the Carroll Clinic indicate

25  that they had noticed any problems with those systems?

1   A     They had.  They didn't have any problems for a little

2   over a month, which corresponds roughly to a time that the

3   malicious code had been conducted on the computer.  Whether

4   it be damage to the systems was intentional or reckless,

5   we're still in the process of determining, but for example,

6   they told us that on one occasion all five air conditioning

7   units went out at the same time for over an hour, which

8   again, it's a hundred degree weather this time of the month

9   and – in Dallas, and it caused at least hardship to the

10  individuals in there, if not any actual injuries.

11  Q     And what type of tenants are in the Carroll Clinic

12  building?

13  A     Well, there's two towers to the building.  In one of

14  the towers, which is the north tower, it's primarily out-

15  patient type procedures.  They come in, they get looked at,

16  they get assessed and they're gone by the end of the day.

17  In the south tower, however, there are overnight patients

18  that are there 24/7.

19  Q     And there are surgery facilities in the building?

20  A     Yes, ma'am.

21  Q     Now, you also indicated that there was at least a

22  computer compromise that had patient information; is that

23  correct?

24  A     That is correct, but we've only been able to tell at

25  this point, without our review being conducted, that he had

1   access to those records.  We don't know if he actually used

2   those records or not until we're finished doing our exam.

3   Q     And technically how was it that he was able to gain

4   access to the information on that computer?

5   A     By having physical access to the machine via his

6   position of trust as security-write access.  He was able to

7   get physical access to the machine and search hardware

8   devices.  In this case, a CD, for example, which would allow

9   him to by-pass the security.  Once he had the security by-

10  passed he then turned off the security features on the

11  computer.  For example, he turned off the antivirus, and you

12  can see that in the video, and then he would put on – by

13  inserting a USB device he put on the malicious code and

14  executed that malicious code.

15  Q     Now on June 26th you obtained a complaint and the same

16  evening arrested the defendant for violations of

17  1030(a)(5)(A) and 1030(c)(4)(B)(iv), in that the defendant

18  knowingly caused a transmission of a program information

19  code or command and as a result of such conduct

20  intentionally caused damage without authorization to a

21  protected computer, creating a threat to public health and

22  safety.  Were the two videos we're about to show the basis

23  on which that complaint was – or some of the basis on which

24  that –

25  A     It gave us a large portion of the basis, yes, ma'am.

1   There were other videos we saw, and there were Craig's List

2   ads we'd seen, and other pieces of information, but

3   primarily it was based on the intrusion into the computers

4   at the Carroll Clinic.

5           **MS. HEATH**:  Your Honor, at this time I would

6   offer into evidence Government's Exhibit No. 1, which

7   contains two videos that were relied on in the affidavit.

8   Together they should take only about ten minutes to play,

9   and we would request the opportunity to play these at this

10  time.

11          **THE COURT**:  All right, you may proceed.

12          **MS. HEATH**:  And if we could play the gear and ID

13  video first.

14                          (Video Played)

15  Q    (By Ms. Heath)  Agent Lynd, this particular video, did

16  you confirm that this report was taken from the Carroll

17  Clinic?

18  A    Yes.

19  Q    Did you determine whether or not - the hours that the

20  defendant worked at the Carroll Clinic?

21  A    Yes, ma'am, he worked until 11:00 p.m. to 7:00 a.m.

22  Q    And during that time did you determine from

23  information that he communicated with other individuals on

24  the internet?

25  A    Yes, ma'am.

1  Q      Was he involved in any group on the internet?

2  A      He was.  The Electronic Tribulation Army.

3  Q      And what type of group is that?

4  A      It's a hacker group.

5  Q      Are you aware of how many members at this time are in

6  the hacker group?

7  A      Depending on various reports, over a dozen.

8  Q      The defendant on that video indicated that he would

9  potentially sell some of these items on the internet; is

10 that correct?

11 A      Yes, ma'am.

12 Q      Now, of these items are you familiar with them as

13 being either illegal or used for illegal purposes?

14 A      Yes, ma'am.

15 Q      And what type of items are either illegally possessed

16 or used in illegal activities?

17 A      Well, for example, the white device that looks like a

18 credit card reader that's known as a credit card skimmer,

19 that's used to basically get people's credit card

20 information illegally so that you can use it to produce your

21 own credit cards, or used on the internet, or whatever, to

22 basically drain their accounts at your own expense.  The

23 cell phone jammers are illegal.  The possession of

24 credentials that you're presenting as FBI credentials is

25 illegal.  The camera in and of itself is not illegal;

1  however, if we're taking the place that that camera is not

2  permitted in order to obtain otherwise unauthorized videos,

3  it could be illegal, again depending on the circumstances.

4  Q    And just for the record, the defendant to your

5  knowledge is not associated with the FBI in any way; is that

6  correct?

7  A    He is not, ma'am, and also the two USB drives that are

8  shown on the chain contain tools that are software tools

9  that are used by – for some people for good purposes but are

10  known to be used by hackers in order to crack into the

11  computers.

12  Q    And have you had an opportunity to look at a still

13  shot of that FBI badge to determine that the photo on the

14  badge was a photo of the defendant's?

15  A    Yes, ma'am.

16       **MS. HEATH**:  Now if we could go to the second

17  clip, which is the – yes.

18                              (Second Video Played)

19  Q    (By Ms. Heath)  Agent Lynd, at the beginning of that

20  video the defendant indicated he was going to drop a botnet.

21  What is a botnet?

22  A    A botnet stands for a network of robots, or robotic

23  programs that are on computers.  A botnet is usually used

24  for committing further compute crimes.  It can be used to

25  distribute (inaudible) service tax, it can be used to try

1    and knock people off line, it can be used for stolen credit

2    cards, also it's criminal activities.  They are usually

3    either used by the owners or resold by the owners on-line

4    and then around the community.

5    Q     So basically it's a computer that has been taken over

6    or compromised; is that correct?

7    A     Yes, ma'am, by somebody who didn't have access to it,

8    or authorized access.

9    Q     And the owner of the computer may not actually know

10   that that has happened to their computer?

11   A     Generally they do not.

12   Q     The person who compromised the computer can control

13   the computer remotely?

14   A     Yes, ma'am.

15   Q     In fact, that second computer we were looking at was

16   the defendant's computer; is that correct?

17   A     Yes, ma'am, he was using it to show how he was

18   controlling that computer and that he was able to log into

19   it remotely.  You could also see other computers in the

20   botnetwork that were part of the network up at the same

21   time.

22   Q     The ETA on that second computer, does that stand for

23   the Electronic Tribulation Army?

24   A     It does, ma'am, and the countdown on the right-hand

25   side was the countdown to devil's day, which is the day that

1  he was calling on hackers, both those in his group and

2  others unknown, to join him in a massive denial of service

3  attack for July 4th.

4  Q    In fact, he said that when he was talking about

5  dropping the botnet to spread it around for July 4th?

6  A    That's correct, ma'am.

7  Q    Now he also showed a disc that had OPH crack?

8  A    Yes, ma'am.

9  Q    What is that?

10  A    Again it's a tool that people use to gain access to

11  computers when you have physical access to the computers.

12  In and of itself it's not necessarily a hacker tool to use

13  to gain inappropriate access.  Sometimes we forget their

14  passwords, et cetera, but for somebody who doesn't have

15  authorized access to be using that on the computer it's only

16  to gain control over that computer without permission.

17  Q    Were you able to verify that the elevator in the

18  hallway and that particular room were located in the Carroll

19  Clinic building?

20  A    Yes, ma'am, and we found most of those items there

21  either – that he reviewed them both, the video was either on

22  his person, in his car, or in his residence at the time of

23  arrest and the time we executed the search warrants on those

24  facilities.

25  Q    Did Carroll Clinic indicate that Mr. McGraw had any

1    authorization whatsoever to access any of the computers in

2    the building?

3    A    They specifically said he had no authorized access.

4    Q    And for record purposes, the Mr. McGraw that was

5    arrested and that was viewed on the video that we just

6    showed, is he in the courtroom here today?

7    A    He is, ma'am.

8    Q    And would you please point him out for the record?

9    A    He's sitting next to his defense attorney in the

10   orange jumpsuit.

11            **MS. HEATH**:  Your Honor, if the record may reflect

12   that the witness has identified the defendant.

13            **THE COURT**:  It will.

14   Q    (By Ms. Heath)  And you indicated that when the

15   defendant was arrested he did give a statement; is that

16   correct?

17   A    He did, ma'am.

18   Q    And did the statement confirm the fact that the

19   defendant accessed these computers without authorization and

20   actually planted codes or software on those computers?

21   A    It did, ma'am, and included a statement to the effect

22   that he had abused his position of trust and authority to do

23   so.

24   Q    Prior to obtaining the statement did you advise the

25   defendant of his rights?

```
1    A     I did, ma'am.

2    Q     And did he actually sign a waiver of those rights?

3    A     He did.

4              MS. HEATH:  Your Honor, we would offer into

5    evidence Government's Exhibit No. 3, which is a waiver of

6    the rights.

7              THE COURT:  All right.

8              MS. HEATH:  And also we would offer into evidence

9    Government's Exhibit No. 2, which is the defendant's

10   statement.

11             THE COURT:  Any objection?

12             MR. NICHOLSON:  Not at this time, Your Honor.

13             THE COURT:  They're admitted.

14   Q     (By Ms. Heath)  With regard to the defendant's

15   statement, what did the defendant admit to?

16   A     He admitted to being inside the computers at the

17   Carroll Clinic, on the written statement, and that he had no

18   authorization to do so, and that he knew it was a criminal

19   act.  During a verbal statement, which was much longer than

20   that and lasted a couple of hours, he admitted to being the

21   leader of the ETA, he admitted to distributing the botnet,

22   he admitted to giving direction to others, and to having a

23   long history of being associated with computers, not all of

24   which in a criminal fashion but a long history of being

25   associated with computers.
```

1      **MS. HEATH**:  Your Honor, as to the issue of

2  probable cause, the Government rests.

3      **THE COURT**:  All right.  Cross examination?

4      **MR. NICHOLSON**:  Just briefly, Your Honor, thank

5  you.

6

7                    **CROSS EXAMINATION**

8

9  **BY MR. NICHOLSON:**

10  Q    Agent Lynd, what is necessary for a person to get

11  access to the computer at Carroll Clinic that controlled the

12  heating and ventilation and air conditioner?

13  A    Physical access to that, sir.  There's probably a way

14  to get remote access to it also, but in truth that was Agent

15  Sing who was checking that and I'm not a hundred percent

16  sure on that portion of it, but otherwise you need physical

17  access to the computer.

18  Q    So a person needs to be able to walk up to a computer

19  terminal?

20  A    Yes, sir.

21  Q    Is there anything in addition to that?

22  A    Normally you would need a password and login to be on

23  that computer.  If you have physical access and have the

24  proper tools, like the disc that was shown on the videos,

25  you could gain access to the computer without authorization

1   and without the password.

2   Q    Let's say if a patient wandered up to the computer and

3   had physical access, that patient wouldn't be able to access

4   the HVAC absent the password and the login.  Is that what

5   you're saying?

6   A    Or absent some other tool that would allow them to

7   gain unauthorized access, yes, sir.

8   Q    Have you been able to determine which of those two

9   happened in this particular case?

10  A    Agent Sing did.  I am not sure which one it was on

11  that.

12  Q    I believe you testified that roughly speaking at the

13  time the Carroll Clinic was having problems with that air

14  conditioning, the time that corresponds to what we're

15  talking about here today; is that –

16  A    And for about the month previously, yes, sir.

17  Q    Have you been able to determine for sure that the

18  problems with the air conditioning system are a result of

19  what you're saying?

20  A    There's a BNC on there which they know is directly

21  related to it, but the full extent we won't know until we

22  finish the examination, and that was determined by the

23  personnel at the clinic and not by us, so again, we're

24  relying on their testimony to us.

25  Q    So you can't say what the FBI's independent opinion is

1  because y'all haven't had the time to image the computers,

2  correct?

3  A      We haven't had time to do the forensic, yes, sir.

4  Q      So right now the FBI doesn't have any independent

5  opinion about whether Mr. McGraw intentionally or

6  negligently harmed the –

7  A      Again, as to the intent or negligence, no, sir.

8  Q      And you don't know for sure that the problems of the

9  air conditioning system had anything to do with Mr. McGraw?

10  A      Based on the circumstances of the evidence we believe

11  so but again, until we finish the forensics we won't know

12  for sure, sir.

13  Q      It's circumstantial evidence?

14  A      Yes, sir.

15  Q      Now, is there a different computer that's necessary to

16  access the personal identification?

17  A      It's on a different system, yes, sir.

18  Q      On a different system?  And how are you saying that

19  Mr. McGraw accessed that different system?

20  A      He physically went into the offices where it was laid

21  out by using that security pass, the video that begins to

22  show the beginning of the second video, as he was getting

23  into the elevator.  Once again, physical access to that

24  space.  He used that disc, he exhibited that CD ROM, put it

25  inside the computer, used that to bypass the security of the

1   computer.  Once the security was bypassing he was logged on,

2   he then turned the antivirus software off, put his USB drive

3   in, which contained the malicious code, dragged it over and

4   executed it.

5   Q     Are you able to determine if Mr. McGraw looked at any

6   of the confidential patient information?

7   A     According to the hospital, he has not, but again,

8   they've only had a real short time to look at that and we

9   have not done an independent confirmation of that.

10  Q     Okay.  So at this point you can't tell the Court that

11  for sure Mr. McGraw looked at any of the information to

12  which you're saying he had access?

13  A     We cannot, sir.

14  Q     Have you discovered anything over the course of your

15  investigation that leads you to believe that Mr. McGraw was

16  going to look at that information or use it for some

17  (inaudible) purpose, was he going to sell it to people that

18  do identity theft, or was it just more the potential that

19  something like this could have happened is the problem?

20  A     The fact that he had credit cards that he had stolen

21  from the lost and found that came through wallets and

22  purses, hidden in a hollowed-out book in his apartment, we

23  just believe he would have at a minimum used the financial

24  information.  He also had an identity manufacturing kit, and

25  again, those are the kinds of things, and experience, that

1   he would have had if he were doing that.  As far as the

2   health records, we have no indication yet for those that he

3   had any intention of using those.

4   Q     But you haven't been able to determine that Mr. McGraw

5   ever did any of these things, only that he had the capacity

6   to do it.  Is that a fair statement?

7   A     Well, sir, he had the physical credit cards with him.

8   We haven't sat and determined if he actually used them or

9   not, yet again just from one at a time but he had them.

10  Q     Did it seem to you that there was a certain aspect of

11  showing off to these videos?

12  A     Yes, sir.

13  Q     Now, the FBI badge that appears in the video, how much

14  similarity did that bear to an authentic FBI badge?

15  A     Without going into specific points because we're not

16  supposed to, it appeared to us from the video that it was a

17  copy off the X-Files, a badge that was on that TV show,

18  which Mr. McGraw actually confirmed during his interview

19  that that's where he had downloaded the images from, it does

20  not correspond directly to an FBI credential.  However,

21  somebody who is not knowledgeable and only gets their

22  information off the television, would believe it's true

23  because it's the one that appears on a lot of TV shows.

24  Q     So if a person wanted to go down to a flea market and

25  get a novelty FBI badge, that's what that might look like?

1  A     I haven't seen that but I'm sure, sir, again it comes

2  back to intent on how you plan on using it.

3  Q     But you don't have any evidence that Mr. McGraw had or

4  was in the process of using this FBI badge to purport that

5  he was an FBI agent?

6  A     The fact that even in the first video he says, "It's

7  useful for getting into places I can't get into otherwise,"

8  leads me to believe he either intended to or did use it to

9  gain access to places he shouldn't have.  He did say in the

10 interview that he had attempted to do so and had been

11 unsuccessful.

12 Q     Is it also possible that this is just a bunch of

13 juvenile posture and then showing off for like-minded people

14 on the internet?

15 A     Sir, anything is possible but again, based on the

16 totality of the circumstances, I would agree that there is

17 an element of showing off, but was that all that it was

18 going to be?  With multiple videos asking for a countdown to

19 the devil's day, multiple cause to do a massive denial of

20 service, websites where he was distributing botnet in order

21 to give it to other people so they could do that (inaudible)

22 service attack, I would have to believe and conclude that he

23 was planning on some massive attack on July 4th.

24 Q     But that's just circumstantial at this point; that's

25 something based on your training and experience?

1  A     And his statements and there would be evidence on the

2  videos, yes, sir.

3  Q     Now, you said his statements.  Did Mr. McGraw tell

4  you, "I am actively planning something for the devil's day,"

5  he mentioned, and if so, what did he say that's going to be

6  specific?

7  A     I would have to go back to my notes, sir.  I know we

8  asked him about it but I honestly do not recall what he said

9  about it.  However, in multiple of the videos he clearly

10 states that he was going to do something big.  I also

11 stepped out of the interview for part of the interview, and

12 Agent Sing and Howard were conducting it then, but I do

13 recall him talking about it but I just don't remember what

14 he said.

15 Q     Agent Lynd, I know you work – there are a number of

16 those types of cases and you're very familiar with these

17 types of defendants.

18 A     Yes, sir.

19 Q     Would you say that posturing and showing off is a

20 frequent characteristic for defendants in this type of

21 situation?

22 A     In certain classes of defendants it's my experience

23 and those of my counterparts that there is generally a set

24 of motivations, usually more than one for any one individual

25 for why they would do this, and one of the sets is economic

1   gain, one of the sets is revenge, one of the sets is frankly

2   ego, to show that you can do it better than anyone else that

3   you know more than anybody else.  In the event of the third

4   class of individual where it's trying to convince everybody

5   else that you know more than they do, the showing off is a

6   frequent occurrence for those individuals.  We also

7   generally associate individuals that use automated routines

8   like we saw here, to do that, particularly developing their

9   own tools, et cetera, to be those kind of individuals who

10  are seeking that recognition of their prowess.

11  Q     And in one of the videos that we saw, it looks like

12  Mr. McGraw is purporting that he somehow gained unlawful

13  physical access to this unnamed building; is that correct?

14  I mean isn't –

15  A     That's what he's implying, yes, sir.

16  Q     But that wasn't the case, was it?

17  A     No, he had lawful access; he was just exceeding that

18  access.

19  Q     But he was trying to make the viewer –

20  A     Believe, yes, sir.

21  Q     - believe that he had done something nefarious to

22  circumvent some fancy security system and get in someplace

23  he wasn't supposed to get into?

24  A     That's correct, sir.

25  Q     Now, does it seem somewhat unusual to you that – let

1   me rephrase this another way.

2            In cases where you've worked where the purpose of

3   this type of cyber crime was to enrich ones self, accessing

4   credit card numbers, that type of thing, did any of these

5   people ever make videos of themselves doing it and posting

6   it on UTube?

7   A    They have made videos.  They usually post it to their

8   internal – their group websites or show them directly to

9   their friends with a peer-to-peer kind of program.  They

10  didn't generally put it on a publicly accessible site, but

11  given the explosion of UTube it was only a matter of time

12  before somebody did that.

13  Q    So that's what Mr. McGraw did in a sense?

14            **THE COURT**:  Well, the motive of the defendant is

15  not at issue here at this probable cause hearing.  I think

16  we need to stick with the issue is there probable cause to

17  believe the defendant did this.  Now, his motivation is

18  something else, but that's not what I'm interested in, and I

19  don't think it has a direct bearing on probable cause.

20            **MR. NICHOLSON**:  Yes, sir, I'll end my quest at

21  that time.  Would you like me to ask questions that go to

22  the issue of detention or –

23            **THE COURT**:  No, I want it just like I told the

24  Government's counsel, let's get the probable cause out of

25  the way one way or the other, and certainly anything that

1    I've heard here on probable cause that has a bearing on the

2    issues of detention or bond, I certainly am going to take

3    into account, but I would like to keep the two segregated,

4    to the extent possible.

5               **MR. NICHOLSON**:   Yes, sir.  I pass the witness.

6               **THE COURT**:   Anything further on re-direct on

7    probable cause?

8               **MS. HEATH**:   Not on probable cause, Your Honor.

9               **THE COURT**:   You may step down.  Mr. McGraw, at

10   this time you have the right to present any evidence on the

11   issue of probable cause for the Court.  You're not required

12   to do so.  Counsel, will Mr. McGraw be presenting any

13   evidence on the issue of probable cause?

14              **MR. NICHOLSON**:   Not on the issue of probable

15   cause, Your Honor.

16              **THE COURT**:   All right, fine.  That will conclude

17   the evidence on the issue of probable cause.  I do find

18   there is probable cause to believe the defendant has

19   committed the crime with which he is charged in this

20   complaint.  Accordingly, I will refer the matter over to the

21   Federal Grand Jury for its determination as to whether or

22   not a bill of indictment should be returned.

23              Having found probable cause then, I will consider

24   further the Government's motion for detention.  Again, just

25   for the record I will reiterate that I will take into

1  account the evidence that I've heard in the course of the

2  probable cause hearing as it relates to the issue of bond.

3            All right, Ms. Heath, does the Government have

4  any further evidence or proffer to make on the matter in

5  support of its motion for detention?

6            **MS. HEATH**:  Yes, Your Honor.  The Government

7  would again call Special Agent Allyn Lynd to the stand.

8            **THE COURT**:  All right.  Agent Lynd, if you will

9  come back here to the stand, and I will simply just remind

10  you that your testimony continues to be under oath.

11           **MR. LYND**:  Yes, Your Honor.

12           **THE COURT**:  All right, Ms. Heath, you may

13  proceed.

14

15     **ALLYN LYND, Called by Plaintiff (Previously Sworn)**

16

17                  **DIRECT EXAMINATION**

18

19  **BY MS. HEATH:**

20  Q    Agent Lynd, are you aware of any alias names or other

21  names that the defendant has gone by, other than Jesse

22  William McGraw?

23  A    Yes, ma'am.  He was adopted at the approximate age of

24  two out in California, and had another name.  I believe it's

25  Bertran.  I'd have to double check my notes.  In addition he

1  used the name Howard Rogers, and he has combined the name in

2  various ways over the time, used different first, middle and

3  last names from all the names.  We learned that by doing a

4  Lexus/Nexus search and finding those other names.

5          In addition, he's had the same driver's license

6  number but issued under those other names, and the same

7  social security number issued under those other names.  He

8  also uses some on-line monikers, again Ghost/Exodus,

9  Phantom, Xmodius, and some other ones that he has told us

10 about during the interview.

11 Q     The FBI badge that showed up on the video, were you

12 able to locate that during the arrest or search?

13 A     During the search of his residence we were actually

14 able to locate two FBI badges, along with an ID creation

15 kit.

16 Q     The two FBI badges, did they both have photographs of

17 the defendant?

18 A     They did.

19 Q     And you said it was an ID making kit.  What is that?

20 A     That was how it was described to me from the agents at

21 the scene.  I was actually with him during the interview and

22 another team of agents was doing the search.

23 Q     Would this be a kit by which he could make the various

24 ID's in different names?

25 A     Yes, ma'am.

1  Q      On the video we also saw a security access card to

2  buildings; is that correct?

3  A      Yes, ma'am.

4  Q      Has he had other jobs as a security guard in the past?

5  A      He has over the past three years.  I believe it was

6  five jobs with security guard companies.

7  Q      You also indicated that you located credit cards at

8  his house and this was in a concealed container; is that

9  correct?

10 A      Yes, ma'am, it was a hollowed-out book on his shelves.

11 Q      And how many different credit cards, approximately,

12 were located in this book?

13 A      I don't know, ma'am.

14 Q      Were there more than multiple?

15 A      There were multiple, and some of them, again, of the

16 same name.  They were four or five, perhaps the same name

17 out of a purse or a wallet, and there were multiple

18 individuals in there, so . . .

19 Q      Were any of these credit cards in this hollowed-out

20 book in the name of McGraw or any of the aliases that he

21 actually used?

22 A      No, ma'am.

23 Q      During his discussion with you after his arrest, did

24 he mention to you where he had gotten those credit cards?

25 A      He told me that he took them out of the lost and found

1  desk at work from the Carroll Clinic.

2  Q     Have you had an opportunity at this early stage in the

3  investigation to determine whether any of those credit cards

4  had been used?

5  A     No, we have not yet.

6  Q     Is that part of his responsibility as a security guard

7  to take credit cards that were from the lost and found?

8  A     No, ma'am, it's part of his responsibility to

9  safeguard the lost and found desk.

10 Q     You indicated that the defendant did admit that he was

11 the creator or leader of the ETA.  We saw the ETA logo,

12 which I guess was a smiley face with a pirate patch; is that

13 correct?

14 A     Yes, ma'am.

15 Q     Have you had an opportunity to review information from

16 ETA to determine what their goal was, what their motives

17 are?

18 A     Basically hacking, anarchy, mischief, malicious acts,

19 those descriptions on various forms telling people to do –

20 and describing how to get away with various criminal

21 activities.  There's also a video of him where he's

22 referring to – pointing to his United States flag on his

23 uniform and making some comment about it should be turned

24 upside down, things like that, so anarchy – not overthrow

25 the Government or anything but just malicious intent.

1   Q      Were there postings by the defendant under the

2   Ghost/Exodus name or other monikers that he used giving

3   instruction to other individuals as to how to hack into

4   systems?

5   A      Yes, ma'am, both written and verbal, and in fact,

6   videos showing them step by step on how to do it.

7   Q      Have you determined that Mr. McGraw is involved in or

8   associated with any other hacking of any other entities, or

9   attempted hacks?

10  A      Yes, ma'am.

11  Q      And what other entities would those be?

12  A      Well, his group – and I don't want to say specifically

13  Mr. McGraw himself, but his group had posted pictures of

14  what purported to be access to City of Dallas computers.

15  We've talked to the City of Dallas.  There are two

16  computers, based on the images we took from the website,

17  which appear to have been targeted.  They're still doing a

18  review on one of them to see if it was compromised.  The

19  other one was, in fact, compromised.

20  Q      What type of systems would those computers have been

21  involved in?

22  A      They were systems that controlled and worked with the

23  aviation assets for the Dallas Police Department, one out at

24  Love Field and one at a helipad outside of the Convention

25  Center.

1  Q     Did you see any postings or videos by the defendant

2  where he talked about destroying evidence?

3  A     Yes, ma'am.

4  Q     And what was that in relation to?

5  A     He created the (inaudible) from his apartment in which

6  he tells – appears to be – he's telling other members of

7  ETA, Electronic Tribulation Army, that one of the members

8  has been arrested.  In that video he describes why that

9  person was arrested, which was another computer intrusion,

10 and then states that it appears that law enforcement are

11 still using that individual's cell phone in order to try and

12 monitor the activities of the group.  He intends to send a

13 code which will destroy some of that evidence, and he does

14 make it clear in there that he's not sure how successful

15 this will be but that's his intent.

16 Q     And is that the type of thing that can be done with

17 regard to bots or other malicious codes or programs that you

18 can remotely destroy evidence on another system?

19 A     Absolutely.

20 Q     Among the activities by the defendant and ETA, have

21 there also been websites or profiles on different websites

22 that have been defaced?

23 A     Yes.

24 Q     And basically what does that mean?

25 A     If you have a webpage, as an example – this isn't one

1  made, but if you had a webpage up where you were selling

2  widgets and it wasn't secure or it wasn't secured properly,

3  a hacker or somebody with malicious intent could go there

4  and instead of a page where it's presenting hey, buy my

5  widgets, it might say ha, ha, we've got you, you're

6  unsecure, you should fire your systems administrator and

7  hire us instead, or it might say – in the case of, for

8  example, the recent unrest in Iran, free elections in Iran,

9  or something along those lines.  So basically it takes the

10 true owner's true face they're trying to present to the

11 world and puts up the intruder's face they want the world to

12 see.

13 Q    Other than the recent protection services that the

14 defendant has worked for, has he now engaged in a new line

15 of employment within the last week?

16 A    He told us during the interview and we saw books that

17 would support it, that he had recently signed up to be or

18 gotten a job as a security administrator for computers where

19 he would be the guy responsible for the security of the

20 network of computers.

21 Q    With regard to the defendant's ability to hack into

22 computers to plant botnets to control computers, do you see

23 the defendant as being a danger to the community?

24 A    Absolutely, ma'am.  While most of his attacks were

25 brute force, he has the ability to, number one, control the

1  assets of the entire ETA bot network, he also has the

2  ability to direct members of the ETA to do malicious

3  activities.  We don't know all the computers out there that

4  are already compromised.  He can use those to do further

5  criminal activities.  He can use the computers that the

6  other individuals in his group have compromised by directing

7  them to do it.  If he were to have access to any kind of

8  computer or access device, he would be able to provide

9  instructions to those individuals on what to do to destroy

10  evidence, conduct further criminal activity, or again, gain

11  access to more computers.

12          The tools that he uses are readily available on

13  the internet, so even if his tool set is gone, he could

14  recreate his tools or get them again from the other members

15  of his group.

16  Q    And the current offense that the complaint charges the

17  defendant has a statutory maximum sentence of ten years; is

18  that correct?

19  A    Yes, ma'am.

20  Q    However, based on the information with regard to

21  creating false ID cards, credit cards, access devices, there

22  are a number of other offenses that could be charged in an

23  indictment if the Grand Jury so chose?

24  A    Yes, ma'am.

25  Q    And those particular offenses would have statutory

1  maxes ranging anywhere from five years to twenty years,

2  depending on what the offense may be?

3  A    I believe that only one is actually three, but yes,

4  ma'am, three to twenty.

5           **MS. HEATH**:  Your Honor, we pass the witness on

6  the issue of danger and flight.

7           **THE COURT**:  All right.  Any questions?

8           **MR. NICHOLSON**:  Yes, Your Honor, briefly.

9

10                   **CROSS EXAMINATION**

11

12  **BY MR. NICHOLSON:**

13  Q    Agent Lynd, you arrested – or Mr. McGraw was arrested

14  at his place of business, correct?

15  A    Yes, sir, it was myself, two other agents on the

16  squad, and a Dallas Police Department Task Force Officer who

17  arrested him.

18  Q    When he was arrested did he attempt to flee from the

19  people arresting him?

20  A    He did not, sir, but we pretty much had him surrounded

21  with weapons drawn when we arrested him.

22  Q    So he didn't attempt to flee when he was arrested?

23  A    No, sir.

24  Q    He didn't attempt to resist in any way?

25  A    He was initially unresponsive to commands but that

1  changed real rapidly.

2  Q     Was he rude or discourteous, or used inappropriate

3  language?

4  A     No, sir.

5  Q     Would you characterize him as being courteous and

6  cooperative?

7  A     Courteous, sir, and cooperative eventually, yes, sir.

8  Q     So yes?

9  A     Yes.

10 Q     During the course of the arrest, courteous and

11 cooperative?

12 A     Yes, sir.

13 Q     Did he attempt to deceive you as to what his name was,

14 did he give you some of these aliases that you talked about,

15 or did he say, "I'm Jessie McGraw."

16 A     He admitted his identity, sir.

17 Q     So he didn't try to deceive you as to who he was or

18 throw you off the scent as to who you were looking for?

19 A     No, sir.

20 Q     You mentioned that over the course of this case you

21 seized two novel FBI badges and the ID making kit.  These

22 items are presently in Government custody, correct?

23 A     They are, sir.

24 Q     So even if Mr. McGraw was released, for the sake of

25 argument, he wouldn't have access to these particular items?

1  A    No, sir, he wouldn't have access to this set that we

2  have in our possession.

3  Q    Now, you testified that the goals of this ETA,

4  mischief, hacking, encouraging other people to do that type

5  of thing.  Can you give me an example of what they've

6  actually done that's of a horrible nature?

7  A    I'm reluctant to say.  There's a lot of claims over

8  there and we're still verifying the claims, so I don't want

9  to say they have done something when all I know is that

10 they've claimed to do something, and I don't want to mislead

11 by saying that they have done it.

12 Q    So it might very well be a bunch of posturing like we

13 saw on the video where Mr. McGraw was posturing that he

14 infiltrated the building that he was supposed to be in

15 anyway?

16 A    No, sir, they did do some things.  Again, we talked

17 about actually in the building weighing the malicious code.

18 Again, we were able to confirm that somebody – and I won't

19 say it was them until we've gone through the forensics – did

20 indeed intrude on the Dallas Police Department computers.

21 Mr. McGraw claims it wasn't him, but there has been an

22 intrusion there and we have to determine who did make it,

23 and he knew which computer was intruded on, which leads me

24 to believe that he did have some involvement with that.

25         There is a picture of a Nassau computer that's

1  got a cross-eyed scripting attack against it, which we're

2  still in the process of confirming with Nassau actually had

3  illicit access to it, and Mr. McGraw says it wasn't

4  accessed, so until I've finished the confirmation of that I

5  can't say he was actually the one in the Nassau computer or

6  he actually gained access.  All I can say is he for sure was

7  doing the attempt.

8           We also seized a notebook from him – I'm sorry,

9  two notebooks from him that were in his possession at the

10  office which had a list of compromised computers in them,

11  including the passwords for the accesses to them.  We're

12  still in the process of confirming which computers those

13  are.  I don't know what he did on those computers until

14  after we have done our forensic review of those computers.

15  Q    And you testified that in your opinion Mr. McGraw

16  poses a danger to the community because of his ability to

17  hack and plant botnits.  All of that is dependent upon Mr.

18  McGraw having access to a computer, either directly or

19  indirectly.  Is that a fair statement?

20  A    That is a fair statement, yes, sir.

21  Q    And based upon your training and experience in this

22  matter, do you think it's reasonable to conclude that anyone

23  associated with this ETA would have anything to do with Mr.

24  McGraw at this point, or would it be more reasonable to

25  conclude that they would stay as far away from him as

1   possible to try to avoid being arrested themselves?

2   A    I have seen it go both ways and that's why it's so

3   hard for me to say.  Based on the arrogance displayed on

4   some of the websites, I would think that they would actually

5   consider it a challenge and continue to do what he requested

6   of them, but that's my opinion, sir, based on what I've

7   seen.  It could well go the other way, but I don't think it

8   would.

9            **MR. NICHOLSON**:  I pass the witness, Your Honor.

10           **THE COURT**:  Anything further?

11           **MS. HEATH**:  No, Your Honor.

12           **THE COURT**:  All right, you may step down.

13           **MS. HEATH**:  Your Honor, the Government rests on

14   the issue of flight and danger.

15           **THE COURT**:  All right.

16           **MR. NICHOLSON**:  Your Honor, at this time the

17   defense calls Beatriz Bracho to the stand.

18           **THE COURT**:  All right.  Ms. Bracho, come forward,

19   please.  If you'll just come around here before you take the

20   witness stand and raise your right hand and be sworn in.

21                          (Witness Sworn)

22           **THE COURT**:  Please have a seat here at the

23   witness stand.  The attorneys are going to have some

24   questions for you, so make yourself comfortable and if

25   you'll state your full name for the record.

1          **THE WITNESS**:  Beatriz, B-e-a-t-r-i-z, Bracho,

2  B-r-a-c-h-o.

3          **THE COURT**:  All right, thank you.  You may

4  proceed.

5          **MR. NICHOLSON**:  Thank you, Your Honor.

6

7      **BEATRIZ BRACHO, Called by the Defendant (Sworn)**

8

9                  **DIRECT EXAMINATION**

10

11  **BY MR. NICHOLSON:**

12  Q    Good afternoon, Ms. Bracho.  Do you know the defendant

13  here, Jessie McGraw?

14  A    Yes.

15  Q    And how is it that you know him, ma'am?

16  A    He's my husband.

17  Q    How long have the two of you been married?

18  A    Approximately two and a half years.

19  Q    Is this a traditional marriage or common law, or

20  common law marriage?

21  A    No, it's legal.

22  Q    Do the two of you have any children?

23  A    Yes.

24  Q    How many children do the two of you have together?

25  A    One.

1   Q     A small child?

2   A     Yes, thirteen months.

3   Q     And where is it that you live, ma'am?

4   A     At XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, Arlington, Texas.

5   Q     And with whom do you live at that apartment?

6   A     With him, my baby, and his younger brother.

7   Q     So Mr. McGraw lives there at the apartment with you.

8   Is this the type of thing where he just officially lives

9   there, or you really don't know where he is, or is he either

10  at work or he's at home there at the apartment?

11  A     Yes, he's either there or at work.

12  Q     And are you employed, ma'am?

13  A     Yes.

14  Q     Now, you've been – what is it that you do for a

15  living?

16  A     I'm a telephone banker for Chase.

17  Q     Is it fair to say that you weren't expecting to have

18  to be here today?

19  A     No.

20  Q     Was this somewhat of a surprise to you?

21  A     Yes.

22  Q     Now, you've been in the courtroom for the hearing

23  today, correct?

24  A     Yes, I was here on Monday.

25  Q     So you were here on Monday and you're here today?

1   A      Yes.

2   Q      And you heard the testimony from the Government

3   agents.

4   A      Right.

5   Q      So you have a general idea as to what this is all

6   about?

7   A      Now I do.

8   Q      If the Court were to release Mr. McGraw would he be

9   free to come back to live at the apartment or does what

10  you've heard here today change your mind about that?

11  A      No.  It doesn't change my mind.

12  Q      So Mr. McGraw would be able to come back to the

13  apartment?

14  A      Well, not particularly our apartment.  With me

15  wherever I go live, yes.

16  Q      And how long have the two of you lived in the Dallas

17  area?

18  A      Well, together?

19  Q      Yes.

20  A      Well, I've known him since January of '06 – I'm sorry,

21  October of '06, got married January of '07, so –

22  Q      So the two of y'all's place of residence is here in

23  Dallas?

24  A      Arlington, yes.

25  Q      Your job is here?

1  A       Arlington, yes.

2  Q       Until very recently Mr. McGraw was employed here?

3  A       Right.

4  Q       Y'all have a child here?

5  A       Right.

6  Q       Now, you and I spoke earlier about the concept of a

7  third-party custodian.  Do you recall that?

8  A       Yes.

9  Q       Is that something that if the Court was so inclined to

10 release your husband on bond to you that you would agree to

11 do?

12 A       Yes.

13 Q       So even though Mr. McGraw is your husband, if you

14 thought he was going to not show up for court, break the

15 rules, something along those lines, would you have any

16 problem calling someone in authority and letting them know

17 what's going on?

18 A       No, I wouldn't have a problem.

19 Q       Now, some people may ask a question about how much you

20 knew of what they're claiming Mr. McGraw did beforehand.

21 Did you keep an especially close eye on what he did?

22 A       No, honestly I didn't.  I didn't know what hacking

23 meant before I met him.  I had no idea what that is.  Like

24 talking to you about open heart surgery, I wouldn't know.

25

1   Q     If the Judge was to release him on bond do you think

2   you would keep a close eye on him now in light of the fact

3   that we're all sitting here in the courtroom today?

4   A     Yes.

5           **MR. NICHOLSON:**  May I have a moment, Your Honor?

6           **THE COURT:**  You may.

7   Q     (By Mr. Nicholson)  Ms. Bracho, are you familiar with

8   this ID creation kit that Agent Lynd was talking about at

9   the house?  Do you have any idea what he was talking about?

10  A     No.

11  Q     Have you ever seen anything like that around your home

12  before?

13  A     No.

14  Q     And has Mr. McGraw ever tried to tell you or anyone

15  else that you know of that he's an FBI agent or anything

16  along those lines?

17  A     No.

18          **MR. NICHOLSON:**  I pass the witness, Your Honor.

19          **THE COURT:**  Cross examination, if any?

20          **MS. HEATH:**  Yes, Your Honor.

21

22                    **CROSS EXAMINATION**

23

24  **BY MS. HEATH:**

25  Q     Ms. Bracho, you and Mr. McGraw met on line; is that

1  correct?

2  A     Yes.

3  Q     In fact, you met on My Space?

4  A     Right.

5  Q     During the period of your marriage there have been

6  numerous times when you've been separated from him?

7  A     Yes.  You would say that, yes.

8  Q     In fact, one of your concerns is how much time he

9  spends on the computer?

10  A     Right.

11  Q     And you don't want him to spend that much time on the

12  computer, you'd rather have him spend that time with you?

13  A     Right.

14  Q     But you haven't been successful all the time in

15  getting him off the computer, have you?

16  A     No.

17  Q     In fact, that was part of the reason of some of the

18  separations in the past was he was spending too much time on

19  the computer?

20  A     Right.

21  Q     But even that doesn't keep him off of the computer,

22  knowing that you would leave with the baby didn't keep him

23  off the computer, did it?

24  A     We always came back, so I never left all together so –

25  Q     And you don't have any expertise in computers?

```
 1   A      No.

 2   Q      Programs?

 3   A      No.

 4   Q      Software?

 5   A      Well, I mean I work in front of a computer but that's

 6   – I only use it for work purposes.  I wouldn't know – I mean

 7   I barely check my e-mail, honestly.  I don't have any

 8   knowledge of anything.  I didn't even know what hacking

 9   meant before I met him.  I never heard of that before.

10   Q      Other than the fact that you worked at Chase and you

11   understand that security is a large concern of a corporation

12   like Chase?

13   A      Yes.

14   Q      Protecting the data, protecting the personal

15   information of customers is paramount; is that correct?

16   A      Right.

17   Q      And you understand from what your husband is doing

18   that he has breeched computer systems in violation of his

19   own agreement with his company to provide security for these

20   companies?

21   A      Right.  If I may add, I mean he's not – I believe he

22   does live in a fantasy world.  He has a history of medical

23   issues, mental issues.  I mean I personally don't – he

24   didn't intend to damage anything.  He's just like a kid, a

25   five year old in a 25 year old body.  That's pretty much
```

1  what I've had to deal with since I've known him.

2  Q    But you understand that breaking into somebody's

3  computer is illegal?

4  A    Yes, I understand.

5  Q    And you understand that he has the ability to do that?

6  A    Yes, I understand.

7  Q    And he understands that that is illegal?

8  A    I would think so, yes.

9           **MS. HEATH**:  Your Honor, we pass the witness.

10          **THE COURT**:  Re-direct, if any?

11          **MR. NICHOLSON**:  No, Your Honor.

12          **THE COURT**:  All right, you may step down.

13          **MR. NICHOLSON**:  We have no further evidence to

14  present, Your Honor.

15          **THE COURT**:  All right.  I'll grant the

16  Government's motion for detention.  I do find that it has

17  been established by clear and convincing evidence that if

18  released on bond the defendant would pose a serious risk of

19  obstruction of justice.  I also find that if released on

20  bond that he would pose a substantial danger to the safety

21  of other persons in the community.  There is absolutely no

22  way that the Court could reasonably assure that Mr. McGraw

23  would not have access to a computer if he were released on

24  bond.  In fact, I would conclude, based upon the evidence

25  that I'm heard that if released on bond and he was given a

1  requirement that he would have no access to a computer, he

2  would do all within his power to circumvent that and to

3  access a computer.

4          It is extremely damaging and risking to the

5  public at large, the kind of conduct that I found probable

6  cause to believe that Mr. McGraw has engaged in.

7          Therefore, I will grant the Government's motion

8  for detention.  I will order that the defendant will be

9  confined in the custody of the Marshal pending disposition

10  of this case.

11          If there's nothing further at this time, we'll be

12  in recess.  Thank you very much.

13

14                              (Hearing Concluded)

15

16

17      I certify that the foregoing is a correct transcript

18  from the electronic sound recording of the proceedings in

19  the above-entitled matter.

20

21

22  Date:  May 5, 2011              /s/Betty Tate, Transcriber
                                    3101 Townbluff #923
23                                  Plano, TX  75075
                                    972-596-9442
24

25