```
                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

UNITED STATES OF AMERICA, )
                          )
            Plaintiff,    )
                          )
vs.                       ) 3:09-CR-00210-B(1)
                          )
JESSE WILLIAM MCGRAW,     )
                          )
            Defendant.    )
```

```
              MOTION FOR APPOINTMENT OF NEW COUNSEL
               BEFORE THE HONORABLE JANE J. BOYLE
                  UNITED STATES DISTRICT JUDGE
                        MARCH 25, 2010
```

### A P P E A R A N C E S

For the Government:

```
      UNITED STATES ATTORNEY'S OFFICE
      1100 Commerce Street - 3rd Floor
      Dallas, TX  75242
      214-659-8600
      BY:  CANDINA S. HEATH
           PAUL YANOWITCH
```

**For the Defendant:**

```
      FEDERAL PUBLIC DEFENDER'S OFFICE
      525 Griffin Street - Suite 629
      Dallas, TX  75202
      (214)767-2746
      BY:  JOHN M. NICHOLSON
           RICHARD ANDERSON, FPD
```

```
COURT REPORTER:   SHAWNIE ARCHULETA, TX CCR No. 7533
                  1100 Commerce Street
                  Dallas, Texas 75242
```

proceedings reported by mechanical stenography,
transcript produced by computer.

```
 1                    (In open court.)
 2            THE COURT:  Good morning.  For the record,
 3   this is Criminal Case 3:09-CR-210-B, United States
 4   v. Jesse William McGraw.  We are here this morning
 5   on his motion for appointment of new counsel.
 6            Let's go ahead and begin by having the
 7   parties introduce themselves, and I will start with
 8   the government.
 9            MS. HEATH:  Your Honor, Candy Heath and
10   Paul Yanowitch here for the government.
11            THE COURT:  Thank you.
12            MR. NICHOLSON:  Good morning, Your Honor.
13   John Nicholson, court-appointed counsel for
14   Mr. McGraw.  We are present in court and ready to
15   proceed.
16            THE COURT:  Thank you very much.  I have
17   read through the papers and, Mr. Nicholson, I think
18   since you are still counsel of record I will ask you
19   to go ahead and give me a brief synopsis of what you
20   see and what your position is.
21            MR. NICHOLSON:  Yes, Your Honor.
22            THE COURT:  Approach the lectern, please.
23            MR. NICHOLSON:  Your Honor, I asked the
24   Court for this hearing in hopes of resolving how
25   Mr. McGraw chooses to proceed in this case in regard
```

1   to his counsel.

2           As the Court is aware, Mr. McGraw is very

3   dissatisfied with the Public Defender's Office, in

4   general, and with me, in particular.  And what I am

5   hoping we can accomplish in the hearing today is

6   that all parties to the action will know how

7   Mr. McGraw chooses to proceed; does he want to

8   represent himself, either with or without standby

9   counsel and have us dismissed?  Does Mr. McGraw want

10  to try to hire a lawyer that he would like better

11  than me?  Does he want to give the Court reasons why

12  he thinks the Court ought to dismiss or relieve our

13  office and appoint somebody else?

14          As the Court is aware, Mr. McGraw filed a

15  grievance against me with the State Bar.  I sent him

16  the form to do so.  As a matter of course, whenever

17  any client says anything that even hints an ethics

18  complaint or a grievance, I send them the form.  I

19  don't think the fact that a person is in custody

20  should inhibit or constrict their ability to file a

21  complaint like that.  I sent him a form and he filed

22  it and it's been dismissed.

23          But in light of that, I feel I ought to

24  tell the Court that I don't think that our office,

25  in general, and me, in particular, can continue to

1    represent Mr. McGraw.

2            And I say that with a lot of reluctance,

3    for a couple of reasons:  Number one, if word gets

4    out that a person can get rid of their public

5    defender just by filing a grievance, then it is

6    going to happen.  It won't happen much.  These kinds

7    of issues don't come up that much, maybe 1 or 2

8    percent of the time.  I think maybe this is the

9    second one I have had in your court in

10   four-and-a-half years.  But if word gets around,

11   then 1 or 2 percent of the time folks are going to

12   do that, and that's not something I think ought to

13   be encouraged.

14           And another reason I am reluctant to ask

15   the Court to withdraw from the case is, I am not

16   confident that it's going to help anything.

17           I can think of three other instances where

18   I have had to ask the Court for permission to

19   withdraw from a case for a reason similar to this

20   one, and those three clients weren't happy with the

21   replacement lawyers, either.  The first thing they

22   said was, the replacement isn't better than

23   Nicholson, I want another lawyer.  One guy went

24   through four lawyers.

25           With that said and with that reluctance in

```
1   mind, the fact of the matter is that, even though
2   the Bar dismissed the grievance, Mr. McGraw and I
3   are litigants right now.  He has the right to appeal
4   the State Bar's denial or dismissal of his
5   grievance.  I believe he is going to file or has
6   filed one against Mr. Anderson.  I just don't see
7   how the office, in general, or I, in particular, can
8   advocate for someone with whom we are presently an
9   adversary litigant.
10            Now, if the Court disagrees and says,
11  Nicholson, you stay on.  I will continue to
12  represent Mr. McGraw without any complaints, and I
13  will do the best that I can.  I just don't think
14  that that's something, from my perspective, that is
15  something that can or should happen at this point.
16            THE COURT:  Well, I appreciate that.  That
17  clarifies where you are coming from, and then I
18  would like to hear from Mr. McGraw.  I want to see
19  if the government has anything that they want to add
20  to any of this.
21            MS. HEATH:  Your Honor, I understand and
22  agree with Mr. Nicholson's position, that it makes
23  it very difficult for him to continue to represent
24  Mr. McGraw in a situation where there are potential
25  adversaries in another litigation.  I understand
```

1    that.

2          I do agree with his concern and also

3    express my office's concern with allowing defendants

4    to woefully get rid of their attorneys when the

5    attorneys that have been appointed to them are

6    excellent attorneys and have worked diligently to

7    get them the best deal possible in the case.

8          So I do have some concern that this will

9    spread like a wildfire among the defendants and that

10   they will start filing grievances against their

11   attorneys to try to get rid of them.  I just think

12   that's a bad precedent to set but, you know, I don't

13   want to see this Court punish Mr. Nicholson and

14   require that he continue to represent Mr. McGraw.

15   And then that causes problems on the appeal end for

16   any continued representation on his part.

17          So I join with Mr. Nicholson's request,

18   that some consideration be made to determine what

19   Mr. McGraw's future attorney or future

20   representation should be like.

21          THE COURT:  Thank you very much.

22          Mr. McGraw, let's hear from you.  Come up

23   on here.

24          THE DEFENDANT:  Thank you, Your Honor.

25          THE COURT:  Good morning.

```
 1              THE DEFENDANT:  Good morning.  First and
 2    foremost, I wanted to say that I believe that it is
 3    the defendant's right to an effective counsel.
 4              One issue that I feel that I have that is
 5    necessary is that I believe that Mr. Nicholson does
 6    not possess the proper technical knowledge or skill
 7    or experience to represent me for my case.
 8              The technicalities of it is beyond your --
 9    your -- your common Internet case, excuse me.  It's
10    very complicated.  And I also need somebody who is,
11    in a sense, like-minded, who understands the
12    technical knowledge that I would be able to have
13    a -- you know, an effective attorney who would
14    understand that.
15              Recently I felt that things were going
16    downhill.  And Mr. Nicholson had told me that it
17    would maybe be in my best interest to have my
18    grandmother flown out by the U.S. Marshals here to
19    testify against me, to betray me, to be mentally
20    incompetent, as a person who had been off of my
21    medication for some time.  However, I don't take
22    medication, and I haven't, and I am not incompetent.
23              THE COURT:  So with those comments, I am
24    assuming you are waiving your attorney-client
25    privilege by talking about what Mr. Nicholson is
```

1   telling you?

2         You have a right to attorney-client

3   privilege.  You don't have to tell me what went on

4   between the two of you.  That's a little difficult

5   here, because I need to know why you don't want him

6   as your lawyer, but from what you have just said, it

7   sounds as though you have opened up some of the

8   conversations between the two of you.

9         THE DEFENDANT:  I will waive that, yes,

10   ma'am.

11         THE COURT:  Go ahead.

12         THE DEFENDANT:  There is one issue I'm

13   also having is I feel that the detention order was

14   not fair, and I have been begging for a bond motion,

15   a PR motion.

16         I do realize that some things will weigh

17   in favor, such as new evidence, and new evidence

18   definitely came up as my wife's worsening health

19   condition.  She has Type I diabetes, myelitis, and

20   she is literally dying.  I have an almost

21   two-year-old daughter, and I see DOJs letting people

22   on child pornography cases and child molestation

23   cases out on PR, posttrial bonds, and I haven't been

24   able to get that.

25         I've been saying that this PR bond motion

1    means a lot to me for my wife's sake.  And he says

2    that he won't file it because, if I do, he risks

3    endangerment of his reputation in the honorable

4    court, and I can understand that.  But also I was

5    under the impression that the magistrate's detention

6    order can be overruled by a district judge, yes and

7    no.

8           He said that he had 570 labor hours that

9    he had been working on my case.  I have noticed a

10   lot of fallacies, and I brought it up to his

11   attention in many letters, and I really beg to

12   differ.  I don't see this happening.

13          He also tells me that the FBI's testimony

14   that was given at the detention hearing -- this is

15   really minimal significance relating to the NASA,

16   the Dallas Police Department, and the names that

17   were originally registered to me under my Social

18   Security number.  However, I find those things not

19   to be true, and I have the evidence pertaining to

20   those.

21          He also convinced me that if I did not

22   take the government's plea agreement for a six- to

23   eight-year cap or to give up my belongings, that I

24   could very well be looking at 15 to 20 years if the

25   government decides to stack those indictments.

1    However, I feel that to be a kind of manipulation.

2            THE COURT:  Do you believe that that

3    comment is untrue?

4            THE DEFENDANT:  I believe that if an

5    attorney was to say, well, because your points are

6    so high, if you decide to burn bridges with the

7    government, it's not going to be weighing in favor

8    of you.  You could very well be looking at 15 to 20

9    years if you don't plead guilty; however, I would

10   like to take it to trial and have my chances.

11           THE COURT:  Anything else?

12           THE DEFENDANT:  Just one thing.  I didn't

13   feel it was necessary for certain things, for

14   Nicholson to call my family, specifically my mother,

15   my wife, about saying that I was cussing at him or

16   in a sense that he was tattling on me or telling my

17   wife that the grievance that I had filed had been

18   denied.  I didn't feel it was necessarily a part of

19   my case, and it kind of seemed like he was kind of

20   tattling, to me.

21           Also, as far as the bond motion goes, I

22   had spoke to Mr. Anderson, and he said that if I had

23   filed -- if I went ahead and filed the bond motion,

24   which I have every right to under Estelle v. Gamble,

25   that they would withdraw from my being my attorneys

 1    if I filed the PR bond.

 2            THE COURT:  Okay.  How much time have you

 3    spent with Mr. Nicholson?  Sounds like you have had

 4    quite a bit of conversation with him and some

 5    meetings with him.

 6            THE DEFENDANT:  Almost nine months, I

 7    believe.

 8            THE COURT:  Nine months and pretty regular

 9    contact.

10            THE DEFENDANT:  Not -- well, I don't

11    necessarily know what regular is.  I haven't seen

12    him for a while.

13            THE COURT:  What does it mean to you?

14            THE DEFENDANT:  I would like to be able to

15    see him more often and respond to my letters more

16    frequently.

17            THE COURT:  All right.  Otherwise, it

18    sounds as though you've got issues with regard to

19    his not being like-minded with you about the

20    strategy of handling the case; is that correct?

21            THE DEFENDANT:  In a nutshell, yes, ma'am.

22            THE COURT:  Okay.  And you are concerned

23    about his technical computer skills?

24            THE DEFENDANT:  Yes, ma'am.

25            THE COURT:  But you're indicating that he

1  has computer skills, just not at the level that you

2  have?

3          THE DEFENDANT:  The level that I need,

4  necessarily.

5          THE COURT:  And you're concerned about the

6  detention order which happened after a hearing; is

7  that right?

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  And you want him to move to

10 overturn that?

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  Okay.  And you have some

13 concerns about the FBI may not be giving correct

14 information or something like that?

15         THE DEFENDANT:  Yes.  I believe that -- I

16 am under the impression that certain elements that

17 was mentioned at the detention hearing was the

18 influence to get me here.

19         THE COURT:  And the conversations he's had

20 with your wife about interactions that you have had

21 with him?

22         THE DEFENDANT:  Would you clarify, please?

23         THE COURT:  You are the one that told me

24 that he called your wife and talked to her or your

25 mother or both about --

1            THE DEFENDANT:  I have given him

2    permission to speak to my family, but certain things

3    I don't feel are necessary, as having to tell my

4    wife that -- that I -- that the grievance was

5    dismissed.  I don't see the point.  Or calling my

6    mother to tell her I am being very bad and I'm

7    basically cussing at him, yes, ma'am.

8            THE COURT:  All right.  Now, what is your

9    position as to whether or not you can work with him?

10   What's the problem other than that?  Is there some

11   problem?  He's a competent lawyer.  He may not have

12   your computer skills.  I have been watching

13   Mr. Nicholson for years.  He is one of better --

14   well, he and all of the Public Defender's are some

15   of the best that we have that come down here.

16           They're experienced, they try cases on a

17   regular basis.  They know the guidelines inside and

18   out.  So other than him not agreeing with your

19   strategy and doing some things that irritated you

20   and the computer issues, I'm trying to figure out

21   how this is affecting your ability to get Sixth

22   Amendment competent representation.

23           THE DEFENDANT:  I do believe that his

24   decisions should ultimately weigh in my best

25   interests.  And if I feel that he is being

1    ineffective, that is all I ask.

2              THE COURT:  All right.  I would like to go

3    ahead and hear from, Mr. Nicholson, now that we have

4    heard from you.  Thank you very much, Mr. McGraw, if

5    you will take a seat.

6              Mr. Nicholson, now that you may have had a

7    chance to hear more than you heard before, if you

8    would like to respond, I would like to give you an

9    opportunity to on the record.

10             MR. NICHOLSON:  Just briefly, Your Honor,

11   and I'm going to have to be cautious because

12   Mr. McGraw has the right and the capacity to waive

13   confidential communication; I don't.

14             But I will say that -- I would say that my

15   personal level of technological knowledge and skill

16   as it comes to computers is about average, maybe a

17   little more.  But we do have what I consider to be a

18   very qualified expert on computers in our office,

19   our Chief Investigator, Dan James, who has spent

20   hundreds and hundreds and hundreds of hours on this

21   case.  So I feel very confidently that I can rely

22   upon him to fill in the pieces that I might not know

23   because of my just moderate ability.

24             In terms of detention motions, if I feel

25   that a motion is arguably supported by the facts and

 1   arguably supported by the law and in my client's

 2   best interests, then I file the motion.  If I don't

 3   think it meets those three criteria, then I don't

 4   file it, no matter how much the client may want me

 5   to.

 6          It's my opinion that an attorney's

 7   credibility before the Court is very important for

 8   all of his clients.  And if the Court is thinking,

 9   well, Nicholson makes a good argument, the

10   prosecutor does, too, this could really go either

11   way, I don't want a Court to think, well, you know,

12   maybe Nicholson doesn't really believe this, or,

13   maybe his arguments aren't that sound because I

14   remember just last week he made this motion that he

15   knew I was going to deny, and it wasn't supported by

16   the facts; he really just kind of let's his client

17   tell him what to do.  I try to avoid that; not for

18   my personal reputation, as it would be important for

19   me, but for the importance of my clients.

20          And if clients tell me not to call family

21   members, I don't call them.  In fact, unless a

22   client specifically asks me to call family members,

23   I don't do it.  When a family member calls me or if

24   I call a family member, I am not able to go to the

25   prison and kind of have a preview with my client as

1   to everything that I am going to say.  I kind of

2   have to go by the parameters that the client has

3   set, and I do that in every case.

4           So I suppose that's all I have to say,

5   although Mr. Anderson may want to address this.  I

6   have never told a client that if a client filed a

7   pro se motion I would withdraw from representing the

8   client.  I have never said that.

9           What I have said is that, when a client is

10  represented by an attorney, courts have no

11  obligation to review, read, or even acknowledge a

12  pro se motion filed by a defendant, because the

13  defendant is not pro se.  And if the defendant wants

14  to force the Court to acknowledge the motions filed

15  by the defendant, then the defendant needs to go

16  pro se; I have said that.  But I have never told a

17  client, well, you better not submit anything to the

18  judge, because, if you do, I'm going to withdraw.  I

19  have never done that, and I don't believe anyone in

20  our office has ever said or done that.

21          That's all I have, Judge.

22          THE COURT:  Thank you, Mr. Nicholson.

23          Mr. McGraw, come up.

24          Mr. Anderson, did you have something?  I

25  would be glad to let you speak if you would like to,

1    as the head of the office.

2            MR. ANDERSON:  Just very quickly, Your

3    Honor.  Almost every case that comes into our office

4    gets passed about the first three weeks, so

5    therefore it has the potential for going to trial.

6    I not only have a lead attorney on that case, I have

7    a lead investigator, a paralegal.  If I think the

8    case is going to involve some unique legal issues, I

9    appoint one of our appellate attorneys on it.

10           On this particular case, while I may not

11   have sat in on every strategy session, I probably

12   sat in on 90 percent of the strategy sessions when

13   the team met to discuss what the particular issues

14   were and how the approach is.  I have also been out

15   to visit Mr. McGraw twice on this case.

16           In terms of advising him the same thing

17   that Mr. Nicholson did, that hybrid representation

18   is not likely to get the attention of the Court, I

19   went -- we also went forward and set out the reasons

20   for, A, why we believe that the research that we

21   have done on the case and, more particularly, the

22   research that Dan James has done on the case, does

23   not necessarily prompt me to go out and hire another

24   computer expert just because it doesn't fit

25   Mr. McGraw's theory of what the case should be.

1          THE COURT:  And Dan James is your computer

2     expert?

3          MR. ANDERSON:  Dan James is our computer

4     expert, and I look to him for advice.  If he says,

5     this is beyond my competence, or, this is beyond my

6     comfort level, then obviously, fortunately, our

7     office does have the resources to go outside and

8     look for those individuals.

9          In this particular case, we believe that

10     we have, based upon the discovery that we have done,

11     the extracurricular work we have done on the case,

12     have an idea, a very good idea of what the sequence

13     of events were and what the situation is.

14          Mr. McGraw also has said that I was

15     somewhat dismissive, and I will actually plead

16     guilty to that, Your Honor.  I was less than

17     impressed with some of the advice he was getting at

18     the detention center, and I probably came across as

19     a bit dismissive in the interview, and for that I

20     apologize to him and the Court.  But I don't think

21     there is anything about the advice that

22     Mr. Nicholson has given or the work that has been

23     put into this case that I have to or will apologize

24     for.

25          THE COURT:  Thank you very much,

1    Mr. Anderson.

2         Ms. Heath, why don't you, because this

3    will all be on the same record, just give me a brief

4    synopsis of the computer aspects of this case.  You

5    don't have to tell me about the technical parts,

6    just the charge and how the computers enter into it.

7         MS. HEATH:  The charge at this time is

8    transmitting a code, program or command to a

9    computer.  There are a number of computers,

10   approximately 14 to 16 computers that were located

11   at the Carrell Clinic, which we are alleging that

12   Mr. McGraw accessed, transmitted codes, commands,

13   programs, et cetera.

14        There are two specific computers --

15   actually, there are four computers that we have at

16   least imaged, and then we have gotten forensic

17   information from the hospital because they did their

18   own remediation of computers.  So as a remediation,

19   they are searching for the different malicious or

20   Malware that may be located in the computers or all

21   of the computers where the antivirus software was

22   turned off, and they were identifying that for us.

23        We have reports from their processes.  We

24   have the actual images of the hard drives, other

25   digital evidence that may be involved.  We've got

1    records back from Photobucket, from LogMeIn, from

2    other places where Mr. McGraw had accounts and that

3    he used, so that would be technically electronic

4    evidence, although not computer evidence.

5              It's not a large case; it's a very compact

6    case with regard to the computer evidence.  We've

7    had much bigger cases, so this is not one that is

8    voluminous in that nature.  It is technical in

9    having to go in and analyze the data that we have,

10   but it's not voluminous in the number of computers.

11             THE COURT:  Thank you very much.

12             Mr. McGraw, come on back up here.

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Mr. McGraw, probably the

15   easiest thing in the world for me to do would be to

16   say, all right, let's start all over again.  The

17   problem with that is that I have to follow the law,

18   and the law is very clear that you have a Sixth

19   Amendment right to competent counsel.  That's one of

20   our important constitutional rights.  But you don't,

21   in any way, have a right to choose your

22   court-appointed counsel or to pick their strategy.

23             And short of that, if you don't like that

24   system, you can choose to represent yourself, which

25   I certainly hope you wouldn't do here.  I always try

1   to make sure defendants understand the importance of

2   not doing that, and sometimes they still choose to

3   do it.  But it doesn't sound like you are even

4   suggesting that you want to represent yourself.  Am

5   I correct about that?

6           THE DEFENDANT:  That is correct, Your

7   Honor.

8           THE COURT:  And so the advice that you got

9   about not filing your own motion is absolutely

10  correct.  The Court -- you have no right to what we

11  call hybrid representation.  We can't have the

12  lawyer and the client sending various motions, so

13  that's correct.  And I'm glad to hear that you are

14  not wanting to represent yourself.

15          So what I have to look for is whether or

16  not this relationship is broken down, whether there

17  is some prejudice to you, whether there's such a

18  conflict that you can't operate, and I don't see

19  that here.

20          What I see is that you don't agree with

21  his strategy, you don't like some of the

22  conversations that you have had.  Perhaps there's

23  been some aggression between the two of you, but

24  none of that is abnormal and none of that

25  disqualifies Mr. Nicholson.

1          What I'm hearing now from him and from

2     Mr. Anderson, which I find credible, is that they

3     have done everything they can, which is exactly on

4     par with what they always do in their cases.

5          You have the opportunity to have someone

6     who has this expertise, perhaps that you have,

7     that's looking at the case, as well, an investigator

8     and a lawyer, as well as an assistant lawyer.  And

9     these gentlemen and ladies that work for the Public

10    Defender's Office are just about pretty much the

11    most experienced lawyers that we get.

12         So let me, just for the record, cite some

13    of the cases in this regard.  And you can go ahead

14    and take a seat while I'm getting my papers open

15    here.

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  Under our Criminal Justice

18    Act, a criminal defendant is entitled to

19    representation at every stage of the proceedings,

20    from initial appearance through appeal.

21         The Court may, in its discretion and in

22    the interests of justice, substitute one appointed

23    counsel for another at any stage of the proceedings.

24    But court-appointed counsel shall not be relieved

25    except in the event of incompatibility between the

1    attorney and client or other most pressing

2    circumstances.  And right now I am citing to an

3    unpublished 5th Circuit case, U.S. v. Delrosario,

4    and it can be found at Westlaw, 2001 Westlaw 85906

5    out of the 5th Circuit, and it is citing to United

6    States v. Trevino, 992 F.2d 64 at 65, 5th Circuit

7    1993.

8            I haven't heard, as in this Delrosario

9    case, sufficient evidence of incompatibility or

10   really much at all as far as the relationship

11   between Mr. Nicholson and Mr. McGraw other than the

12   fact that they may disagree on strategy and that

13   Mr. McGraw is not happy with some of the

14   conversations they have had and some of the

15   conversations that Mr. Nicholson has had with his

16   family.  It doesn't rise to the level of the

17   incompatibility that requires that the Court change

18   counsel.  Of course it would set a very poor

19   precedent if the Court were to do this as a matter

20   of course every time a defendant came forward.

21           Again, some of the cases on this:  A

22   defendant is entitled to counsel capable of

23   rendering competent, meaningful assistance in the

24   preparation of the trial and the pending charges,

25   including appropriate evaluation and advice with

24

1    reference to a plea of guilty.  A defendant is

2    entitled to an attorney who will consider his views

3    and seek to accommodate, but has no right to an

4    attorney who will docilely do as he is told.  Every

5    defendant is entitled to assistance of counsel

6    dedicated to the proposition and capable assuring

7    that the prosecution's case shall be presented in

8    conformity with the Constitution and the Rules of

9    Evidence.  No defendant has a right to more.  That's

10   McQueen v. Blackburn out of the 5th Circuit, 755

11   F.2d 1174, 5th Circuit 1985.

12          And again, the Court is required to

13   relieve appointed counsel only upon a showing of a

14   conflict of interest, which there has not been here,

15   or other most pressing circumstances, or that the

16   interest of justice otherwise requires relief of

17   counsel.  And none of that has been established in

18   this case.

19          And finally, on the proposition that the

20   Sixth Amendment does not afford a defendant absolute

21   and unqualified right to counsel of choice is U.S.

22   v. Brown, 591 F.2d 307, 5th Circuit 1979, at pages

23   310 and 311.

24          And for that reason, Mr. McGraw, I am

25   going to deny your motion.  I have heard sufficient

1   information from Mr. Anderson and Mr. Nicholson to

2   believe that you are getting excellent advice,

3   excellent counsel.  I know they are competent.  And

4   from what they have said today, they are doing more

5   than you might expect from some counsel as far as

6   all the visits and the discussions.

7          You haven't met the standard, so I'm going

8   to deny your motion.  Understanding that you want to

9   continue to have counsel, then, that's where we will

10  leave it, with Mr. Nicholson on board, and go

11  forward as I understand it to trial.  All right?

12          THE DEFENDANT:  Thank you, ma'am.

13          THE COURT:  Mr. McGraw and Mr. Nicholson

14  and Ms. Heath, if there is nothing else, Mr. McGraw

15  is remanded to federal custody, and we will be in

16  recess.

17          (Court in recess at 10:29 a.m.)

18

19

20

21

22

23

24

25

```
1                   C E R T I F I C A T E

2              I, Shawnie Archuleta, CCR/CRR, certify

3    that the foregoing is a transcript from the record

4    of the proceedings in the foregoing entitled matter.

5              I further certify that the transcript fees

6    format comply with those prescribed by the Court and

7    the Judicial Conference of the United States.

8              This 20th day of May 2011.

9

10

11                        s/Shawnie Archuleta
                          Shawnie Archuleta CCR No. 7533
12                        Official Court Reporter
                          The Northern District of Texas
13                        Dallas Division

14

15

16   My CSR license expires:  December 31, 2011

17   Business address:  1100 Commerce Street
                        Dallas, TX  75242
18   Telephone Number:  214.753.2747

19

20

21

22

23

24

25
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**