```
           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
                   DALLAS DIVISION

UNITED STATES OF AMERICA, )
                          )
          Plaintiff,      )
                          )
vs.                       )  3:09-CR-00210-B(1)
                          )
JESSE WILLIAM MCGRAW,     )
                          )
          Defendant.      )
```

```
                SENTENCING HEARING
       BEFORE THE HONORABLE JANE J. BOYLE
          UNITED STATES DISTRICT JUDGE
                MARCH 17, 2011
```

```
              A P P E A R A N C E S
For the Government:

     UNITED STATES ATTORNEY'S OFFICE
     1100 Commerce Street - 3rd Floor
     Dallas, TX  75242
     (214)659-8600
     BY:  CANDINA S. HEATH

For the Defendant:

     THE DURDEN LAW FIRM
     5750 Rufe Snow Drive - Suite 130
     North Richland Hills, TX  76180
     (817)581-9900
     BY:  TODD A. DURDEN

COURT REPORTER:  SHAWNIE ARCHULETA, TX CCR No. 7533
                 1100 Commerce Street
                 Dallas, Texas 75242
```

proceedings reported by mechanical stenography,
transcript produced by computer.

TRANSCRIPT OF PROCEEDINGS

CAROL ROGERS
Examination By Mr. Durden                          27
Examination by Ms. Heath                           36

ERIC MONTOYA McCLELLAN
Examination By Mr. Durden                          39
Examination by Ms. Heath                           44

ROBIN SHAW
Direct Examination By Ms. Heath                    58
Cross-Examination by Mr. Durden                    69

AJEET SINGH
Direct Examination By Ms. Heath                    74
Cross-Examination by Mr. Durden                   109

```
 1                    (In open court at 2:55 p.m.)
 2              THE COURT:  The last case of the day, and
 3   we're here for sentencing, is the U.S. v. McGraw
 4   case.  We will wait until Mr. McGraw gets out here.
 5   For the record, it's 3:09-CR-210.
 6              For the government?
 7              MS. HEATH:  Candy Heath for the
 8   government.
 9              THE COURT:  And for the defense?
10              MR. DURDEN:  Todd Durden for the
11   defendant.
12              THE COURT:  And Mr. McGraw is here.  If
13   you and your client will come up to the lectern,
14   please.
15              MR. DURDEN:  Thank you, Your Honor.
16              THE COURT:  Mr. McGraw, good afternoon.
17              THE DEFENDANT:  Good afternoon.
18              THE COURT:  As you know, we are here today
19   for the sentencing in your case.  It's been pending
20   for a little bit longer than normal for a lot of
21   different reasons.
22              But I want to make sure, before we go too
23   far, that I've made sure that you and I have looked
24   over all the same paperwork, there's nothing else
25   that's out there that I should see, and that you
```

1  have had a chance to look with Mr. Durden at all the

2  important papers.

3                  And because I will be going through

4  several things with you, I will ask you to raise

5  your right hand and put you under oath.

6                  (The Defendant was sworn.)

7                  THE COURT:  All right.  Mr. McGraw, let's

8  talk first about the presentence report, the first

9  one.

10                 Have you had a chance to review this

11  carefully with Mr. Durden?

12                 THE DEFENDANT:  Yes, Your Honor, I have.

13                 THE COURT:  Okay.  You fully understand

14  it?  Any questions about it?  I know we've got some

15  objections, but I'm just now asking you if you

16  understand it.

17                 THE DEFENDANT:  Yes, I do understand it.

18                 THE COURT:  Okay.  There was an addendum

19  that was filed in January that had to do with -- let

20  me see.  It's filed January the 21st, and it had to

21  do with a competency issue.

22                 Have you had a chance to review that with

23  Mr. Durden?

24                 THE DEFENDANT:  Yes, Your Honor, I have.

25                 THE COURT:  Any questions about that?

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**

```
 1              THE DEFENDANT:  No, ma'am.
 2              THE COURT:  Mr. Durden, you've got it
 3    there, and you agree you have reviewed this with
 4    him?
 5              MR. DURDEN:  That is correct, Your Honor.
 6              THE COURT:  Okay.  On February 10th of
 7    this year, Mr. McGraw, Mr. Durden filed objections
 8    to the presentence report on your behalf.
 9              Have you had a chance to review those with
10    him?
11              THE DEFENDANT:  Yes, I have, Your Honor.
12              THE COURT:  Any question about those?
13              THE DEFENDANT:  No.  No, Your Honor.
14              THE COURT:  The government, I believe,
15    about the same day or right after, filed a lengthy
16    document called Government's Comments, Corrections
17    and Objections to the Presentence Report and Motion
18    for Upward Departure.
19              Have you had a chance to review that
20    carefully?
21              THE DEFENDANT:  Yes, Your Honor.
22              THE COURT:  Any questions about that?
23              THE DEFENDANT:  No, none.
24              THE COURT:  Your attorney then filed a
25    response to the government's comments on
```

1    February 14th.

2              Have you had a chance to review that with

3    him?

4              THE DEFENDANT:  Yes, I have, Your Honor.

5              THE COURT:  Okay.  And then there was a

6    second addendum filed by Probation in response to

7    all of the objections and comments by your counsel

8    and the government.

9              Have you had a chance to review that with

10   Mr. Durden?

11             THE DEFENDANT:  Yes, I have, Your Honor.

12             THE COURT:  Any questions about that?

13             THE DEFENDANT:  No questions, Your Honor.

14             THE COURT:  Right after that, your counsel

15   filed a response to the second addendum to the

16   presentence report.

17             Have you had a chance to review that with

18   him?

19             THE DEFENDANT:  Yes, I have, Your Honor.

20             THE COURT:  Any questions about that?

21             THE DEFENDANT:  No, ma'am.

22             THE COURT:  And then a sentencing

23   memorandum was filed for you by Mr. Durden on March

24   the 3rd.

25             Have you had a chance to review that with

1    him?

2              THE DEFENDANT:  Yes, I have, Your Honor.

3              THE COURT:  And then there was a Motion

4    for Sentencing Variance filed on March the 3rd of

5    this year.

6              Have you had a chance to review that with

7    him, that motion filed by your counsel?

8              THE DEFENDANT:  Yes, I have, Your Honor.

9              THE COURT:  And then the government filed

10   on March the 3rd their objections to the presentence

11   report, second addendum, and reurging their Motion

12   for Upward Departure.

13             Have you had a chance to review that?

14             THE DEFENDANT:  Yes, I have, Your Honor.

15             THE COURT:  Any questions about that?

16             THE DEFENDANT:  No, ma'am.

17             THE COURT:  And along the way, I believe

18   it was perhaps in the sentencing memo, I had

19   attached several letters from friends and family

20   members, which I have reviewed.  I just wanted to

21   make sure you know I have looked at those and am

22   familiar with those letters.

23             So anything else that you are familiar

24   with that I should have for this sentencing?

25             Mr. Durden?

1          MR. DURDEN:  No, Your Honor.

2          THE COURT:  Government?

3          MS. HEATH:  No, Your Honor.

4          THE COURT:  Okay.  Let's go ahead and

5    start going through these objections then,

6    Mr. Durden.  Perhaps some have been resolved by

7    probation, perhaps some have not.  But I want to

8    find out where we are with regard to your comments,

9    objections in particular.

10          MR. DURDEN:  Okay.  And Your Honor, I'm

11    looking at the document that was filed on

12    February 22nd by the probation officer.  That would

13    be her second addendum to the presentence report.

14          THE COURT:  Okay.

15          MR. DURDEN:  I think that's probably the

16    key evidence in the hearing under Rule 32.

17          THE COURT REPORTER:  I'm sorry, I can't

18    hear you.

19          THE COURT:  We need you to speak up a

20    little bit.  Could you say that again, perhaps?

21          MR. DURDEN:  The key evidence in the

22    hearing under Rule 32 is, of course, the presentence

23    investigation report and then the probation

24    officer's report.  So I will begin looking at the

25    objections that we have made that are addressed in

 1    that report that I have in front of me.

 2              The defendant's objections begin at

 3    page 7 -- I should say the probation officer's

 4    treatment of the defendant's objections begin on

 5    page 7.

 6              We have made an objection, as shown there

 7    on paragraph Roman Numeral I, as to the

 8    sophisticated means.  We made the objection in

 9    writing.  And we haven't abandoned that objection,

10    but I have nothing further to offer on that.

11              THE COURT:  You have not abandoned that

12    objection?

13              MR. DURDEN:  Excuse me?

14              THE COURT:  You said you have not

15    abandoned that objection?

16              MR. DURDEN:  I haven't abandoned it.  I

17    have nothing to offer further.  I just ask the Court

18    to consider what you have before you.

19              THE COURT:  Ms. Heath, of course I've read

20    your response.  Is there anything you wanted to say

21    in addition to what you've already said?

22              MS. HEATH:  Yes.  Some of the evidence

23    that we intend to present would show that the

24    actions of the defendant while in the Carrell Clinic

25    Building with regard to the computers there did

1   constitute sophisticated means and that the

2   defendant's actions with regard to further

3   defacements and intrusions of other persons'

4   computers, other entities' computers, also

5   constitute sophisticated means.

6           THE COURT:  I will let you do that.  I

7   don't know that I need anything right now.

8           Mr. Durden?

9           MR. DURDEN:  Okay.  Thank you, Your Honor.

10          Then on paragraph --

11          THE COURT:  I want to go ahead and resolve

12  each of these as we go.  So is there anything else

13  on sophisticated means?

14          MR. DURDEN:  No, Your Honor.  We have made

15  the objection.  We think that really the probation

16  officer's report sets forth adequate evidence.

17          And we would object to any further

18  evidence because we feel like, you know, we have

19  made our objection.  The probation officer has

20  responded to it.  It sets forth the facts that the

21  Court is supposed to consider under Rule 32, and we

22  believe you can rule upon it.

23          THE COURT:  Well, the government is

24  certainly entitled to prepare to offer evidence

25  based upon your objection.  The Court has the

1   discretion to decide whether or not we need to hear

2   it.  But they are not precluded from offering

3   evidence just because there's an objection and you

4   haven't brought evidence yourself.

5          But having said that, we'll talk about

6   that in a moment.

7          The presentence report itself, in the

8   Court's view, more than adequately supports the

9   sophisticated means enhancement or adjustment, in

10   this Court's view.

11          If you're just looking at the paragraphs 7

12   through 20 alone, I think that justifies that the

13   crime itself was committed and would constitute by

14   sophisticated means.

15          So I overrule the objection just based on

16   the presentence report alone.  Whether or not I need

17   to hear or it's in conjunction with other evidence

18   the government wants to offer later on in the

19   hearing, I will take up later.

20          What else did you have, Mr. Durden?

21          MR. DURDEN:  Thank you, Your Honor.

22          Going back to Paragraph Number 2 and,

23   again this is on page 8 of the second addendum to

24   the presentence report, we had submitted to the

25   Court our objection as to the two-level enhancement.

```
 1              Our point was that the guidelines require

 2     either a conscious risk or a reckless risk of death

 3     or serious bodily injury, and that wasn't present

 4     here.  So we made the objection, and we have no

 5     further evidence to offer.

 6              THE COURT:  All right.  Ms. Heath.

 7              MS. HEATH:  Your Honor, the risk that the

 8     Probation Department has indicated, based on the

 9     evidence presented to the Probation Department,

10     shows that the intrusions into the Carrell Clinic

11     computers, which contained medical records necessary

12     for any procedures that the doctors were engaging in

13     at the time and simply just the medical records that

14     could be altered and affect a patient's care while

15     at the facility, would put any patient at risk.

16              Additionally, the defendant accessed the

17     HVAC computer, which would affect the temperature

18     controls in the building.  The temperature controls

19     in the building could adversely affect any of the

20     procedures, any of the equipment, any of the

21     supplies in the hospital and could put at risk a

22     person's safety.  And there could a potential risk

23     of death, depending on the length of time and what

24     was actually occurring at the time.

25              THE COURT:  Mr. Durden, in response,
```

13

1    anything else?

2           MR. DURDEN:  Just briefly.  The guidelines

3    require that the Court look to the intent of the

4    defendant.  Did he consciously intend for death or a

5    substantial risk of death or serious bodily injury,

6    or was he reckless about it?

7           And the Court is familiar with many

8    offenses where people do take actions that are

9    just -- people can -- there's a serious risk of

10   death, there's a serious risk of people getting

11   hurt, drive-by shootings, things like this, where

12   there is a conscious effort on the part of the

13   defendant that people could be killed, people could

14   be hurt.

15          And when you have arguments like it could

16   have affected the treatment, I take the position it

17   does not reach to the level where you have shows

18   intent that people be hurt by the offense.

19          THE COURT:  Okay.  The reason I'm flipping

20   through this is I'm looking for a particular

21   paragraph in the presentence report that I think

22   speaks to this.  So if you will bear with me just a

23   minute.

24          In paragraph 11 -- and there are many

25   other paragraphs that I think support this

1   enhancement.  But in paragraph 11, when talking

2   about the HVAC screen and what he was able to get

3   from it or could get from it, my recollection, at

4   least here, and I'm looking at paragraph 11 on

5   page 4 of the presentence report -- is that the

6   defendant made the following statement to

7   characterize the HVAC computer:  It's a slow, crappy

8   server computer, but it does have something neat on

9   it, something that could F blank some real S blank

10  up.

11          And I think that's indicative of what he

12  realized he was capable of doing by virtue of his

13  actions that he's been indicted for in this case.

14          So that and, I think, many other

15  paragraphs in the presentence report support that

16  enhancement that you've just objected to.  So I

17  overrule your objection with regard to that second

18  area that is raised and spoken to in the second

19  addendum.

20          Mr. Durden, go ahead.

21          MR. DURDEN:  Okay.  After that, Your

22  Honor, as to III and actually IV, I would make the

23  same announcement.  We have made our objections.

24          You know, we don't have anything further

25  to add, and we would ask the Court to make a ruling

 1    on those.

 2              THE COURT:  Okay.  And the first one has

 3    to do with the obstruction of justice, and the

 4    second one has to do with acceptance of

 5    responsibility.  Okay.

 6              And before I go forward with this, I want

 7    to make sure it's clear that in overruling the

 8    objections, I'm relying on the presentence report as

 9    well as the probation officer's reasons as she's set

10    them forth in the second addendum to the presentence

11    report.  So I adopt those as well.

12              Ms. Heath, did you want to address either

13    of these?

14              MS. HEATH:  Yes, Your Honor.

15              As far as the obstruction of justice,

16    first, there were search warrants issued while this

17    case was pending for a number of individuals that

18    Mr. McGraw had communicated with with regard to

19    obstructing justice.

20              The obstruction included things such as

21    instructing other individuals to obtain information

22    on an individual he believed to be an informant in

23    the case; to do things to interfere and harass that

24    particular person he believed to be an informant,

25    such as --

1          THE COURT:  Described as CW in the

2     presentence report?

3          MS. HEATH:  Correct, correct.

4          And some of the things he was directing

5     people to do would include a DDoS or

6     denial-of-service attack on that individual's

7     website, to get on the website and just talk badly

8     to the individual or make statements to the

9     individual.

10          He had an individual, Mr. Nichols, one of

11     the ETA members, another member of his hacking

12     organization, set up a website that would be

13     harassing the CW or the individual he believed to be

14     an informant in the case.

15          He had his sister look up information.

16     Which in the hacker world, you look up information

17     to have control over somebody.  So you're trying to

18     find their home address, their home phone numbers,

19     their family members' names, what kind of cars they

20     drive, any sort of information that would give a

21     hacker power over an individual.  He had his sister

22     looking up that information on the person he

23     believed to be an informant.

24          He also asked his sister to look up that

25     same type of information on me and on you, as the

1    judge in the case.

2            He also realized that the government was

3    aware of the other individuals in the ETA

4    organization and, at that time, tried to get word

5    out to those members that they were compromised and

6    that they needed to become what he called Defcon

7    Black, which was to basically go as far underground

8    as possible, destroy any records that they had.

9            He sent word out through his sister.  He

10   made phone calls from jail to other ETA members to

11   try to get word out to those individuals.  He talked

12   to one of the individuals directly and indicated

13   that they had been compromised and that they needed

14   to get rid of the ETA website, get rid of all the

15   evidence of anything that was going on and stop

16   doing anything overt that would get him in further

17   trouble and to protect themselves.

18           Based on some of the obstruction that he

19   was engaged in at that time, search warrants were

20   obtained and executed at his sister's house and at

21   three of the individuals that were members of the

22   Electronik Tribulation Army, the ETA.

23           The individuals agreed to provide

24   information to law enforcement as to their

25   communications with Mr. McGraw in addition to

1  computers at their houses that were seized, letters

2  between themselves and Mr. McGraw were seized.

3           In those letters were some of the

4  indications of this direct communication, the direct

5  instruction as to what they needed to do.

6           Additionally, the individuals, at least

7  one of the individuals, Mr. Nichols, advised law

8  enforcement that he had understood the warning that

9  he got from Mr. McGraw and had wiped his computer

10  clean and had sold the computer on craigslist or to

11  somebody else to get rid of that and had since tried

12  to destroy a lot of things that he had that would

13  connect him to Mr. McGraw to the ETA.  So the

14  message got through, and evidence was destroyed.

15           Additional evidence was destroyed by his

16  sister.  Mr. McGraw told his sister to go on to

17  Mr. McGraw's e-mail account and find e-mails that

18  related to a malware called The Beast and to delete

19  all of The Beast e-mails, to get rid of them.

20           And we know that she did do this because

21  prior to those instructions, we had done a search

22  warrant, obtained that e-mail account, and found

23  those Beast e-mails.  And then after we realized

24  that she had that instruction, we again did a search

25  warrant to determine whether or not they had been

1    destroyed.  And sure enough, they had been

2    destroyed.

3              So we do know that he had directed her to

4    destroy evidence in the case and that she did

5    destroy what she believed to be the evidence in the

6    case.

7              THE COURT:  Thank you, Ms. Heath.

8              Mr. Durden, did you want respond to any of

9    that?

10             MR. DURDEN:  Thank you, Your Honor.  My

11   client has instructed me to withdraw the objection

12   to the obstruction of justice adjustment made by the

13   probation officer.

14             THE COURT:  Mr. McGraw, you're standing

15   right here, so I can ask you.  Do you agree with

16   that?

17             THE DEFENDANT:  Yes, I do, Your Honor.

18             THE COURT:  All right.  I would overrule

19   the objection, if it was still standing, based upon

20   the information contained in the presentence report.

21   With it withdrawn, that's kind of a moot point.

22             But since we've gone through this exercise

23   in detail, Probation has done a very, very thorough

24   job in this case, Ms. Foster, and I think the

25   evidence in the presentence report supports the

1    enhancement.  But having had it withdrawn, there is

2    no reason to make a ruling for the record.

3            So let's move on then to the next area,

4    Mr. Durden.

5            MR. DURDEN:  Okay.  May it please the

6    Court?  Paragraphs IV, V, and VI on pages 9 and 10

7    of the second addendum to the presentence report,

8    they are submitted as objections.

9            But in looking at them more closely, I

10   believe they would be more properly considered by

11   the Court in weighing the factors under 3553.  And

12   in stating this, I'm guided by Assistant Federal

13   Public Defender Doug Morris, who appeared before

14   this Court in the prior sentencing.  And then

15   sometimes it does seem that there's some bit of

16   overlap.

17           For example, Paragraph V does talk about

18   the significantly reduced mental capacity, the

19   departure under 5K2.13.

20           And then, as the Court is well aware,

21   there are issues dealing with my client's -- his

22   childhood and some of his -- I will just use the

23   word issues, for no better term.

24           But I don't believe those would be best

25   addressed by the form of the objection, but rather

1    by the Court considering the factors under 3553 in

2    our motion thereunder.

3             THE COURT:  Let me just back up for a

4    minute.  Because you did object to IV, in

5    conjunction with your objection to the obstruction

6    of justice, and that was not withdrawn.

7             And just so the record is clear, I do

8    overrule that objection as to acceptance of

9    responsibility for the reasons set forth in the

10   presentence report.

11            And with regard to Objections V and VI,

12   I'm understanding you're withdrawing those.  If you

13   were not withdrawing those, I would find that they

14   are supported by the presentence report.  I mean the

15   presentence report's position that you've objected

16   to is supported by the presentence report.  And I

17   would overrule those objections, but I'm

18   understanding you to have withdrawn them.

19            Am I correct?

20            MR. DURDEN:  That's correct, Your Honor.

21   And Mr. McGraw is here to state that also.

22            THE DEFENDANT:  That is correct, Your

23   Honor.

24            THE COURT:  Okay, all right.

25            So where that leaves us with your

1    objections, Mr. Durden, and you have done a very

2    thorough job for your client here, and I want to

3    make sure he understands that, extremely thorough

4    with all the filings and the detail you have added

5    to the case, is there anything else?

6              MR. DURDEN:  No, Your Honor.

7              THE COURT:  I don't think there's anything

8    the government wants me to address right now with

9    regard to the presentence report, but I want to make

10   sure there's nothing I'm overlooking.  I know you

11   have issues with regard to amount of loss and all of

12   that.

13             MS. HEATH:  Yes, Your Honor.  Other than

14   the victims and the amount of loss and the upward

15   departure.

16             THE COURT:  All right.  The Court then

17   overrules the objections to the extent stated,

18   except for those that are withdrawn, and adopts the

19   presentence report, as well as the first and second

20   addendum, as the findings, calculations and

21   conclusions of the Court, which I believe at least

22   initially leaves us where we started, which is an

23   offense level of 24, with a criminal history

24   category of 1 and a guideline range of 51 to 63

25   months.

1          So with that, Mr. Durden, I'm going to

2     turn to you and see what you have to offer, see what

3     you want to say, what your client wants to say.  And

4     then I will give the government a chance to do so as

5     well.

6          MR. DURDEN:  Thank you, Your Honor.

7          At this point in time I understand the

8     Court is dealing with the guidelines and the

9     determination.  So I wish to inform the Court that

10    there are a number of people here that are present,

11    that wish the Court to know that they are here in

12    support of Mr. McGraw.

13         And with the Court's permission, I would

14    like to ask them to stand at this time.  Would those

15    persons that are here on behalf of Jesse McGraw

16    please stand?

17         THE COURT:  I know you all have been here

18    all afternoon, things that aren't even related to

19    anything you know about, so thank you very much.  It

20    means very much to have the family come down here.

21    I know it's not an easy thing to do, so thank you

22    very much.  Go ahead and take a seat.

23         MR. DURDEN:  Just so the Court knows, I

24    don't intend to call of these people to testify.  I

25    would give just a brief summary of who is here today

1  and why they are here.

2         THE COURT:  Go ahead.

3         MR. DURDEN:  We have the defendant's wife

4  and his mother-in-law and his sister-in-law, and

5  then we have his mother here also.  We have his

6  pastor, and we have a number of people from the

7  church and the prison ministry of the church,

8  including a psychologist who works in the prison

9  ministry is here.

10        THE COURT:  All right.

11        MR. DURDEN:  And basically I would proffer

12 that if they were to testify, they would testify

13 that they have known Jesse.  They have known him

14 actually participating before in the prison ministry

15 and in the ministries of the church.

16        About a year ago, he kind of fell out of

17 participation.  His behavior changed.  But they

18 would tell the Court that they are here to support

19 him; they are to support the Court; that at that

20 time that he is released, and whenever it is, they

21 know he will be released on supervision, that they

22 are here to support the Court to make sure that he

23 lives up to the terms of the supervision and help

24 him in any way they can to live on the right track.

25        THE COURT:  Thank you, Mr. Durden.

1          MR. DURDEN:  Thank you, Your Honor.

2          THE COURT:  Go ahead.

3          MR. DURDEN:  Other than that, Your Honor,

4    as far as testimony, I will be calling the

5    defendant's mother, Carol Rogers, to testify.

6          Briefly, because of the client's

7    background, it has to do with his childhood and some

8    things that -- it's a little bit different from the

9    average defendant.

10          I may ask his wife to make a very brief

11    statement; perhaps his pastor, also.  I think they

12    could testify from the lectern, but I would ask his

13    mother to testify from the witness stand.

14          THE COURT:  That's fine.  Before I go any

15    further, I want to clarify something because we've

16    had more comments on the presentence report in this

17    case than normal.

18          To the extent I have adopted the

19    presentence report and all of its findings, I know

20    we still have some open issues with the government,

21    which would include -- and I want to make sure I

22    haven't made a determination as to those -- the

23    amount of loss; the victim issue, which you all

24    disagree about; not raised by you, raised by you,

25    and then objected to by you; and I think there was

1   another point.

2          MS. HEATH:  His role in the offense, as

3   well as just the upper departure grounds.

4          THE COURT:  Okay, all right.

5          With that understanding, let's go ahead,

6   Mr. Durden.

7          MR. DURDEN:  Okay.  Thank you, Your Honor.

8          Then I would ask my client to go ahead and

9   make his statement, and then I will make some

10  allocutions on his behalf.

11         Would the Court like to hear the evidence

12  as far as like the 3553 factors, the testimony of

13  the mother --

14         THE COURT:  I think you should put on

15  whatever you have, including 3553, at this time in

16  whatever order you choose.  You might want to give

17  Mr. McGraw a chance to hear everything before he

18  speaks, but I will leave that up to you.

19         MR. DURDEN:  That will be fine.  Then I

20  would like to call Carol Rogers, his mother, to

21  testify at the time.

22         THE COURT:  She's going to come to the

23  lectern?

24         MR. DURDEN:  Actually, I would like for

25  her to speak from the witness box.

```
 1                THE COURT:  That's fine.

 2                Ms. Rogers, come up here.  Watch for cords

 3     and whatnot, and if you will raise your right hand.

 4                          CAROL ROGERS,

 5     having been first duly sworn, testified as follows:

 6                THE COURT:  Ms. Rogers, have a seat,

 7     please.

 8                           EXAMINATION

 9     BY MR. DURDEN:

10     Q.    Please state your full name for the Court.

11     A.    Carol Rogers.

12     Q.    And how are you related to the defendant in

13     this case?

14     A.    I am his mother, biological.

15     Q.    And I'm going to call him Jesse then, not the

16     defendant, while I'm examining you.

17                Can you tell me a little bit about Jesse, about

18     when he was born and his early childhood?

19     A.    He was born in Fort Worth, Texas.  And he was

20     with me for about two and a half years, and --

21     Q.    Was that in Fort Worth, Texas?

22     A.    Sir?

23     Q.    Was that in Fort Worth, Texas?

24     A.    Yes, sir.  Yes, sir.

25     Q.    When you say he was with you, does that mean
```

28

```
1   you had primary care and custody of him at that
2   time?
3   A.   Yes.
4   Q.   You took care of him?
5   A.   Yes.  Well, I didn't do a very good job.  The
6   first couple of years of his life, I was strung out
7   on amphetamines.  And it was a pretty rough ride,
8   and I wasn't a very good mother to him.
9        And actually, at the time he was -- my father
10  was helping me at the time, as well, because I was
11  so messed up.  I mean I was beyond helping and
12  taking care of my own child.
13  Q.   You were a drug addict?
14  A.   Yes.  Yes, sir.
15  Q.   And what about Jesse's father?
16  A.   He was a heroin addict.
17  Q.   How did this affect Jesse at that time?
18  A.   He was tossed around quite a bit.  I know it
19  had to hurt him.  I just -- I wasn't very good with
20  him.
21  Q.   What happened?
22  A.   I had to send him away with his biological
23  father.  I felt like he could take better care of
24  him because I was constantly using every day.
25       And he had lived with his father, which was in
```

1   the Navy, and I thought that they would take better

2   care of him than me.

3   Q.   Did he?

4   A.   No.  They actually abandoned him, and he was

5   fending for himself for years, and I had no

6   recollection of that.

7         And the old man turned to drinking again.  I

8   knew he had a drinking problem.  But I had asked

9   people how he was doing I think one time.  And they

10   said he was doing fine, but they were lying.  I did

11   get to talk to him about six months after I gave him

12   to his father --

13   Q.   So you didn't see him at all for six months?

14   A.   I didn't even -- I talked to him one time up

15   until the time I seen him whenever he was grown.

16   Q.   So from the time he was two and a half years

17   old, he didn't see his mother until when?

18   A.   No.

19   Q.   When?

20   A.   Not until he was 19 years old.  But I did talk

21   to him about six months after.  And I can remember

22   him crying for me and saying, I miss you, Mom.

23         And my heart was just so hard, and I was just,

24   you know, in that lifestyle where it just didn't

25   matter.  He was out of my sight and out of my mind.

1    So I just -- you know, I have it engrafted in my
2    mind forever of his cries for me.
3    Q.    Did you spend some time in prison?
4    A.    Yes.  After years of drug abuse and everything,
5    I went to prison in 1998.  There I really believe I
6    received the help that I needed, because I had done
7    so many terrible things to my children.  He wasn't
8    the only victim.  I mean I abused all of them.
9         I didn't want to grow up to be an abuser, but
10   the very thing that I didn't want to do to my
11   children was the very thing that I did.
12        And I got saved there.  And my life started
13   shifting around because I knew I had done so many
14   horrible things to my kids and -- I mean it took me
15   years to be able to feel what my children actually
16   had to go through.
17        And whenever I started feeling, you know, what
18   I did to my children, I was just like, only God
19   could forgive me because no one else could.  I mean
20   I was just terrible.  Everybody in my family
21   constantly was saying that I was just a horrible
22   mother, and I had to live with that.
23        But somewhere in the back of my mind, I knew
24   one day that I would see him when he would grow up.
25   Q.    Did you start making efforts to reunite with

1   your son?

2   A.   I just started praying about it and looking for

3   him over the Internet.

4   Q.   And eventually did you find him again?

5   A.   His adopted mother hired an adoption detective

6   or something to that matter and found me, and --

7   Q.   Did you respond to that?

8   A.   Yes, sir, I did.  Yes, sir, I did.

9   Q.   Tell me about you being united with Jesse and

10  what happened at that time.

11  A.   Well, when I got reunited with him, I mean it

12  was a really exciting time.  And I could just feel

13  something in my heart changed, because it was a part

14  of my life that I didn't think I could ever be

15  forgiven for.  And it brought some healing to my

16  heart just to see him come to Texas and want to see

17  me.

18       And it was wonderful.  Because within weeks, he

19  was playing music in our church.  And I mean I would

20  look at him, and he would be crying because he

21  wanted what I had.  And right away we made a

22  connection together.

23  Q.   About what time was it that he came back here

24  to the DFW area?

25  A.   It was in '04.

1   Q.    Okay.  2004?

2   A.    Yes.

3   Q.    And you mentioned attending church with him.

4   Did he become involved in the church at that time?

5   A.    Yes.  Immediately they seen the giftings that

6   he had, and he wanted to use them.  And instead of

7   using them where he was using them prior, I guess he

8   was just playing for different bands or whatever, he

9   wanted to use them for the Lord.

10  Q.    And you say, "giftings."  Is he gifted in

11  musical abilities?

12  A.    Yes.  He has many, many giftings.  He plays

13  many, many instruments.

14  Q.    And would you tell the Court what church this

15  is that he's involved in or has been involved in?

16  A.    The Mercy Seat Church.

17  Q.    And it's located --

18  A.    In North Richland Hills, Texas.

19  Q.    Okay.  And so we know, when we talk about the

20  church, that we're talking about the Mercy Seat

21  Church.  And the people here today are from the

22  Mercy Seat Church?

23  A.    Yes, sir.  Yes, sir.

24  Q.    Now, does the Mercy Seat Church have a prison

25  ministry?

33

1    A.    Yes.

2    Q.    Was Jesse involved in that prison ministry?

3    A.    Yes.  He did several different ministries,

4    whatever Bishop wanted him to do.  He was involved

5    in every -- he did nursing homes, street ministry,

6    everything, prison ministry.

7    Q.    What was his role in these ministries?

8    A.    He was a musician, minister, a minister of

9    music.

10   Q.    Are you involved in the ministry yourself?

11   A.    Yes, sir.  I'm a chaplain for Tarrant County

12   Jail, and I have been since '05.  And I've been a

13   prison minister since '02.  I also am a pastor's

14   wife since 2000.

15   Q.    Now, Jesse was involved with this in 2004.  At

16   some point did he withdraw from participation in the

17   church?

18   A.    Yes, he did, sir.  And I think he was only gone

19   for about a year.  I mean it wasn't something that

20   he was practicing the whole time that we were

21   together.

22   Q.    Okay.  So about 2008, then?

23   A.    Yes, sir.

24   Q.    Okay.  Okay.  About a year before his arrest --

25   A.    Yes, sir.

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**

```
 1   Q.   All right.
 2   A.   Yes.  He was currently involved in many
 3   different things that was good for the community.
 4   Charities, things like that.
 5   Q.   Okay, all right.  Now, is further work in the
 6   prison ministry something that Jesse is looking
 7   forward to?
 8   A.   Yes, I believe so.  I believe that he has a
 9   preaching ability.  Since he's been locked up, I
10   have just seen him, you know, be -- I mean maybe at
11   first, he was still puffed up.  But I've seen him go
12   down into humility and see that there's a call on
13   his life.
14        And we are worldwide ministers together.  And I
15   believe that, you know, with all my heart.  I've
16   seen him play, and I know he can play before
17   thousands, and he has that in him.  He has it in
18   him.
19        I've seen his teachings, his writings.  His
20   things make me cry.  They didn't the first year.
21   But his life -- I mean he's building in character.
22        And I know when he was living with me, I
23   remember him being -- I mean he was very immature.
24   And I even asked his wife, I was like, My God, do
25   you want to float down the river with him in a trash
```

1  can?

2       I mean he was very, very creative.  He liked to

3  make movies.  He did lots of things for people in

4  our neighborhoods and all the young people, the

5  youth.  I mean I seen him pray and fast and go

6  without food.  I mean he's just a very creative

7  individual, very creative.

8  Q.   He's been in custody since 2009; is that

9  correct?

10  A.   Yes, sir.

11  Q.   Have you been in communication and in contact

12  with him since that time?

13  A.   Yes, sir, I have.

14  Q.   You've mentioned that you've seen a change in

15  him over the months of his incarceration?

16  A.   Yes, sir, I have.

17  Q.   I believe he was incarcerated in June of 2009;

18  is that correct?

19  A.   Yes, sir.

20  Q.   Okay.  Now, you've been there for him

21  throughout his incarceration?

22  A.   Yes.

23  Q.   And will you be there for him when he's

24  ultimately released by this Court?

25  A.   Absolutely, yes.

```
 1              MR. DURDEN:  Thank you.  Thank you.  Pass
 2     the witness.
 3              THE COURT:  Thank you, Mr. Durden.
 4              Do you have any questions, Ms. Heath?
 5              MS. HEATH:  Yes, Your Honor.
 6                         EXAMINATION
 7     BY MS. HEATH:
 8     Q.   You mentioned, Ms. Rogers, that it was the
 9     Mercy Seat Church in North Richland Hills?
10     A.   Yes, ma'am.
11     Q.   And were you aware of the period of time when I
12     believe it was the Bishop there had instructed
13     Mr. McGraw not to use the computers there anymore
14     because they had found malware on their computers
15     that he had planted there?
16     A.   No, I was not aware of that.
17     Q.   And that the church --
18     A.   I know.  I know that -- you know, I didn't know
19     anything about any malware or anything like that,
20     no.
21     Q.   And that the church had to hire somebody to fix
22     their own computers because of what Jesse McGraw had
23     done; you're not aware of that?
24     A.   I don't think so, no.  I don't recall.
25     Q.   Mr. McGraw, your son, has not sent you copies
```

1   of letters that he has sent to other members of his

2   hacking organization, has he?

3   A.   No.  I would not -- no.

4   Q.   Were you even aware that your son was the

5   leader or self-proclaimed leader of a hacking

6   organization called the Electronik Tribulation Army?

7   A.   I thought he was really immature, and I just

8   didn't realize -- I knew that there was -- I know

9   that's illegal, but I did not know that he was the

10  head of it.  I did not know.

11  Q.   Did you realize that while he's been

12  incarcerated, that he's maintained contact by

13  telephone and by letters with several members of

14  this Electronik Tribulation Army?

15  A.   No, ma'am.

16  Q.   And that through his letters, he has indicated

17  that he intends to get out of jail and take over the

18  organization again?

19  A.   No, ma'am.

20  Q.   Are you aware in the letters that he has

21  indicated to people that he -- or has instructed

22  some of these individuals to continue to go out and

23  hack individuals or harass other individuals in the

24  community?

25  A.   No, ma'am.

1   Q.   Were you aware that in a letter, he actually

2   bragged that he was able to gain unauthorized access

3   to one of the computers in prison while he's been

4   there?

5   A.   No, ma'am.

6   Q.   So there are some things about your son's life

7   that he may not be telling you; is that correct?

8   A.   I knew he had some problems.  I mean he has

9   told me that.  But I really believe that he's not

10  still currently doing that at this month, this time.

11  Q.   And that's what he's been representing to you,

12  that he is not doing this anymore?

13  A.   Yeah.

14  Q.   And he's representing to you that he has

15  changed his life?

16  A.   I believe so, yes.

17          MS. HEATH:  Pass the witness.

18          THE COURT:  Redirect?

19          MR. DURDEN:  No further questions, Your

20  Honor.

21          THE COURT:  Thank you very much.  You may

22  step down.

23          THE WITNESS:  Thank you.

24          THE COURT:  Do you have a character

25  witness?

```
 1            MR. DURDEN:  May I have just a moment,
 2    Your Honor?
 3            THE COURT:  Yes.
 4            MR. DURDEN:  Your Honor, in light of the
 5    cross-examination, I would like to call Bishop
 6    McClellan to the stand to clear up maybe some issues
 7    that the Court may have.
 8            THE COURT:  That's fine.
 9            MR. DURDEN:  The defense calls Bishop
10    McClellan.
11            THE COURT:  If you will come around here,
12    please, and raise your right hand.
13                ERIC MONTOYA McCLELLAN,
14    having been first duly sworn, testified as follows:
15                    EXAMINATION
16    BY MR. DURDEN:
17    Q.   Please state your name for the Court.
18    A.   Eric Montoya McClellan.
19    Q.   And Mr. McClellan, are you the pastor of the
20    Mercy Seat Church?
21    A.   I am.
22    Q.   How long have you been the pastor out there at
23    the Mercy Seat Church?
24    A.   Almost seven years.
25    Q.   And I use the term "pastor."  And I believe you
```

1    actually have the title of Bishop at that church; is

2    that correct?

3    A.   That is.

4    Q.   So you are the leader of that church?

5    A.   Um-hum, yes, sir.

6    Q.   And now let me ask you, did the church have to

7    remove malware from its computers that was put on by

8    Mr. McGraw?

9    A.   A couple of statements that were made in that

10   last cross-examination were not true.  We had some

11   issues with our computer.

12        But as far as removing those, the only comments

13   that we made to Jesse was that he needed to refrain

14   from using computers at a particular time for the

15   sake of pulling him out of that environment, trying

16   to counsel with Jesse on numerous occasions and talk

17   with him.

18   Q.   And that's important because you worked very

19   closely with Jesse, didn't you?

20   A.   Yes.

21   Q.   In fact, he saw you very much like a father

22   figure?

23   A.   Yes.

24   Q.   And you were there, and you saw he had a

25   problem with obsession?

1    A.    Yes, sir.

2    Q.    And that obsession being with those computers?

3    A.    If I may address that particular mindset?

4    Q.    Yes.

5    A.    In dealing with Jesse, Jesse is very immature.

6    He's almost like a child.  I'm not trying to give

7    validity to what he did wrong.  There is

8    repercussions for that.

9          But at the same time, with the remarks that

10   have been made, in looking at the counseling that I

11   have done with him over the period of time.

12         Also in regards to computers, if you give a

13   child those type of things, even my own son, looking

14   at the wrong things on the Internet, playing with

15   the wrong things, doing those type of things with

16   the mindset of someone who doesn't have the maturity

17   development to be able to handle those particular

18   things are going to go down the wrong path and be

19   influenced by those paths.

20         There is also the potential of helping him and

21   to assist him to get out of that particular mindset

22   and pulling back from those things.  He chose the

23   wrong path, and we tried to prevent those things.

24   And this is where it's come to, so . . .

25   Q.    Now sometimes people make the wrong

1    decisions --

2    A.    Yes.

3    Q.    -- take the wrong path?

4          In fact, the ministry at the Mercy Seat Church

5    is to people that are in prison and who have gotten

6    out of prison; is that correct?

7    A.    Yes, sir.

8    Q.    Can you tell the Court a little bit about that

9    ministry?

10   A.    We have a discipleship home.  And it's actually

11   a retention so that we can keep from recidditation,

12   (sic) going back into the same prison systems again.

13   So recidi- -- how do you say it?

14   Q.    Recidivism.

15   A.    Yeah, thank you.  So they don't go into the

16   prison systems again.

17         We have a discipleship home where we try to

18   carry those people through a process of getting them

19   to rehabilitate and to move their mind back into the

20   framework that can relate with society.

21   Q.    And do you have a psychologist as part of that

22   ministry?

23   A.    We have a clinical psychologist that does some

24   periodic counseling for us that is on staff there.

25   Q.    Okay.  And that's Mr. Galvan, is that correct?

43

1   He has Master's?

2   A.   Ron Galvan, yes.

3   Q.   Can you spell that full name for the court

4   reporter?

5   A.   Ron, R-O-N, Galvan, G-A-L-V-I-N, I believe it

6   is.

7             MS. BRACHO:   V-A-N.

8   Q.   (By Mr. Durden)  Is he present in court today?

9   A.   He is.

10  Q.   Mr. Galvan?  There we go, okay.

11       And do you believe Jesse would benefit from

12  working -- let me ask you this:  Has Jesse talked

13  with Mr. Galvan in the past?

14  A.   He has.

15  Q.   And do you believe he would benefit from

16  working in the prison ministry and working with

17  Mr. Galvan in the future?

18  A.   Ask the question again.  I apologize.

19  Q.   I asked it actually in two parts.

20       Do you believe he would benefit from working

21  with Mr. Galvan in the future?

22  A.   I believe that he could benefit.  I always have

23  hope for individuals that they can be rehabilitated

24  and get into some corrective mindsets that would

25  benefit society.

44

```
 1   Q.   And did Jesse make a positive contribution to
 2   the prison ministry when he participated in it?
 3   A.   He did the entire ministry, while he was there,
 4   in functioning and flowing.  He did contribute
 5   tremendously.
 6   Q.   And is he welcome to come back?
 7   A.   He is always welcome to come back.
 8           MR. DURDEN:  Thank you very much.
 9           I pass the witness, Your Honor.
10           THE COURT:  Questions?
11           MS. HEATH:  Just a couple of questions,
12   Your Honor.
13                     EXAMINATION
14   BY MS. HEATH:
15   Q.   Mr. Bishop, I'm Candy Heath.
16   A.   Nice to meet you.
17   Q.   I just wanted to make sure that I had the facts
18   correct.
19   A.   Yes, ma'am.
20   Q.   After Mr. McGraw was arrested, you had a
21   telephone conversation with an FBI agent; is that
22   correct?
23   A.   I did.  Yes, ma'am.
24   Q.   And during that conversation, you indicated
25   that on one instance you had an occasion to find out
```

1    that Jesse McGraw had accessed the computers at the
2    church and placed malware on the computers.
3    A.   No, ma'am, I didn't say that.  What I did say
4    is that he had access to the computers.  I didn't
5    know whether Jesse -- because if I had known it was
6    him, I would have made corrective actions then.  So
7    I didn't know it was him.
8         And the thing is, is that the things that we
9    did, there was nobody that came in and did any
10   removal of any malware or those things there.
11        The only thing that I made the statement to the
12   FBI agent that is here is that I had him set aside
13   those computers for a time period because I knew
14   that it was beginning to have more of an influence
15   on him than he needed to have at that time.
16   Q.   So you are indicating that there was no need to
17   have anybody remove anything from the computers?
18   A.   No, ma'am.
19   Q.   But you did instruct Jesse McGraw not to
20   continue using the computers at the church.
21   A.   Yes, ma'am, that is true.
22            MS. HEATH:  Okay.  Pass the witness.
23   Nothing else.
24            THE COURT:  Anything else, Mr. Durden?
25            MR. DURDEN:  No further questions, Your

```
1   Honor.
2               THE COURT:  You may step down.
3               Call your next I guess witness or --
4               MR. DURDEN:  Just briefly, I would like to
5   call Beatriz Bracho, the defendant's wife, just to
6   make a brief statement to the Court at the lectern.
7               THE COURT:  That's fine.  If you will give
8   us -- right up there.  You can do it at the
9   microphone.
10              MR. DURDEN:  Beatriz, I'm sorry.
11              THE COURT:  What I would like to do is
12  just get you to state your full name and spell your
13  last name.
14              MS. BRACHO:  Beatriz Vanessa Bracho,
15  B-R-A-C-H-O.
16              (Ms. Bracho sworn.)
17              THE COURT:  Go ahead.
18              MR. DURDEN:  Just tell the Court who you
19  are.
20              MS. BRACHO:  Well, we met in 2006.  And I
21  mean, he's -- I am a very brittle diabetic, and he's
22  always been there to take care of me.  He was also a
23  very good husband to me, and I don't see him as a
24  criminal at all.
25              He was just immature, just like what they
```

1    said.  And everybody makes mistakes.  And I mean I'm

2    still here for him and we are still together, and

3    he's -- my whole family also loves him very much.

4                THE COURT:  Thank you.

5                MS. BRACHO:  Uh-huh.

6                THE COURT:  Mr. Durden, anyone else?

7                MR. DURDEN:  No further witnesses, Your

8    Honor.

9                THE COURT:  Mr. McGraw, of course, wants a

10   chance to say something.  And I'm sure you do as

11   well.

12               MR. DURDEN:  Yes, Your Honor.

13               Mr. McGraw, why don't you come up here?

14               THE DEFENDANT:  Thank you, Your Honor.

15               This has been a very anticipated day for

16   me.  I've been waiting for a long time.  First off,

17   I mean here stands before you is a man who is

18   literally broken, ashamed and humiliated not by

19   anybody else, but by what I have done.

20               And not only that, but as being somebody

21   in a leadership role not only in my household, but

22   also within the ministry.  For one thing, I'm

23   thankful that the youth in the ministry did not

24   follow me in this path.

25               In this path, there is no light at the end

 1    of the tunnel.  It's a very scary path and a violent

 2    path.  It's a path that has no future, no future

 3    whatsoever.

 4            The day that I got arrested, my life was

 5    literally put on hold.  And all I have is -- all I

 6    had was the memories of the past.  And I'm just so

 7    thankful that my wife has been able to stand by me,

 8    which is more than what I deserve.

 9            I mean most people statistically in the

10    prison, their families will leave them within six

11    months.  And we've been together for four years.

12    And I'm very, very thankful.

13            And honest to God, I am very guilty.  I am

14    so guilty for what I have done.  It just doesn't

15    stretch to the two counts of malicious code or the

16    two counts of the obstruction of justice.  But it

17    ought to also stretch to the 13 or 14 counts in the

18    superseding indictment, as well as the 50-plus other

19    victims.

20            But moreover, the real victim in this is

21    my daughter and my wife.  I've missed over 22

22    months' worth of development from my daughter,

23    Milania.  I haven't been able to raise her.  I

24    couldn't change any diapers.  And just by the grace

25    of God, I believe she remembers who I am.

1          And my wife, being a type 1 or a type 2

2     diabetic, hypoglycemia myelitis, knowing that she is

3     laying in bed with -- having a diabetic seizure and

4     having to have the Emergency Response Team have to

5     revive her and I'm not there to take care of her,

6     this isn't just about -- this is -- this is

7     moreover -- I have made just a horrible, horrible

8     mistake.

9          And coming to prison really was a slap in

10    the face, and it is a reality check.  Because I've

11    lived so long, lived so long pretending to be

12    somebody I'm not, when I know what my future is.  I

13    know what my destiny is.  I know exactly what my

14    purpose in life is.

15         And the fact that I wasn't pursuing that

16    really -- excuse me.  And I can't live the rest of

17    my life wasting away for something that's so

18    trivial.

19         It's so stupid, juvenile posturing is, and

20    committing crimes that -- these people won't

21    remember who I am in five years from now.  They're

22    not the one putting money on my commissary.  They're

23    not coming up to visit me.  It's been my mother, my

24    pastor, my wife bringing my daughter.  I love them

25    very, very much.

1          And I just wanted to thank the United

2     States Government, moreover the Dallas FBI, because

3     if they hadn't intervened, I would still be out

4     there, wasting my life away, when I should be doing

5     music, I should be doing ministry.  That's what I

6     love.  That's what I do.

7          Before I ever got into computers, I did

8     music.  I've been playing music since I was seven

9     years old.  I can almost play just about anything

10     ever made.  It's just been my knack, and it's been

11     my gift.  It's my love, what I do.

12          And since I've been locked up, I've been

13     spending a lot of time, a lot of time reading and

14     studying.  So when I do get a chance to get out, I

15     have new knowledge by evolving myself, evolving my

16     mind and putting off what is old, what is former.  I

17     don't need computer hacking.

18          What I need is knowledge, and knowledge to

19     put forth in a productive manner, in a productive

20     way, in ministry.  That way, I could actually help

21     somebody, help people.  That's what my destiny is,

22     to help people, to lead youth, to break the chains

23     of bondage, bondage like computer hacking, for one.

24     That is a bondage.  I was addicted to it.

25          And anyone who is addicted to something is

1    a slave to that thing, and I was a slave.  And

2    Special Agent Allyn Lynd, he played an important

3    role in delivering me from that, answering the call,

4    arresting me, and bringing me to prison so I could

5    wake up and see what I'm supposed to be doing and

6    what I shouldn't be doing anymore.

7            And for repentance, I repent, I repent.

8    Repent means to be remorseful for what you have done

9    and to make a 180-degree turn, not going back to

10   what you used to do, but pressing forward.  Because

11   once you're set free, there's no logical reason to

12   go back and to do what you were doing before.

13           I can't live like that.  Because if I ever

14   screwed up again, I would lose the support of my

15   wife, my daughter.  I would lose them all, and

16   they're all I've got.  They're all I have.

17           Thank you, Your Honor.

18           THE COURT:  Thank you, Mr. McGraw.

19           Mr. Durden?

20           MR. DURDEN:  Thank you, Your Honor.

21           May it please the Court?

22           THE COURT:  I'm going to give you a chance

23   at the end to also make some closing comments, so I

24   don't want you to think this is your last chance.

25           MR. DURDEN:  Well, thank you, Your Honor.

1        I have some brief comments about the law,

2    and then I will have some comments about Mr. McGraw

3    as a person.  And I'll save the comments for him as

4    person until the end.

5        Briefly on the points of law, I would like

6    to offer -- I know the Court will be considering

7    some PSR points that the government has made --

8        THE COURT:  I think that microphone might

9    need to be pulled back to your level.

10        MR. DURDEN:  Okay.  Thank you, Your Honor.

11        I would like to begin with, this is an

12    economic crime.  This is a 2B1.1 guideline crime.

13    This is an economic crime.

14        And probably the central point of a crime

15    like that is that when you've done something wrong,

16    you've taken from somebody, you've harmed somebody

17    economically, you pay them back.  That's as old as

18    the Code of Hammurabi.  The old eye for an eye and

19    tooth for a tooth is actually a measure of justice.

20    I mean it's when you take something from somebody,

21    you pay them back.

22        That's something that I would ask the

23    Court to be careful with in calculating the amount

24    of restitution.  Because I ask and believe that the

25    Court will enter an order of restitution because

1   that's part of our liberty.  And part of justice is

2   that the wrongs and the harms that have been done

3   have to be paid back.

4          Now, we're here today for the sentencing

5   on the two counts to which Mr. McGraw pled guilty.

6   And there's a number of factors for the Court to

7   consider.

8          But I would just like to say this.  In

9   hearing him speak, Mr. McGraw had a tough childhood.

10  And really, I feel sad for him, but yet what he had.

11  And then he didn't have the benefit of a public

12  school education.  He was homeschooled.

13         His socialization skills.  I will say,

14  when I first met Mr. McGraw, he was a very difficult

15  person to get along with.  You know, he said bad

16  things.  You know, he was difficult to get along

17  with.  He said bad things about me.  He said bad

18  things -- he said some bad things.

19         (Audience laughing.)

20         THE COURT:  I'll just guess the rest.

21         MR. DURDEN:  But you know, he never said

22  anything bad about his mom.  You know, it takes a

23  lot to forgive somebody.  A mother who would walk

24  out on her own child, leave him, leave him to fend

25  for himself, it takes a lot to forgive that.  Jesse

1    has that kind of forgiveness.

2              Thank you, Your Honor.

3              THE COURT:  Thank you, Mr. Durden.

4              Ms. Heath, just so the record is clear,

5    why don't you give us some preparatory remarks about

6    what you're going to be offering the evidence on.  I

7    know you've already said that.  But we're at that

8    the juncture now, so go ahead.

9              MS. HEATH:  Not in any particular order,

10   but the government has filed objections to the

11   presentence report and the second addendum,

12   basically objecting to the fact that Mr. McGraw's

13   role in the offense was not taken into

14   consideration.  It's the government's contention

15   that he is a leader and organizer, and we would like

16   to present evidence on that.

17             Connected to that would be the loss

18   figure, the intended loss.  The government has

19   objected to the fact that the intended loss did not

20   cover all that could reasonably be foreseen from the

21   defendant's conduct in this case.  And therefore, we

22   have objected to the presentence report and the

23   addendum.

24             Additionally, again connected to the loss

25   and the role in the offense would be the number of

1    victims actually impacted by Mr. McGraw's conduct.

2            And then finally, all of that also comes

3    into play with regard to our motion for upward

4    departure in this case.  And the upward departure

5    not only includes those factors, but also includes

6    Mr. McGraw's attitude, as could be seen from the

7    offense in this case, and from the evidence that the

8    government has in its possession, which would

9    include any phone conversations or recordings made

10   by Mr. McGraw or letters written by Mr. McGraw

11   showing what his intent was even during the period

12   of time that he's been incarcerated.

13           The government has a representative from

14   the hospital to present some information about the

15   reasonably foreseeable impact and loss figure that

16   could be assessed, based on Mr. McGraw's conduct,

17   and also has at least one, if not two, of the

18   special agents, Special Agent Singh and Special

19   Agent Lynd, that could testify regarding

20   Mr. McGraw's conduct that resulted in the loss that

21   we are presenting and the number of victims we're

22   presenting and in the role in the offense.

23           THE COURT:  All right.

24           MS. HEATH:  First, we would like to call

25   Robin Shaw.

1              THE COURT:  Agent Shaw.

2              MS. HEATH:  No, just Robin Shaw.

3              THE COURT:  Ms. Shaw?

4              MR. DURDEN:  And Your Honor, if I may, the

5    defense's case was presented along the lines of the

6    second addendum to the presentence report.

7              And I do understand, as the Court has

8    pointed out, that under Rule 32, subpart (i)(2),

9    that the government has a right -- again, the PSR

10   report and the addendum are the primary evidence,

11   and the government does have a right to introduce

12   evidence on the objections.

13             I'm just going to ask which objection.  Is

14   this I or II?

15             THE COURT:  If you can clarify.  Again, I

16   think they're entitled to -- there's a lot of

17   complexity, a lot of detail in this case.  It's

18   unusual.  It's more technologically advanced than

19   most of the cases we deal with.

20             I have no problem with the government

21   trying to clarify some things, and I think they have

22   clearly raised it with their two lengthy briefs.

23   But if you can do that for him, that would might be

24   helpful.

25             I'm pretty sure she has this set forth in

```
 1   her objections, Document 84.

 2           MS. HEATH:  Ms. Shaw's testimony will go

 3   to --

 4           MR. DURDEN:  I think paragraph number 1,

 5   the probation officer --

 6           THE COURT:  I'll tell you what,

 7   Mr. Durden.  Let's do this.  I'm very comfortable

 8   that everything they're intending to offer is along

 9   the lines of what they've objected to or somehow in

10   response to something that you've raised.

11           We can clarify this before we finish, but

12   I don't want to spend a lot of time right now trying

13   to do that.  I think we're talking about the

14   intended loss.  It's absolutely no secret that's a

15   been a big contention of the government since the

16   very first presentence report came out.

17           So we'll take a short break at some point

18   so perhaps we can clarify that.  But I don't think

19   it in any way precludes them from offering evidence

20   on these issues that were clearly raised by the

21   objections in the presentence report long before

22   today.

23           All right.  Come on up, Ms. Shaw.

24           MS. HEATH:  I did find it.  It's on page 4

25   of the second addendum, and it's paragraph III.
```

1            MR. DURDEN:  Okay.  Thank you.

2            THE COURT:  Raise your right hand.

3                        **ROBIN SHAW,**

4    **having been first duly sworn, testified as follows:**

5                   **DIRECT EXAMINATION**

6    **BY MS. HEATH:**

7    Q.   Please state your name and how you are

8    employed.

9    A.   My name is Robin Shaw.  I am the regional vice

10   president of a company called United Surgical

11   Partners.  And we manage North Central Surgical

12   Center, which is the hospital.

13   Q.   And within the building on Central Expressway,

14   what entities are there?

15   A.   There is the Carrell Clinic; there are several

16   physician offices; there's a pharmacy, and then

17   there is our surgical hospital.

18   Q.   Where in the building is the surgical hospital

19   located?

20   A.   It occupies the first floor of Tower 1.  Our

21   emergency room is in Tower 2, on the first floor.

22   We also have a patient care unit, which is --

23            THE COURT:  Slow down just a little bit.

24   A.   We have a patient care unit, 25 beds for

25   overnight stay for patients, on the second floor of

1   Tower 2.

2   Q.   Briefly, what is your background that leads you

3   to this position?

4   A.   I'm a registered nurse, and I've worked in

5   outpatient surgery centers and was an administrator.

6   Now I'm the regional vice president of eight

7   facilities in the Dallas area, two hospitals and six

8   outpatient surgery centers.

9   Q.   So I take it that you're traveling quite often

10  during the day around to the different locations?

11  A.   Around just the Dallas area.

12  Q.   Let me direct your attention back to June of

13  2009 and ask you if you became aware of an incident

14  where the computers had been hacked into at the

15  Carrell Clinic Building.

16  A.   I was called by one of my personnel at the

17  hospital.  I was at another facility that was about

18  five miles away.  And they told me there was a

19  situation going on, so I drove up to North Central.

20  Q.   What was your responsibility with regard to the

21  situation that you were told about?

22  A.   I was told that there was a potential

23  compromise of our computer system, and we weren't

24  sure to the extent that our system had been

25  compromised.

 1       We have actually two computer systems.  One

 2  manages all of the patient accounting information.

 3  It has all of the billing information for patients.

 4  And the other is the system that manages the air

 5  conditioning system of our facility.

 6  Q.   And with regard to the -- were both computers

 7  affected, both systems affected?

 8  A.   We weren't sure at that time.  We had to do

 9  research.  We have computers that are located

10  throughout our facility.  I couldn't even tell you

11  how many computers there are.  But there are over, I

12  would say, 50 computers throughout the facility,

13  printers and fax machines.

14       So we had to go into each system and check and

15  verify to see if that system had been compromised.

16  Q.   And if you could let the judge know

17  approximately what size of a team was involved in

18  trying to determine what damage had been done.

19  A.   We had a team of, let's see, probably five

20  people that are direct employees.  And then our home

21  office is in Addison, so we have a computer network

22  that's based there.

23       And the specialists were involved, as well.  So

24  there were, I don't know, maybe three or four of

25  them checking all of the computers to make sure

1   there was no compromise.

2   Q.   And a while ago, at the government's direction,

3   you helped prepare a summary of different costs or

4   dollar figures related to that intrusion back in

5   June of 2009; is that correct?

6   A.   Correct.

7   Q.   And I believe that's Attachment D to the

8   Government's Comments, Corrections, Objections to

9   the Presentence Report.

10       And with regard to the information on

11  Attachment D -- and you have that in front of you;

12  is that correct?

13  A.   I do.

14  Q.   -- you did identify the personnel costs

15  directly associated with the discovery of the

16  compromise.  Is that what you're talking about now?

17  A.   We did.

18  Q.   And what time was put in to determine what the

19  compromise was, just in general?

20  A.   Oh, it was -- I would think it was hours, maybe

21  two days' worth of work, of research, a day and a

22  half.

23  Q.   And do you recall whether or not both systems

24  that you have described were compromised?

25  A.   No.  Only our HVAC system was compromised.  I

1    don't believe our patient accounting system was

2    compromised.

3    Q.    With regard to the HVAC, how is your location

4    set up, and where is the HVAC located?

5    A.    The computer closet where the HVAC is located

6    is on the first floor, behind the lounge.  There are

7    several doors of access.  And then that door is

8    locked with a key, so it's very secure.

9    Q.    And the HVAC is the heating and ventilation and

10   air conditioning system; is that correct?

11   A.    Correct.

12   Q.    And how does that particular system impact the

13   surgery center?

14   A.    Well, there are two different types of supplies

15   that you have in a hospital or surgery center.  One

16   are implants, bone; there are tendons; there are

17   different implants that you can implant in patients

18   during different surgical procedures.

19        Those have to be maintained either frozen, cool

20   or room temperature.  If they're heated to above

21   room temperature or where they're not supposed to

22   be, outside the acceptable range, then they have to

23   be discarded.

24        There are supplies that have to be kept at room

25   temperature.  If they are outside room temperature

1   and the humidity goes up, they have to be discarded.

2   They can't be resterilized and used.

3       There is also instrumentation that you have

4   that has to be kept at room temperature.  And if

5   that goes outside that safe range, it has to be

6   resterilized.  So there are some items you can

7   resterilize and use, and others that you have to

8   discard.

9   Q.   Did you make a determination -- when you were

10  trying to ascertain what damage could have been done

11  had the heating and air conditioning system been

12  compromised to the point of affecting the

13  temperature, did you determine what supplies and

14  equipment was on hand at that time?

15  A.   That's correct.  And we do a quarterly

16  inventory, so we have an idea every three months

17  where we go back and true up our supplies.  You

18  know, your pharmaceuticals are huge because a lot of

19  those pharmaceutical items are kept at room

20  temperature.

21  Q.   In June of 2009, had you, just within the

22  month, done a calculation of what supplies you had

23  on hand?

24  A.   I believe we did that at the end of May.

25  Q.   And the information that you have on

1    Attachment D, which sets out the supplies, the

2    pharmaceuticals, the implants, with a cost next to

3    it, what does that indicate?  Was that the supplies

4    that were on hand at the time?

5    A.    With -- I'm sorry, which?

6    Q.    In the Supplies and Pharmaceuticals At Risk

7    section --

8    A.    Um-hum.

9    Q.    -- where you have the supplies listed,

10   pharmaceuticals --

11   A.    These were implants on our shelves at the time.

12   Q.    And these are the implants that had the

13   temperature --

14   A.    They are all temperature sensitive.

15   Q.    And so you would have lost those particular --

16   A.    These items would have had to have been

17   discarded.  You can't sterilize them to make them

18   okay, once they're out of range.

19   Q.    The total amount would have been $135,095?

20   A.    That's correct.

21   Q.    The next column down talks about costs

22   associated to resterilize.  Is that what you just

23   talked about, as far as there are certain

24   instruments that, if they had been affected by the

25   heat and humidity, they would have needed to be

1    resterilized?

2    A.    Correct.  You don't have to discard them, but

3    you need to reprocess them.

4    Q.    And the costs that you have associated with

5    those particular instruments total $5,945, is that

6    correct?

7                THE COURT REPORTER:  I'm sorry, Ms. Heath.

8    Can you ask that question again, please?

9    Q.    (By Ms. Heath)  And the value that you

10   associated with the instruments that needed to be

11   resterilized, had the temperature gone beyond where

12   it needed to be, was $5,945?

13   A.    Yes, ma'am.

14   Q.    Additionally, you were asked about what

15   procedures were occurring over the July 4th weekend,

16   which was the target date for -- and I will present

17   evidence on this a little later.  But that was the

18   target date for what the defendants intended

19   compromise was going to affect?

20   A.    Correct.

21   Q.    And so you were asked to determine, with regard

22   to the patients that were on hand or that had

23   appointments set up, what loss the hospital -- or

24   what the hospital would have to do in order to

25   accommodate a potential compromise at that time?

1    A.    That's correct.  If we had patients that had

2    had surgery and they were in the hospital without

3    air conditioning over the 4th of July, we would have

4    had to make arrangements at another facility and

5    have them transported.

6    Q.    And according to your calculations and the

7    potential revenue lost and costs associated to

8    transport patients, you had approximately 12

9    patients that were in-patients; is that correct?

10   A.    On this calculation, those were 12 patients

11   that were scheduled to have surgery on that Monday

12   that would have had to be canceled, and that revenue

13   would have been lost.

14   Q.    And had the procedures started and they were

15   actually in-patients there, there would have been a

16   cost to transport each of them; is that correct?

17   A.    Yes.

18   Q.    And then the line 25 above that I believe

19   indicates 43 patients had actual appointments on

20   that Monday; is that correct?

21   A.    Correct.

22   Q.    And having to have canceled those and not able

23   to reschedule them would have been $431,000; is that

24   correct?

25   A.    Correct.

1   Q.   Now with regard -- let me go back down to the

2   personnel costs that we talked about earlier.

3         And you have listed yourself and some of the

4   other individuals that worked to determine what the

5   compromise affected, what systems were affected,

6   what efforts were made by the hospital or by the

7   surgery center to repair what compromise had

8   occurred?

9   A.   I'm not sure what all our IT Department did.

10  But I know they spent a lot of time going in and

11  trying to determine where the compromise was and how

12  they could fix it.

13  Q.   And then the final line, number 39 on the

14  personnel costs, shows Fort Knox Security Company.

15        Let me take a step back.  Mr. McGraw was

16  employed by another security company that was

17  contracted with the surgery center or the hospital,

18  the building, to provide security; is that correct?

19  A.   Correct.  We felt we needed security for our

20  employees and our patients.  And so we contract with

21  another security company to -- there was another

22  security company that was contracted by the building

23  to secure the parking lot, make sure it's safe and

24  the doors were secured.

25        And so when this situation happened and it was

1   our security guard who was doing the hacking or

2   whatever into the computer, then we were very

3   frightened for our patients and our employees.

4       So we went outside and got another security

5   because we felt we were defenseless then.  And we

6   wanted to make sure we were, you know, provided that

7   security.

8   Q.   And that was done?

9       And the cost indicated here was only for a

10  limited time from the realization that the computers

11  in the building had been comprised to just shortly

12  after the July 4th weekend, July 11, 2009; is that

13  correct?

14  A.   Yes.

15  Q.   And for that cost, it was $8,244?

16  A.   Yes, ma'am.

17  Q.   Now, you mentioned the security person's

18  responsibility to watch not only what was happening

19  in the building, but to watch the parking garage and

20  the exterior of the building, too; is that correct?

21  A.   Correct.

22  Q.   And although there is not necessarily a value

23  associated with it, let me ask you about the second

24  page of Attachment D, where it talks about security

25  issues from November of 2008 to that July 4th

1    weekend.

2         Had there been crimes committed on the property

3    during that period of time?

4    A.   Yes, ma'am.  I don't have that attachment, but

5    I can just tell you from memory that there were.

6         We had a break-in into the pharmacy of the

7    building, not the hospital.  And there had been

8    also, I think, break-ins into some of the offices in

9    the building in the past.

10   Q.   And in some of the cars in the parking lot?

11   A.   There were cars stolen from the parking lot and

12   break-ins.

13   Q.   And you're not here today to testify about

14   Mr. McGraw personally or what his intent was or how

15   he actually did the compromise; is that correct?

16   A.   No, ma'am.

17             MS. HEATH:  Your Honor, pass the witness.

18             THE COURT:  Before we get into the cross,

19   I need to take about a five-minute break.  So we

20   will break for five minutes and we will start the

21   cross.

22             (Recess taken from 4:13 to 4:26.)

23             THE COURT:  Mr. Durden.

24                    CROSS-EXAMINATION

25   BY MR DURDEN:

1    Q.   Ms. Shaw, my name is Todd Durden, and I am the

2    attorney for the defendant in this case, Jesse

3    McGraw, and I'm going to ask you some questions.

4         And if I ask any question in a way that you

5    don't understand it, please let me know and I will

6    be glad to rephrase it.

7    A.   Okay.

8    Q.   Now, the attorney for the government asked you

9    some questions about losses that could have

10   happened.  And in fact, she referred to

11   Attachment D; is that correct?

12   A.   As what?

13   Q.   She referred to what was Attachment D.  It was

14   a spreadsheet that you have there.

15        Okay, very good.  Thank you.  I think I have a

16   copy of that.

17        Now, I notice a lot of these are costs that you

18   say if something had happened, then another cost

19   would have been incurred; is that correct?

20   A.   Yes.

21   Q.   Things like at-risk supplies.  If the system

22   had been compromised and gone down, those supplies

23   would have been lost; is that correct?

24   A.   Yes.

25   Q.   And potential lost revenue and lost costs if

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**

1   the patients had been canceled, like $431,000 and

2   $290; is that correct?

3   A.   Yes.

4   Q.   But that didn't happen, did it?

5   A.   No.

6   Q.   Now I'm going to ask you some questions about

7   actual out-of-pocket amounts that were spent.

8   A.   Okay.

9   Q.   Now, it looks like the costs associated to

10  resterilize the instrumentation, were those actual

11  costs?

12  A.   No.  That's what it would have cost if we had

13  to resterilize the instrumentation.

14  Q.   So the at-risk supplies are not actual costs or

15  the resterilizations are not actual costs that were

16  incurred, correct?

17  A.   Correct.

18  Q.   Then the potential lost revenue and lost costs

19  associated to transport patients were not actual

20  costs incurred, either?

21  A.   That's correct, they were not.

22  Q.   Now, were there some out-of-pocket costs

23  incurred after this event took place?

24  A.   Yes.

25  Q.   What are those actual out-of-pocket costs?  Is

72

1   that the one here --

2   A.   Personnel costs directly associated with the

3   discovery.

4   Q.   These are actual out-of-pocket costs?

5   A.   Yes.

6   Q.   Okay.  Now the Knox Security Company, we have

7   that down -- that was the new security company that

8   you got; is that correct?

9   A.   That was the security company that the hospital

10  actually hired because of this event.

11  Q.   Okay, okay.  Was that in addition to the

12  regular security company, or is it --

13  A.   Correct.

14  Q.   Is it a new one?

15  A.   It was new to this time.  At the time this

16  happened, we had only the building security in

17  place.

18  Q.   Okay.

19  A.   So after this happened with building security,

20  we decided to get our own security until it was

21  resolved.

22  Q.   Okay, okay.  So I'm just going to do some math

23  here.  As far as actual out-of-pocket costs, I see

24  the 2,000, the 8,244 and -- I'm going to try to do

25  some math quickly -- it looks like about 1,000 of

1   other personnel costs there.  So that looks like

2   it's about 11,244 -- 11,250, more or less, of actual

3   out-of-pocket costs?

4   A.   That's correct.

5   Q.   If Mr. McGraw repays that, would you feel that

6   he's made restitution in this case?

7   A.   I don't know, sir.

8   Q.   Okay, okay.  But that's the actual

9   out-of-pocket loss that your company had; is that

10  correct?

11  A.   That is correct.

12           MR. DURDEN:  I'll pass the witness, Your

13  Honor.

14           THE COURT:  Redirect?

15           MS. HEATH:  No, Your Honor.

16           THE COURT:  Thank you.  May this witness

17  be excused?

18           MS. HEATH:  Yes, Your Honor.

19           MR. DURDEN:  Yes, Your Honor.

20           THE COURT:  Ms. Shaw, you may be excused.

21  Thank you very much.

22           Call your next witness, Ms. Heath.

23           MS. HEATH:  Yes, Your Honor.  The

24  government calls Agent Singh.

25           THE COURT:  Agent, come on up here.  Raise

```
 1   your right hand.
 2                        AJEET SINGH,
 3   having been first duly sworn, testified as follows:
 4                      DIRECT EXAMINATION
 5   BY MS. HEATH:
 6   Q.   Please state your name for the record.
 7   A.   My name is Ajeet Singh, S-I-N-G-H.
 8   Q.   And how are you currently employed?
 9   A.   I'm currently a supervisory special agent in
10   the FBI Cyber Division in Washington, D.C.
11   Q.   When did you go to Washington, approximately?
12   A.   April 26, 2010.
13   Q.   Back in June of 2009, what was your position?
14   A.   I was a special agent on the Dallas Cyber
15   Squad.
16   Q.   Were you one of the case agents working on the
17   case involving Jesse McGraw?
18   A.   Yes, I was.
19   Q.   Now, with regard to this case, describe an
20   overview of what you, as an FBI agent, case agent,
21   did to investigate this matter.
22   A.   We received a lead from our office in -- gosh,
23   it was a resident agency near Mississippi State.
24   Agent Provine provided me with some e-mails and some
25   other documentation related to a possible hack at a
```

1    local area hospital.  Hack, you know, a computer

2    intrusion.

3    Q.   And ultimately you had search warrants that

4    were issued; is that correct?

5    A.   Correct.  We had issued search warrants once we

6    identified who we believed had committed the

7    intrusions.  We had a search warrant on his

8    apartment and his two vehicles.

9    Q.   And a criminal complaint to arrest him?

10   A.   And a criminal complaint to arrest him,

11   exactly.

12   Q.   That was done during his shift, security shift

13   at the hospital; is that correct?

14   A.   Right.  We determined the best place to locate

15   him was -- after we acquired the complaint the same

16   day, which we got at 9:00 at night, we just executed

17   the arrest warrant at 11:00, when he showed up on

18   the scene.

19   Q.   Were you one of the arresting agents of

20   Mr. McGraw?

21   A.   Yes, I was.

22        MR. DURDEN:  Your Honor, I'm going to

23   object to that question and this line of questioning

24   as being overly broad.

25        We're here, Your Honor, for a hearing

1    under Rule 32 of the Federal Rules of Criminal

2    Procedure.  We've had a presentence investigation

3    report and a supplement, and all of these things are

4    set forth there.  We're here now for a hearing on

5    objections under 32(i)(2).

6              THE COURT:  Mr. Durden, let me look into

7    this first before you spend as much time objecting

8    that she was going to do spend asking him the

9    questions.

10             I'm taking it this goes to one of these

11   areas you have pointed out, Ms. Heath.  We're not

12   going back through the entire background of the

13   case?

14             MS. HEATH:  No, Your Honor.  I was getting

15   up to then he interviewed the defendant and some

16   statements that the defendant made towards his role

17   in the offense.

18             THE COURT:  I thought that's where she was

19   going.  I'm fine with the background.  Overruled for

20   right now, but I think you make a good point.  I

21   don't think that's where she is going.  Go ahead.

22             MS. HEATH:  Thank you, Your Honor.

23   Q.   (By Ms. Heath)  So you were one of the

24   arresting agents of Mr. McGraw?

25   A.   That is correct.

1   Q.   At his arrest, did he make statements?

2   A.   Yes, he did.  We arrived there.  And one of the

3   first things he said to us, was this about Ghost

4   Exodus?

5        But at that time, we hadn't secured the scene.

6   We hadn't gotten another security guard from the

7   company out there.  So I told him essentially we

8   would talk to him later about it.

9        And then I went out to make sure we got another

10  security guard for the hospital.

11  Q.   Did you have an opportunity, later that evening

12  or early the next morning, to interview Mr. McGraw?

13  A.   Yes, we did.  We brought him back to our field

14  office, just outside of Stemmons Freeway at One

15  Justice Way.  And myself and Agent Lynd, who is also

16  in the room, interviewed him.

17  Q.   And at that time Mr. McGraw admitted to hacking

18  into the Carrell Clinic computers?

19  A.   That's correct.

20  Q.   Did he indicate to you or state why he did

21  that, what his intent was?

22  A.   We asked him why he did it and why he posted

23  the videos, which we showed him.

24       And he said, as a leader, you have to show that

25  you can do things.  So my understanding was that his

1  intent was to show other people what he was doing.

2  Q.   Did he indicate at any point that his intent

3  was to do a distributed denial-of-service attack on

4  rival hacker groups?

5  A.   Yes.  We asked him what Devils Night was.  He

6  refers to Devils Night as July 4th.  And he was

7  going to conduct a denial-of-service attacks against

8  rival --

9  Q.   I'm sorry.  You said a what?

10 A.   Denial-of-service attacks.

11         THE COURT:  I have a question, Agent, and

12 I just missed this.  And that is:  When you're

13 talking about the questions about him posting, is

14 this the area where he had posted pictures of the

15 HVAC computer system?

16         THE WITNESS:  We did show him the pictures

17 of those postings, but also of the YouTube videos

18 that he had posted online.

19         THE COURT:  Which reflected what?

20         THE WITNESS:  His intrusion into what we

21 refer to as the Pink Flamingo computer in the

22 Carrell Clinic.

23         THE COURT:  Okay.  I was just trying to

24 see if what you were talking about related back to

25 the offense conduct in this case.  Okay, go ahead.

1          MS. HEATH:  And actually, we have the

2    videos, if the Court would like to see any portion

3    of those videos.

4          THE COURT:  All right.

5    Q.   (By Ms. Heath)  So Mr. McGraw was explaining to

6    you that he was going to engage in a distributed

7    denial-of-service attack on a rival hacker group; is

8    that correct?

9    A.   Yes, using the computers at the hospital.

10   Q.   And a distributed denial-of-service attack is

11   something we've been referring to as DDoS, D-D-O-S;

12   is that correct?

13   A.   Right.

14   Q.   What exactly is a DDoS attack?

15   A.   Essentially, a DDoS attack is when you have

16   multiple computers attempting to communicate with a

17   single computer, in the hope that the multiple

18   communications would use up all the resources on the

19   victim computer so that it would not be accessible

20   to legitimate users.

21   Q.   How is it that repeated or multiple computers

22   repeatedly contacting a single victim computer would

23   cause damage to the victim computer?

24   A.   Well, one of the resources of the computer will

25   be used.  So it would be slower and could

80

1    potentially be open for reprisals from the other

2    group.  In this case, Anonymous was one of the

3    groups that Mr. McGraw was planning to attack.

4        I don't know if you've seen the news, but they

5    were responsible for retaliation after the Wikileaks

6    arrest of Bradley Manning where they attacked

7    PayPal, took the PayPal servers offline.

8    Q.   So one of the rival hacking groups that

9    Mr. McGraw identified for you was Anonymous; is that

10   correct?

11   A.   Yes.

12   Q.   Did he identify any other rivals or enemies of

13   his organization?

14   A.   Anonymous was the primary one.  But he also

15   indicated several IRC, Internet Relay Chat,

16   channels, where other groups -- 4chan was one of

17   them.

18   Q.   What is an IRC channel?

19   A.   Essentially, an IRC channel is a chat room or

20   similar to an instant messenger, except multiple

21   people get on there and they can talk about whatever

22   their interests are or hobbies.

23       It's also a forum where hackers exchange tools,

24   where identity thieves sell identities, buy

25   identities.

1   Q.   And can an IRC channel such as 4chan be a

2   victim for this type of DDoS attack by multiple

3   computers?

4   A.   Yes.  Any service that's running on the

5   Internet could be a victim to this.

6   Q.   Did Mr. McGraw tell you anything about his

7   hacking organization?

8   A.   Yes.  He said that he had started it with

9   another individual.  I believe it was Nyk0N.

10   Q.   Is that N-I-K-O-N?

11   A.   I believe it's N-Y-K zero N, I believe.

12        And that the individual who was known as

13   Immortal first posted the HVAC pictures and provided

14   them to a Mr. Wesley McGrew.

15        He talked about knowing who Immortal was and

16   that Immortal was potentially a cooperating witness

17   for the Department of Defense.

18        He also had in his possession notebooks, which

19   had identifiers of the individuals by true name,

20   what he believed was their true names, and also

21   their identifiers.  He provided phone numbers to us.

22   Q.   During that first interview of Mr. McGraw right

23   after his arrest, did he write down for you the

24   names of some of the individuals that were members

25   of his Electronik Tribulation Army, his hacking

1   group?

2   A.   Yes, he did.

3         MS. HEATH:   Your Honor, may I approach the

4   witness?

5         THE COURT:   You may.

6   Q.   (By Ms. Heath)   Let me show you Government's

7   Exhibit 2 and ask you if this is the document

8   written by Mr. McGraw indicating the list of some of

9   his ETA members.

10  A.   That is correct.

11  Q.   And on the remaining pages here, does it also

12  just indicate some other passwords or other

13  information that Mr. McGraw had at his disposal that

14  he was providing to the FBI?

15  A.   Yes.   He provided us with his common passwords.

16  And also at that time he provided consent for us to

17  look at his e-mail accounts, as well.

18  Q.   On page -- I believe it's page 3 of the

19  document, does it indicate additional phone numbers

20  for some of the people that are mentioned on the

21  front, the first page of Government's Exhibit 2?

22  A.   Yes, it does.

23        MS. HEATH:   Your Honor, at this time the

24  government would offer Government's Exhibit 2.

25        THE COURT:   Let's make sure Mr. Durden has

1    had a chance to see it.

2              MR. DURDEN:  For what purpose, Your Honor?

3    I would ask the government for what purpose they are

4    offering Exhibit Number 2.

5              THE COURT:  I think it would be your place

6    to offer an objection.

7              MR. DURDEN:  I object to this, Your Honor.

8    I object to this as irrelevant.  I don't believe

9    it's related to any of the issues pertaining to the

10   objections, and I cannot see why they are offering

11   this document at this time.

12             THE COURT:  Ms. Heath?

13             MS. HEATH:  Your Honor, this is a list of

14   some of the members of the Electronik Tribulation

15   Army, which, from further testimony, will show that

16   they were also involved in defacing computers and

17   hacking into computers in preparation for this

18   Devils Day, this July 4th attack.

19             THE COURT:  Again, it all has to relate,

20   though, to the offense conduct here.  I've heard the

21   agent talk about the discussion that he was sending

22   these pictures around of the inside of this HVAC

23   computer that's directly involved in this case.  So

24   that indicates to me that there is some involvement.

25             But otherwise, I'm wondering if we're not

84

1   going a little far afield with connecting all these

2   entities back to this case.

3           MS. HEATH:  Your Honor, in the factual

4   resume, the defendant also admits to the fact that

5   the reason that he committed a 10-30 violation at

6   the Carrell Clinic was to commit further 10-30

7   violations, which would be DDoS attacks on rival

8   gang members or rival hacker groups; and that the

9   intrusions at the Carrell Clinic were a portion of

10  the bigger picture, which are the intrusions of all

11  these other computers that they had to get control

12  of so they then could do this DDoS attack on the

13  rival hacker groups.

14          The more computers you have, the more

15  power you have to take down the system somewhere.

16          THE COURT:  All right.  Mr. Durden?

17          MR. DURDEN:  Thank you, Your Honor.  May

18  it please the Court?

19          Mr. McGraw pled guilty to two counts of an

20  indictment.  And there is a 14-count superseding

21  indictment out there that he is not on trial for and

22  we are not here to hear today.  We are here to hear

23  evidence as to Rule 32(i)(2), which is related to

24  the objections that the government has made.

25          And my understanding was that this list of

1    persons was something to do with whether or not they

2    were -- that my client was somehow a leader because

3    he would have supervised them.  That was my

4    understanding of why this list was being offered and

5    what his testimony was going into.

6              If that's the case, I would like to take

7    the witness on voir dire.

8              THE COURT:  Okay, here's what I'm going to

9    do.  Give me just a moment before I make a ruling.

10   I want look to look at something real quick.

11             The Rules of Evidence don't really apply

12   to a sentencing proceeding, other than to the extent

13   that they affect due process, right to

14   cross-examine, all of that.

15             This, as I understand it, is something

16   that the agent can identify as something that was

17   prepared by the defendant?

18             THE WITNESS:  Yes, correct.

19             THE COURT:  So I don't see a confrontation

20   issue there.  I understand that it probably goes far

21   afield from what I also agree is the offense conduct

22   in the case, but I'm not convinced it doesn't touch

23   on the offense conduct.

24             So I think your objection goes to the

25   weight and not to the admissibility.  I don't agree

1   with what I'm understanding the government's present

2   theory is, that this offense conduct extends as far

3   as what's described in this paperwork.  But I think

4   there's some connection that comes in the paperwork

5   to the offense conduct.

6           So I overrule your objection.  You can

7   take him on voir dire when it's your turn to cross.

8   Okay.

9           MR. DURDEN:  Thank you.

10          MS. HEATH:  If we can show Government's

11  Exhibit 2, if we can show the top half of the list

12  of names.

13  Q.   (By Ms. Heath)  Agent Singh, you were present

14  when Mr. McGraw was providing this information and

15  writing this information; is that correct?

16  A.   Correct.

17  Q.   And what does this list of words mean, from

18  what Mr. McGraw told you?

19  A.   On the left would be the handles of ETA

20  members, in the center is what he believes are their

21  real names, and on the right are possible aliases

22  and locations.

23  Q.   So for example, Nyk0N, the one you mentioned

24  N-Y-K zero N, is Kevin Gibbs?

25  A.   Correct.

1   Q.    C0aX is Ben Nichols?

2   A.    Correct.

3   Q.    And Cr4sh 0verr1d is James Smith; is that

4   correct?

5   A.    Correct.

6   Q.    And so on and so forth all the way down the

7   list; is that correct?

8   A.    Correct.

9   Q.    In fact, on this Government's Exhibit 2, which

10  I'll bring up in a moment, there's also a Splaxor;

11  is that correct?

12  A.    That is correct.

13  Q.    On the additional pages -- and I'm not going to

14  show them at this moment -- but Mr. McGraw also

15  provided his different accounts that he had, e-mail

16  accounts, YouTube accounts and things like that; is

17  that correct?

18  A.    That is correct.

19  Q.    And from some of those accounts -- you can take

20  Number 2 down.

21        From some of those accounts, you were able to

22  find videos and other presentations prepared by

23  Mr. McGraw; is that correct?

24  A.    Correct, including one for Devils Night, where

25  he was recruiting members to -- in fact, other

1    machines added to the botnet for the attack.

2    Q.    Now with regard to what Mr. McGraw was doing in

3    the Carrell Clinic, that building on Central

4    Expressway, you were one of the agents that actually

5    examined the computers or the data from the

6    computers from that building; is that correct?

7    A.    That is correct.

8    Q.    Okay.  With regard to the offense that was

9    committed so he then could branch out and show how

10   the other individuals were also involved in the same

11   type conduct, what was he actually doing with the

12   computers at the Carrell Clinic?

13   A.    I believe he was preparing to use them in his

14   denial of service, but also using them for personal

15   Web browsing.

16        We found e-mail on there from his Web mail

17   accounts.  We found other malware on there.  We

18   found remote access programs, LogMeIn, that was on

19   there, which allowed him to have access to those

20   systems.

21        And also in his interview, he advised that he

22   had shared user names and passwords with other

23   members of the ETA group to access those systems.

24   Q.    Now, you indicated that he accessed these

25   computers.  Most of the access was physical access,

1    is that correct?

2    A.    Correct.

3    Q.    So he's actually sitting down at the computer?

4    A.    For the most part, correct.

5    Q.    When he's sitting at the computer, how is he

6    able to get access to the computer?  What was he

7    doing to the different computers?

8    A.    The best I could tell is he was using a tool

9    called Ophcrack.

10   Q.    And that's O-P-H --

11   A.    It's O-P-H-C-R-A-C-K.

12   Q.    -- crack?

13   A.    Yeah, crack.

14        And at the time I had found evidence that he

15   had downloaded that on the HVAC system downstairs.

16   He was then taking that and then inserting it into

17   other computers.

18        Ophcrack allows you to recover passwords from

19   Windows-based systems.  So essentially you put in

20   the disk, start the computer up, and it launches the

21   Ophcrack application before it even goes into the

22   normal Windows operating system.

23              THE COURT:  Excuse me.

24              MR. DURDEN:  Your Honor, I'm going to

25   object to this evidence as being repetitive under

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**

1    Rule 403.  This is all detailed at length in the

2    PSR.  There's nothing further that's being added by

3    this witness that's not present in the PSR that's

4    before the Court.

5            THE COURT:  I'm going to overrule the

6    objection.  I understand where you are coming from.

7    I don't see that this is duplicative to the extent

8    where we've had too much of it.  I'm going to allow

9    it.

10           MR. DURDEN:  Your Honor, may I request --

11   it's getting late in the day -- that the government

12   try to focus their -- I withdraw my statement, Your

13   Honor.

14           THE COURT:  All right.  Go ahead,

15   Ms. Heath.

16   Q.   (By Ms. Heath)  So the Ophcrack was used to

17   basically crack the passwords on various computers

18   so he could access and get system administrator

19   rights to some of the computers; is that correct?

20   A.   Correct, which allowed them to remove any

21   viruses and install the botnets.

22   Q.   When you say botnets --

23   A.   The bots.

24   Q.   -- what type of botnets were there, and what is

25   a botnet?

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**

1   A.   The tool that Mr. McGraw was using was called

2   Rxbot.  A botnet essentially is a group of computers

3   that are connected together via some program that

4   are not necessarily for malicious activity.

5   However, they can be used maliciously.

6        You will have either IRC-controlled bots or Web

7   http-controlled bots.

8             THE COURT REPORTER:  Can you slow down a

9   little bit?

10            THE COURT:  That's another problem.  Slow

11  down and explain or spell out what you're saying.

12  A.   Not a problem.  A botnet consists of a

13  controller and victim bots.  The controller normally

14  is either IRC, internet relay chat, or Web-based.

15  This particular bot was IRC based.

16       When you --

17  Q.   When it's IRC based, does that mean once you

18  planted the bot on the computer, the malicious codes

19  and commands, once you placed those on the computer,

20  that computer now, when it's turned on or

21  operational, it will call into the -- or log into

22  the IRC chat and sit there, waiting for a command;

23  is that correct?

24  A.   That is correct.

25  Q.   And you found evidence on multiple computers at

1    the Carrell Clinic Building of this Rxbot having
2    been put on those computers?
3    A.    Correct, on those nine computers.
4    Q.    And have you also observed a video of
5    Mr. McGraw where he's accessing a computer and
6    showing bots, calling in or logging into this IRC
7    chat room?
8    A.    Yes.  I have one video which led us to the
9    Carrell Clinic in the first place.  It showed
10   Mr. McGraw walking around the hospital, accessing a
11   computer, turning off antivirus, introducing the
12   botnet to the system.  And then the next screen cuts
13   to him pulling up the IRC channel and then showing
14   how many bots were connected.
15   Q.    And having control of bots means you have
16   control of the computer where the bot is planted.
17   A.    Correct.
18   Q.    And therefore, from this IRC channel,
19   Mr. McGraw could order all those computers then to
20   do what?
21   A.    He could order them to collect documents, to
22   reach out simultaneously and connect to a website
23   like yahoo.com.  And that's how you would get it to
24   initiate a denial-of-service attack.
25   Q.    Now, have you seen a video of Mr. McGraw where

 1   he's actually recruiting members to take over

 2   computers in preparation of Devils Night?

 3   A.   Yes, I have.

 4   Q.   And where was that found, or where did you find

 5   that video?

 6   A.   That was provided to me by the Texas Attorney

 7   General's Office, and they told me they had gotten

 8   it off of Mr. McGraw's YouTube channel.

 9          MS. HEATH:  Your Honor, the government

10   would offer into evidence that video just to show he

11   was recruiting members to do exactly what he did at

12   the Carrell Clinic, which was to take over computers

13   in anticipation of Devils Night.  That's

14   Exhibit 102.

15          MR. DURDEN:  Is this the Mission

16   Impossible  video?

17          MS. HEATH:  No.

18          MR. DURDEN:  Okay.

19          Well, Your Honor, I object because it's

20   not relevant.  It has nothing at all to do with the

21   objections before the Court.  He has two offenses to

22   which he has pled guilty, for which the Court has to

23   sentence him.

24          And this has nothing to do with whether

25   he's a leader or an organizer.  And as defined under

1   the guidelines, it's only offered for the purpose of

2   offering additional evidence, which is already

3   reflected in the PSR, and to incite and inflame the

4   finder of fact.

5           I object.  This is again overly

6   cumulative.  We have the PSR, we have the PSR

7   objections.  I just feel like, you know, if I was

8   going to have a trial -- I mean -- excuse me.

9           THE COURT:  I understand, Mr. Durden.  But

10  they have objected.  And you don't agree with their

11  objections, so they are entitled to try to prevail

12  on their objection.

13          I'm trying to make sure it's not

14  cumulative.  But I think, for the most part, they're

15  entitled to offer this.

16          Again, it doesn't necessarily mean that

17  what they're offering I think is appropriately, in

18  its entirety, supportive of the point they're trying

19  to make.

20          But otherwise, I think there's enough I've

21  heard that it goes to the issue of leader or

22  organizer, and so I'm going to admit it.

23          Is that Government's Exhibit 2?

24          MS. HEATH:  102.

25          THE COURT:  Government's Exhibit 102.

1   What was the other one?

2          MS. HEATH:   Two.

3          THE COURT:   Government's Exhibits 2 and

4   102 are in evidence.

5          MS. HEATH:   I apologize for the number

6   discrepancy, but we kept the same numbers that we

7   had provided to the defense in preparation for

8   trial.

9          THE COURT:   Go ahead.

10          MS. HEATH:   Can we play Government's

11   Exhibit 102?

12          (Video played.)

13   Q.   (By Ms. Heath)  Agent Singh, was that one of

14   many videos regarding Devils Day?

15   A.   Yes, it was.

16   Q.   Are there videos where Mr. McGraw is

17   instructing members of the ETA how to go out and

18   compromise computers?

19   A.   Yes.  He's instructing them to go to places

20   like BestBuy, Internet kiosks, and install the bot

21   that way.  Anything that's available publicly.

22   Q.   So even before somebody purchases the computer,

23   he's wanting them to place this malicious bot on

24   there?

25   A.   Correct.

1   Q.   And does he indicate how they're supposed to be
2   putting the bots on the computers?
3   A.   USB or I believe it was a flash memory card.  I
4   can't remember if it was SSD or -- one of the flash
5   memory cards.
6   Q.   So USB is a little thumb drive?
7   A.   USB is a thumb drive, right.
8   Q.   Now, you were involved in the search of
9   Mr. McGraw's house, as well?
10  A.   No, I was not.  That was happening while we
11  were interviewing him.
12  Q.   From his house, were there books seized that
13  indicated that Mr. McGraw controlled or had examples
14  of defacements and intrusions?
15  A.   Yes.  Mr. McGraw had a binder with the names of
16  members of ETA and also exploits or screen shots of
17  what they have done.
18  Q.   And the binder was divided up according to the
19  names of some of the individuals that were part of
20  the ETA, correct?
21  A.   Correct.
22  Q.   Including a big section for Mr. McGraw?
23  A.   Correct.
24  Q.   What name or handle did he go by?
25  A.   Ghost Exodus and also Genesis.

1           MS. HEATH:  Your Honor, may I approach the

2      witness?

3           THE COURT:  You may.

4      Q.  (By Ms. Heath)  Let me show you Government's

5      Exhibit 216.1 and ask you if this book is the book

6      from Mr. McGraw's house with all the different

7      screen shots of defaced pages and intrusions.

8      A.   It is.

9           MS. HEATH:  Your Honor, the government

10     would offer Government's Exhibit 216.1 into

11     evidence.

12          THE COURT:  Mr. Durden?

13          MR. DURDEN:  Same objection previously

14     made.

15          THE COURT:  Okay.

16          And Ms. Heath, can you narrow this down to

17     how this relates to this case?

18          MS. HEATH:  Yes, Your Honor.  Each one of

19     the pages in this book reflects an intrusion or

20     defacement of a particular Web page, a particular

21     system, similar to what Mr. McGraw was doing at the

22     Carrell Clinic.

23          This is evidence of him doing additional

24     intrusions to computers and, in some instances,

25     trying to gain control over those computers so they

1    could be used for Devils Day or Devils Night.

2              Also, he kept screen shots of what some of

3    the other ETA members were accomplishing in the same

4    manner, in defacing Web pages.

5              To deface each of these Web pages or to

6    intrude on these Web pages, he has to commit a 10-30

7    violation.  He has to actually unlawfully access the

8    computer and transmit codes and commands to the

9    computer, just exactly the same conduct that he did

10   at the Carrell Clinic.

11             And the other individuals in the ETA had

12   to do the exact same thing at his direction.  He was

13   the leader, he was directing them.  He was keeping

14   evidence of their successful exploits into other

15   computers.

16             THE COURT:  I'm going to sustain the

17   objection.  I think this is too far afield, under

18   the circumstances.

19             I think the evidence as to what he planned

20   to do in connection with this case and the computer

21   systems in this case and to the extent it's

22   connected to what he was doing with others, that's

23   already been -- you've established that this was

24   going to be used to encourage this all-out attack on

25   the victim computers in this case.

```
1              Beyond that, I really think it is far
2   afield.  And I really don't think it goes
3   sufficiently to the objections that you have made
4   and you are concerned with to admit it, so I sustain
5   the objection.
6   Q.   (By Ms. Heath)  Agent Singh, in addition to the
7   videos that you obtained during the investigation
8   after Mr. McGraw was arrested, there was a search
9   warrant done for Google or YouTube; is that correct?
10  A.   Correct.
11  Q.   And additional videos were obtained that
12  Mr. McGraw prepared which explained the Devils Night
13  and explained how the other individuals were
14  supposed to be assisting with this?
15  A.   Correct.
16  Q.   And I believe Government's Exhibit Number 60 is
17  the results from the Google search warrant, the
18  first Google search warrant that was done?
19  A.   Yes.
20           MS. HEATH:  And the government would offer
21  one video from Government's Exhibit 60.
22           THE COURT:  And what's the purpose of
23  that?
24           MS. HEATH:  Again, to show Mr. McGraw
25  directing other individuals to compromise computers
```

```
 1    in anticipation of Devils Night.
 2              THE COURT:  And how, again, are they
 3    connected to his direction, in your view, of
 4    individuals in this case?
 5              MS. HEATH:  The only reason Mr. McGraw --
 6    the only admitted reason Mr. McGraw compromised
 7    computers at the Carrell Clinic was in furtherance
 8    of this Devils Night.
 9              THE COURT:  I understand.  I understand
10    that theory, and you've established that as far as
11    the government's theory.
12              But what does this add to that?  Because
13    I'm not sure if this is more than you need.
14              MS. HEATH:  The rival hacker gang, hacker
15    group, is a rival to the Electronik Tribulation Army
16    of which Mr. McGraw is the leader.
17              Mr. McGraw is instructing, as a leader
18    organizer, other individuals to do exactly what he's
19    done.  He chose the Carrell Clinic Building in which
20    to compromise his computers.
21              He also compromised other computers, which
22    would be shown from the exploits in Government's
23    Exhibit 216.1.  But also, he directed these other
24    individuals to be involved in compromising
25    computers.
```

```
 1              THE COURT:  Okay.  And Mr. Durden?
 2              MR. DURDEN:  Your Honor, my objection is,
 3   as I've stated before, the Court has allowed quite a
 4   bit of latitude in going into something that's apart
 5   from the actual offenses to which Mr. McGraw pled
 6   guilty and is being sentenced for today.
 7              Any further videos, testimony, exhibits
 8   and evidence is merely cumulative and does not add
 9   to the Court's --
10              THE COURT:  I think this is cumulative.
11   And I think that to the extent it's not cumulative,
12   it's outside the offense conduct.  I sustain the
13   objection.
14   Q.   (By Ms. Heath)  One of the additional victims
15   at the Carrell Clinic Building was the Cirrus Group;
16   is that correct?
17   A.   That's correct.
18   Q.   When Mr. McGraw was arrested and searches were
19   done, was a Dell computer seized from his possession
20   that actually belonged to the Cirrus Group?
21   A.   Yes.  It was a laptop.
22   Q.   Did you talk to people at the Cirrus Group to
23   find out whether that was the only instance where
24   they had a problem with a computer?
25   A.   No.  They indicated that they had had several
```

1    laptops go missing.

2    Q.    In fact, there was a second laptop, a different

3    laptop, that Mr. McGraw had taken and returned back

4    to the Cirrus Group; is that correct?

5    A.    That's correct.

6    Q.    That's the laptop he used in a video which

7    somebody had written in Magic Marker, ETA, on the

8    laptop; is that correct?

9    A.    Correct.  And in the video, Mr. McGraw was

10   using that one.

11   Q.    In this particular video where Mr. McGraw is

12   using that laptop, sitting next to him is Splaxor,

13   another member of the ETA Group; is that correct?

14   A.    Correct.

15   Q.    And in that video, Splaxor is using an

16   identical Dell computer.

17   A.    Correct.

18   Q.    Did the Cirrus Group indicate they had multiple

19   computers disappear during the time Mr. McGraw

20   worked there?

21   A.    Yes.  I believe it was five.

22   Q.    So one of the five was the one taken in his

23   possession that the FBI seized.

24   A.    Correct.

25   Q.    A second one was one that appeared in a video

1    that had "ETA" written on it; is that correct?
2    A.    Correct.  And that's the one that appeared back
3    in the Cirrus Group's inventory, but then they
4    quarantined it.
5    Q.    When it appeared back in the Cirrus Group's
6    inventory, had it been reimaged or reformatted?
7    A.    It had been reformatted.
8    Q.    Had it been reimaged or reformatted to be a
9    duplicate of an image from another Cirrus computer
10   that was already present at the Cirrus office?
11   A.    Yes, it was.
12   Q.    Now, that particular computer, you were able to
13   find out what that computer had been doing while it
14   was gone because it had a program on it called
15   Computrace; is that correct?
16   A.    Correct.
17   Q.    Now, the remaining -- so that's two of the
18   computers.  So the remaining three computers at the
19   Cirrus Group, other than the one that may appear in
20   the video where Splaxor is using it, you're not
21   aware of where those went?
22   A.    Mr. McGraw said he had sold some online.
23   Q.    When did he tell you that?
24   A.    I think that was during a proffer session.
25   Q.    Were these other computers recovered from the

1   Cirrus Group?

2   A.   Not to my knowledge.

3   Q.   Now, for the record, any of the Web page

4   defacements that were referenced in this 216.1, did

5   Mr. McGraw actually engage in some of those himself,

6   according to how the book is set up?

7   A.   Yes.

8   Q.   And when a Web page defacement occurs --

9           MR. DURDEN:  Wait a minute.

10          Your Honor.  I think I just caught

11   something.  Is counsel referring to that book that

12   was offered as evidence, and then the objection was

13   sustained as to it?

14          THE COURT:  Ms. Heath?

15          MS. HEATH:  Yes, I think I mentioned the

16   number 216.1.

17          THE COURT:  And what is the purpose of

18   this questioning?

19          MS. HEATH:  I'm just focusing the agent on

20   those particular defacements so I can ask him

21   questions about whether a defacement is actually a

22   10-30 violation.

23          THE COURT:  Okay.  Which of your issues

24   does that go to?

25          MS. HEATH:  That would again go to the

1    number of victims involved in the case, as well as

2    role in the offense, but primarily the number of

3    victims in the case.

4            THE COURT:  But I don't know how we can

5    glean the number of victims from conduct which is

6    outside the offense conduct, which is the reason

7    that I sustained the objection.

8            I'm giving you some leeway to try to -- I

9    think you've covered all you need to cover on --

10   we've heard what you've had to say on laws, we've

11   heard what you have to say on role.  Number of

12   victims, I'm willing to listen to that.

13           But right now I agree with Mr. Durden that

14   this doesn't do that, so I sustain the objection to

15   that question.

16           MR. DURDEN:  Thank you, Your Honor.

17           MS. HEATH:  Your Honor, I, just for the

18   record, would like to indicate that we do object to

19   that, in that the offense for which Mr. McGraw is

20   being convicted is a 10-30 violation.

21           The 10-30 violation, the intent of it was,

22   of course, to gather control of computers so he

23   could do a DDoS attack, which is a 10-30 violation

24   in the bigger scheme of things.

25           THE COURT:  Don't you agree that these

1    enhancements that you are trying to get, objecting

2    that they weren't added, have to be based on offense

3    conduct?  It's a relatively broad concept.

4              But offense conduct is set forth in the

5    presentence report.  And I don't think that just

6    because a person is generally a hacker, that all of

7    their hacking activity can be considered in terms of

8    an enhancement.

9              Certainly to the extent it's connected

10   with a scheme in this case, and it doesn't have to

11   be precisely the indicted conduct, but it has to be

12   offense conduct.  And I think Mr. Durden is correct

13   on this, that you're going beyond that.

14             You can't get victims from his general

15   hacking activity to add to this case.

16             MS. HEATH:  And that's why we're not going

17   into the general hacking activity.  We're trying to

18   go into what was focused on for the Devils Day

19   attack, the July 4th, which was within several days

20   of when he was arrested, and what his focus was for

21   the Carrell Clinic.

22             THE COURT:  I think we just have a

23   difference of opinion on how far you can go on that.

24   So I sustain the objection.  If you want to ask him

25   some more questions on the victim issue, I will let

1    you do that.

2         MS. HEATH:  Your Honor, with regard to a

3    motion for an upward departure, this evidence, if

4    it's not properly considered to be part of the

5    offense conduct or part of what would be used to

6    calculate the guidelines in this case, we would

7    offer this evidence as part of the upward departure

8    to show that this defendant should be sentenced

9    higher, based on his conduct.

10        THE COURT:  Well, I think there's a fine

11   line there.  You'd have to show me some cases that

12   allow conduct that's not part of a criminal

13   conviction, criminal history, and that's outside the

14   scope of offense conduct.  How generally being a bad

15   hacker is something I can rely upon to upwardly

16   depart.  I don't know that I can, and I would

17   question whether or not I can.

18        It seems to me, when I'm looking even at

19   the 3553 factors, you look at the defendant,

20   generally his background and history, but it doesn't

21   extend to every bad thing he's ever done.  It really

22   has to be something connected to the case or

23   something like a crime that goes to his criminal

24   history.  I just don't think we can, any more than

25   you can in a trial, go to general 404(b) type of

1    evidence, which this is seeming to become to me.

2           It seems to me it has to be connected to

3    the number of victims or to properly admitted

4    evidence or considered evidence for upward

5    departure.  So I think you're going far afield,

6    Ms. Heath, on that.

7           MS. HEATH:  Your Honor, if I may have a

8    moment?

9           THE COURT:  Yes, you may.

10          MS. HEATH:  Your Honor, the only other

11   thing that I would mention with regard to the number

12   of victims in this case, during Mr. McGraw's

13   allocution to the Court, he did mention 50 or so

14   victims.  So he has identified the fact that there

15   are additional entities that were victims of his

16   conduct.

17          And you know, we would offer this evidence

18   in to be consistent with what his own intent was,

19   which was to compromise as many computers as

20   possible, not limited by the building on Central

21   Expressway, so that he could engage in this Devils

22   Night attack.

23          THE COURT:  All right, I understand that.

24   And I heard what he said, and I understand that's

25   what the government wants me to consider.

1          Is there anything else?

2          MS. HEATH:  No, Your Honor.  We pass the

3    witness.

4          THE COURT:  Mr. Durden, do you want to

5    cross-examine?

6          MR. DURDEN:  Yes, Your Honor.  Thank you.

7                        **CROSS-EXAMINATION**

8    **BY MR. DURDEN:**

9    Q.   Good afternoon, Agent Singh.

10   A.   How 'ya doin'?

11   Q.   Did I pronounce that correctly?

12   A.   Yes.

13   Q.   Now, are you familiar with the indictment in

14   this case?

15   A.   Yes.

16   Q.   Okay.  And it charges -- Count 1 dealt with

17   malicious code as to a computer, which is referred

18   to in the indictment as WBCCW125.

19        Did you have another name for that computer?

20   A.   The Pink Flamingo.

21   Q.   That was the Pink Flamingo?  Okay.  And then

22   there was the HVAC computer that was mentioned in

23   Count 2?

24   A.   Correct.

25   Q.   Now as to the offense conduct in the

1    indictment, transmitting the malicious code,

2    Mr. McGraw pled guilty to that.  Okay?

3         Is there any other person who is criminally

4    responsible for that activity, for that offense?

5    A.   For that indictment?  No.

6    Q.   Okay.  Now, I wanted to mention this.  All this

7    Devils Night and everything, Mr. McGraw told you

8    about that when you confronted him, didn't he?

9    A.   Right.

10   Q.   He could have said no, I don't want to talk to

11   you.  I don't want to give you this information.  I

12   mean he gave you a lot of information, didn't he?

13   A.   Correct.

14   Q.   Would you say he did the right thing?

15   A.   Yes.

16   Q.   Okay.  And in doing that, he might have

17   actually maybe helped aver some harm that might have

18   been caused by this future activity that might have

19   been planned for later on, correct?

20   A.   Correct.

21   Q.   And in fact, I heard you refer to proffer

22   sessions, interviews.  About how many times did you

23   meet with Mr. McGraw?

24   A.   I would say three, but I would have to check

25   the official record on that.  I think it was three

1   times.

2   Q.   Did he speak with you each time?

3   A.   He did, but only to his own actions.  He

4   wouldn't provide any information on any other group

5   members.

6   Q.   He told you what he did?

7   A.   Yes.

8   Q.   And was it helpful?

9   A.   It confirmed what we thought, yeah.

10  Q.   Okay.  Did you fly in from Washington for the

11  hearing today?

12  A.   Well, yes, I did.  But also, my kids are on

13  spring break.

14  Q.   So coming down here to visit again?

15  A.   Yeah.

16  Q.   Okay.  Well, I'm actually from

17  Washington, D.C. --

18          THE COURT:  Mr. Durden, you've been the

19  loudest complainer about wasting time.  Let's move

20  ahead.

21          MR. DURDEN:  I'll pass the witness, Your

22  Honor.

23          THE COURT:  All right.  Ms. Heath?

24          MS. HEATH:  No further questions, Your

25  Honor.

```
 1              THE COURT:  You may step down, Agent.

 2              Do you have another witness?

 3         MS. HEATH:  Your Honor, I will proffer

 4  what Agent Lynd would say with regard to some of the

 5  issues that you've indicated.

 6              THE COURT:  Okay.

 7         MS. HEATH:  Agent Lynd was involved in the

 8  affidavit for the obstruction -- for the searches of

 9  the sister's home and some of the other ETA members.

10         Agent Lynd would testify that he

11  interviewed a couple of those members of the ETA.

12  One particular member, Mr. Nichols, indicated -- who

13  went by C0aX and TheFixer -- Mr. Nichols indicated

14  that he assisted Mr. McGraw in that Rxbot, creating

15  the bot that was placed on all the Carrell

16  computers.

17              THE COURT:  My recollection is that some

18  of this is in the presentence report about the

19  Nichols connection.

20         MS. HEATH:  As far as the obstruction of

21  justice, I think it was, yes, Your Honor.

22              THE COURT:  I was just thinking it was

23  part of the offense conduct.  And maybe Ms. Foster

24  can help us out there.  But I'm pretty sure there's

25  some mention of Nichols in there somewhere.
```

1          PROBATION OFFICER FOSTER:  Yes, Your

2    Honor.  I think it is part of the information about

3    obstruction.

4          THE COURT:  Thank you.  All right.

5          MS. HEATH:  I'm offering it in a proffer

6    to show that the other members of the ETA were

7    involved in helping with the bot that was being used

8    for this Devils Night and the bot that was being

9    used for the Carrell Clinic intrusions, the bot that

10   was placed on most of the computers at the Carrell

11   Clinic.

12          THE COURT:  Your theory being again, that

13   the whole Carrell Clinic event, which is the core of

14   this cause of action, this criminal case, again was

15   part of the tools or the prospective tools for this

16   Devils Night attack?

17          MS. HEATH:  Correct, correct.  And that

18   Mr. Nichols would admit that he was part of the ETA

19   group, as did Mr. Giles.  And that they indicated

20   that they were aware and participating in the Devils

21   Night activities to attack other rival groups, and

22   so they were also involved in that.

23          THE COURT:  Thank you.  And I will accept

24   that proffer as part of the proof offered by the

25   government in this case.

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**

1          Government rests on their points?

2          MS. HEATH:  Government rests.

3          THE COURT:  Mr. Durden?

4          MR. DURDEN:  Thank you, Your Honor.  May

5   it please the Court?

6          THE COURT:  Mr. Durden.

7          MR. DURDEN:  It's our position that the

8   PSR addendum correctly calculates the number of

9   victims who sustained an actual loss.  That is set

10  forth at page 3 and 4 of the PSR addendum.

11          We've heard a lot of testimony about that.

12  But again, I think the testimony that we have heard

13  has been outside the scope of what is relevant

14  conduct, knowing that under 1B1.3, as the Court has

15  pointed out from the bench, relevant conduct is all

16  acts and omissions committed, aided, abetted,

17  counseled, commanded, procured by the defendant that

18  occurred during the commission of the offense of

19  conviction.  And that's important.

20          And of course, if they were jointly

21  undertaking activity, we know the conspiracy law is

22  a little bit different.

23          But again, that occurred during the

24  commission of the offense of conviction.  That

25  offense of conviction was in Counts 1 and 2 of the

115

1    indictment.

2           And when we look at the next point as to

3    the role, that the government has asked for 4 points

4    as leader organizer, well, leader organizer has to

5    be defined under 3B1.1, and you have to have an

6    organizer or leader that involved five or more

7    participants.

8           Well, participant is a word of art under

9    the guidelines.  A participant is a person who is

10   criminally responsible -- and I'm looking at

11   Application Note 1 of guideline 3B1.1, a person who

12   is criminally responsible for the commission of the

13   offense.

14          And Agent Singh plainly said there's only

15   one person who's responsible for this offense, and

16   that's Mr. McGraw.  Therefore, we don't have four

17   more participants, as that term is defined under the

18   guidelines.  And that goes to the role enhancement

19   that's set forth on page 5, going over to 6, of the

20   PSR addendum.

21          Finally, as far as the actual loss

22   amounts, the witness on the stand testified that the

23   amount actually lost by the surgical center was --

24   well, the amounts actually, as used by the probation

25   officer in her calculations, I guess as I stand

1    here, you know, with all the testimony we've had and

2    all the witnesses and everything that's been

3    offered, it seems like we come back to the

4    sentencing hearing like we have in every case.

5              It comes down to what is in the PSR,

6    what's in the PSR addendum?  We address those

7    issues.  And then the Court, you know, moves forward

8    from that point.

9              It's our position that the PSR addendum is

10   correct as to all those issues objected to by the

11   government.  The Court has already dealt with, of

12   course, the defendant's objections.  And then we

13   would proceed to just ask the Court to proceed to

14   sentencing, based upon that.  Thank you.

15             THE COURT:  I think the government has

16   thoroughly covered their position.  But I will give

17   you a chance to respond to that.  And then we will

18   go from there with regard to the victims, the

19   offense conduct, any of that.

20             MS. HEATH:  Your Honor, with regard to the

21   loss calculation, there's a difference between what

22   the actual loss would be, what the intended loss

23   would be, and what restitution is.  They are totally

24   different types of calculations, and totally

25   different types of evidence can be introduced for

 1    those.

 2            With regard to the intended loss, I think

 3    the government was trying to make it very clear what

 4    the difference was between the actual loss and the

 5    intended loss through the testimony of the witness

 6    with regard to the surgical center.

 7            She's only representing the surgical

 8    center.  She doesn't represent the Carrell Clinic

 9    and she doesn't represent the Cirrus Group.  So

10    those are the two other individual entities.

11            THE COURT:  Ms. Heath, doesn't it sort of,

12    in this instance, boil down to reasonably

13    foreseeable?

14            MS. HEATH:  Yes, Your Honor.

15            THE COURT:  And that's really what I think

16    I have to look at.  Were these losses, as you've

17    described, as catastrophic as they might have been?

18    Were they reasonably foreseeable?

19            So if you want to address that, we will

20    move on quickly to the other one that I'm most

21    interested in.  And that's the leadership role.

22            MS. HEATH:  The reasonable foreseeability

23    of Mr. McGraw's conduct is very apparent in his

24    admission in his factual resume; that the reason he

25    took over those computers and hacked into those

1   computers goes again back to doing a DDoS attack on

2   Devils Night.

3          On July 4th, he intended to take his army

4   of computers, including the army of computers that

5   his ETA members had gathered together, and use all

6   of the computers to attack rival groups.

7          During the time when the DDoS attack is

8   occurring, the victim computers that are being used

9   to implement the attack, they're focused on

10  implementing the attack.  They're doing repetitive

11  actions towards a rival hacker group network.

12         While they're doing that, their systems

13  slow to the point of sometimes shutting down to the

14  point of potentially not being able to come back up

15  again.

16         So any service that was provided by those

17  computers -- and in this case, we have medical

18  computers that were used by the Carrell Clinic, and

19  we have the HVAC computer used in the surgery center

20  and for the building.  Those computers would have

21  been shut down if Mr. McGraw had been permitted and

22  not stopped by the FBI, permitted to engage in his

23  Devils Night -- his DDoS attack.

24         So he, as an intelligent hacker who

25  employs sophisticated means with which to do all of

119

1    this, knows that when he causes a computer to
2    repeatedly attack another computer, the computer
3    that he's taking over, his bot computer, can very
4    well shut down.  He's compromising hospital
5    computers with hospital information in the HVAC
6    computer.
7            We brought Ms. Shaw in because the HVAC
8    computer was the more system-controlling computer in
9    the building that actually would control the
10   environment in the middle of June in Texas.  So had
11   that computer shut down during Mr. McGraw's July 4th
12   attack, yes, the HVAC computer would have slowed
13   down to the point of potentially stopping.
14       Another effect of trying to remediate what was
15   done by Mr. McGraw, you have to go in and almost
16   shut down everything to be able to then find what
17   was done and fix it, take it out, do what you need
18   to do.  So everything has slowed down at this point.
19       But because of Mr. McGraw's conduct, he knew
20   that he was risking the integrity of those computers
21   to be able to operate efficiently.  And when you're
22   affecting an HVAC computer, and as you read from the
23   presentence report, Mr. McGraw himself knew that he
24   could do a lot of bad things with the computer that
25   he had, that he could have shut down the air

1    conditioning system for whatever length of time it

2    took for the hospital to realize that that had

3    happened and then try to fix the systems.

4        So yes, we feel that that was reasonably

5    foreseeable to Mr. McGraw.

6            THE COURT:  Let's talk about the

7    leadership issue.  Respond to Mr. -- sorry, it's

8    late.

9            MR. DURDEN:  Durden, Your Honor.

10           THE COURT:  -- Durden's argument that it's

11   not connected -- this whole Devils Day attack that

12   he clearly has indicated he was going to use this

13   system in this case to participate in, that he says

14   that's not part of the offense conduct, not part of

15   what he pled guilty to.  Just address that, if you

16   would.

17           MS. HEATH:  There are videos that showed

18   on Government's Exhibit 60 that was not

19   introduced -- I'm sorry, 102, that showed that

20   Mr. McGraw was directing people that Devils Night

21   this year, 2009, would happen; that it was a dud

22   last year.  He wasn't able to get it off the ground.

23   But this year, they were gathering enough computers

24   to do this.

25           Starting in about November, we know it's

1   November, because he's talking about President Obama

2   just having been elected, having President Obama as

3   the president.  In some of these videos, he's

4   gathering his members of his Electronik Tribulation

5   Army to go out and get as many computers as possible

6   to aim at Devil's Day.

7           THE COURT:  Where do we get the five or

8   more people?

9           MS. HEATH:  We have the list of

10  individuals.

11          THE COURT:  Okay.  I thought that's what

12  you were doing.  I just wanted to make sure.

13          MS. HEATH:  And from the videos he sends

14  out shout-outs:  Thank you, Nyk0N; thank you,

15  Immortal; thank you whatever the individual's names

16  are.

17          On some of these videos he gives shout

18  outs to them for having done the compromises and

19  having done the defacings and having taken over

20  computers.  So he thanks them on some of these

21  videos where he's actually involved in it.

22          With regard to even the HVAC computer, we

23  have Mr. Nichols admitting that he helped with the

24  Rxbot that went into the HVAC computer, as well as

25  other computers at the Carrell Clinic.

1         The individual that announced to law

2    enforcement that they had found on the Internet

3    postings of the HVAC system, it was posted by yet

4    another individual who was part of the ETA

5    organization.

6         Had we been allowed to get into some of

7    the videos, we could show that there were five or

8    more participants from the Electronik Tribulation

9    Army that were all participating in screen shots.

10        Government's Exhibit 216 in the book has

11   separate categories.  Each of those individuals were

12   compromising computers in preparation for Devils

13   Day.  So there are more than five people in this

14   book, five tabs in this book for the individuals

15   that were assisting Mr. McGraw.

16        THE COURT:  Ms. Heath, I think you've

17   covered your positions on your issues.  What I would

18   like to do is take a short break and come back and

19   let you each have two minutes to summarize, and then

20   we will go ahead and finish up.

21        (Recess taken from 5:28 to 5:35.)

22        THE COURT:  Okay.  I'm going to go ahead

23   and rule on the government's objections, and then I

24   will let you each talk a bit in summary.

25        This case had quite an amount of detail to

1    it.  Both sides have worked very hard on this, and I

2    know the FBI has invested a lot of time and effort

3    in this.

4            Mr. Durden, as I have said before, this

5    was a tough case.  You spent a lot of time on this.

6    You filed more than I usually get in criminal

7    sentencings.  So I'm sure your client appreciates

8    that, and I appreciate that.

9            MR. DURDEN:  Thank you, Your Honor.

10           THE COURT:  With regard to the intended

11   loss, I understand the government's position on

12   this.  And as I've said before, I think we had a

13   case not too long ago about the defacing of a

14   website and the intended loss there and how much

15   more difficult it is to prove.

16           I think the problem I'm having here is

17   what I mentioned with Ms. Heath earlier, that it

18   boils down to what is foreseeable, intended loss.

19   And I think the element that's missing for me here

20   with regard to bumping this amount up to any amount

21   other than what it is, especially up to 500,000, is

22   the foreseeability factor.

23           The reason I say that is because although

24   all of these catastrophic events could have

25   certainly occurred by virtue of what the defendant

1    was doing, given my understanding, and pretty much

2    undisputed, of his position in this company, he was

3    sort of a deep night security guard, worked there

4    for about six months, I don't think there's enough

5    information for me to rely on to find that he would

6    have even fathomed that these things could have

7    happened.

8            For example, I think in this similar case,

9    had you had, say, the nurse that was here

10   testifying, if she had been the hacker or someone

11   with her knowledge, it would be easy to say that

12   these losses would be foreseeable because she knew

13   exactly how the inner workings operated and the

14   fallout from something like this.

15           So I think the government has made a

16   valiant effort on this, but I don't think you've

17   established it under the pretty strict standard I

18   have to rely upon in finding what is reasonably

19   foreseeable.  So I'm going to deny that objection.

20           With regard to the number of victims,

21   again I overrule that objection as well.  I think

22   the only way I can get to the number of victims that

23   the government is asking for is to go outside the

24   offense conduct.

25           I think, for the record, that the defense

1    position on the offense conduct is narrower than the

2    law allows.  I think offense conduct would include

3    what's in the presentence report, which offense

4    conduct itself hasn't been objected to in that

5    regard, as well as what's in the factual resume.

6            And for anyone reviewing this on appeal, I

7    know it's going to be confusing because of the

8    withdrawal of the original guilty plea and the

9    second arraignment coming without an actual document

10   filed in connection with that rearraignment.

11           But as I said at that time, we're relying

12   on -- and everyone agreed -- the factual resumes and

13   that information that are set forth in Document 21.

14           So reading Document 21, as well as the

15   offense conduct in the presentence report, I do

16   think the conduct itself goes farther, perhaps much

17   farther, than what the defense is trying to limit it

18   to.  But I still don't think it goes far enough to

19   get the 50 victims.

20           To do that, I think we'd have to go

21   outside to general hacking activity.  As bad as it

22   was, I don't think it sufficiently satisfies the

23   standard to constitute offense conduct.  I overrule

24   that objection.

25           I sustain the objection as to the leader

1    role, however.  I think that the offense conduct as

2    set forth in the presentence report, the offense

3    conduct as gleaned from the factual resume, as well

4    as the testimony from the agent more than

5    established beyond a doubt, in my regard, that this

6    scheme, that this whole compromising of the HVAC

7    system which is underlying the offense to which he

8    pled guilty, was part and parcel of this greater

9    scheme and an essential element of this greater

10   scheme, as I understand it, to institute this Devils

11   Day attack.

12          The Devils Day attack, from the

13   information from the agent, as well as the exhibits

14   I have admitted here at the sentencing hearing,

15   relying on the factual resume and all of the

16   information in the presentence report, the offense

17   conduct certainly established that there were five

18   or more participants that he was leading.

19          He himself -- I'm not going to rely on

20   everything he said, sort of blurted out during his

21   colloquy.  But he specifically said he was a

22   leader/organizer.  That was not solicited.  It was

23   unsolicited.

24          I think the young man, Mr. McGraw, is a

25   very smart young man.  And for all of those reasons,

1    I think the government has established that, which

2    results in a 4-level increase to the offense

3    conduct.  And with a 4-level increase, we go to a

4    28, with an offense level -- with a criminal history

5    category of 1, which takes him to a 78 to 97 level.

6              Now, I know the government has asked for

7    upward departure, as well a variance, as I

8    understand it, and the defense has asked for

9    downward in that regard.  So I'll let you use your

10   closing minutes to make that argument, and then I

11   will make the sentencing.

12             Go ahead, Ms. Heath.

13             MS. HEATH:  Yes, Your Honor.

14             Mr. McGraw has engaged in compromising

15   computers not only at the Carrell Clinic during his

16   security job there, but also at prior employers.

17             It's a continued pattern of activity where

18   he goes in, takes over a computer.  At the Daystar

19   facility, when he went in within two or three days

20   of working there, he went into the computer,

21   unauthorized access.  They have him on video.  And

22   by his unauthorized access in transmitting codes and

23   commands to that computer, he took their whole

24   telephone system down.

25             So he is very aware that he can take down

1   systems.  So his pattern of activity of prior

2   employers leading up to the Carrell Clinic shows

3   that he is constantly focused on hacking into

4   computers.

5           His letters from jail, his telephone calls

6   from jail indicate that he's going to continue this

7   activity.  He had no intention of stopping this

8   activity.  He wants to retaliate against people that

9   he believes have undermined his ability to continue

10  to hack into computers and be the leader of the

11  Electronik Tribulation Army.

12          Because of this pattern of conduct and

13  because of his desire to continue the activity, we

14  have a letter where he's telling them that he has

15  compromised the jail computers at Seagoville.  He

16  has gotten into those systems and compromised those

17  computers.

18          So not even being in prison has stopped

19  his ability to continue his criminal activity as

20  focused on the 10-30 violation to which he pled

21  guilty.

22          For that reason, we request that the Court

23  consider upwardly departing in this case, because of

24  the totality of Mr. McGraw's conduct, for the safety

25  of the community and to assist him in being able to

1    change his behavior in the future.

2           We would also request some additional

3    conditions in jail.  But I will wait until a

4    different point, if you want, to add or comment on

5    different conditions we would request in jail.

6           THE COURT:  Thank you, Ms. Heath.

7           Mr. Durden.

8           MR. DURDEN:  Thank you, Your Honor.  May

9    it please the Court?

10          Yes, but did he?  I mean that's what was

11   coming through my mind as I was listening to the

12   fine allocution of the government.

13          It was like the Devils Day could have done

14   this and Devils Day could have done that.  But wait

15   a minute.  He was, you know, arrested.  He

16   voluntarily, you know, met with law enforcement,

17   gave them information which would have kept them

18   from -- you know, it would have allowed them to keep

19   this from happening.  And then he's somehow asked to

20   be held responsible for that.

21          It seems to me so much like the argument

22   of, hey, this guy was selling -- some drug dealer

23   case.  Hey, look.  He was selling, you know, a gram

24   a week.  And if we hadn't stopped him, over the next

25   three years, he would have sold this amount.

1           Yes, but he didn't, you know.  You get him

2     for what he's done.

3           And this is also kind of troubling to me

4     when you look at the fact he's not getting

5     acceptance of responsibility, despite having met and

6     given all this evidence -- he even wrote out some of

7     these exhibits that they have offered.  I mean he

8     handwrote that, and that's being used against him.

9           And he did that in an effort to try to do

10    the right thing.  As challenging as it is for him,

11    he was trying to do the right thing and was trying

12    to help law enforcement minimize the damage of his

13    actions.

14          I would ask the Court to consider that

15    and, you know, consider the fact that he doesn't get

16    acceptance.  In fact, he's getting obstruction and

17    he's ending up at such a high range.

18          Gosh, the hard thing about this case --

19    there's so many hard things.  One of them is we've

20    got, you know, this two-and-a-half-year-old baby

21    crying for his mama.  And he's pretty much left to

22    fend for his own and grow up in a way that society

23    hasn't really done a whole lot for him.

24          And now he has a little girl about that

25    same age, I guess, more or less, that's out there.

1    I just really hate to think of him being away from
2    that little girl for so long.
3            All in all, this comes back to an economic
4    crime.  It's a 2B1.1 crime.  The old law has always
5    been, as long as we've had any kind of organized
6    justice system, you pay for what you break; you
7    repay what you took.  It's an economic crime.
8            But you know, there's no justice without
9    mercy, and there's a higher law.  It says, blessed
10   are the merciful.
11           THE COURT:  Thank you, Mr. Durden.  If you
12   and your client could step over.
13           Mr. McGraw, you're a young man.  And
14   you're a smart young man, smarter than most.  I
15   don't know what your IQ is.  But I would expect it's
16   impressive, given what you've been able to do
17   musically and otherwise.
18           As you know, we start off with this
19   guideline level with the points added.  I said you
20   were up to 28, with an advisory guideline range of
21   78 to 97 months.
22           The thing I have to decide is whether or
23   not I should go above that, below that, or stay
24   within it and where.  In deciding that, I have to
25   look at the factors of 18 U.S.C. Section 3553, and

1  they very, very much make a material difference for

2  me in this case.

3           Without specifically expressly stating

4  each factor, the first two, of course, are the

5  background of the defendant and the nature and

6  circumstances of the crime.  We want to make sure

7  the offense promotes just punishment, is a

8  deterrent; promotes again respect for the law and

9  all the other factors.

10          But what I think causes me to find the

11 most reasonable sentence in this circumstance is a

12 couple of levels up from where it is right now.  I

13 have a number of reasons for that.

14          Mr. McGraw, the nature of the crime here,

15 we have many, many young, brilliant people like

16 yourself out there with, for some reason, a complete

17 lack of responsibility or notion of how their

18 conduct impacts others.

19          And there is a very important principle at

20 stake here that others like that out there know that

21 this is very serious conduct that you don't get

22 probation for and you don't get a slap on the wrist

23 for, especially when it's consistent, chronic and

24 goes on over a period of time.  And I'm talking

25 about just what's in the offense conduct here and

1    just what's in the factual resume.

2            It was a concerted effort, with nothing

3    that I can see behind it but ill will and an attempt

4    to harm.  It wasn't necessarily anything I saw as

5    just fun or gaming.  We have had cases like that

6    before, where people used computers to do something

7    called swatting each other; sometimes harmful,

8    sometimes not.

9            Here I didn't see anything but evil

10   purpose behind what you were doing over the course

11   and period of time that the offense conduct covers

12   in this case.

13           And although I'm very pleased to see how

14   you've acted today -- I see a different person than

15   I saw that first came in here on numerous occasions

16   who couldn't get along with his counsel and then

17   engaged in conduct that's outside the norm for

18   individuals arrested for this kind of crime, once

19   they've been in jail, and that is this obstruction

20   of justice conduct, which indicates to me that you

21   didn't quite get even close to the impact that you

22   caused with this crime or that you could have

23   caused.

24           The obstruction of justice, of course, you

25   got credit for that against you.  But I'm going to

 1   consider the way that obstruction of justice

 2   occurred, including after you got in custody, that

 3   indicates to me that you and your background, the

 4   way you committed this crime and what you did after

 5   you got arrested, warrants a strong message.

 6           A reasonable sentence, in my view, that

 7   promotes respect for the law and promotes

 8   deterrence.  Deters others like you from doing the

 9   same thing, which if it was carried to its next

10   logical step, which you heard from the nurse, would

11   be devastating.

12           And certainly I'm not giving you credit

13   for the loss that could have occurred.  But I'm

14   going to consider what could have happened if it had

15   been carried out as you planned, which would have

16   been devastating.

17           So I'm adding two levels.  That takes you

18   to a level 30, with 97 to 121 months.  You can't get

19   more than 121 months in this case.  And I'm

20   sentencing you to 110 months on each count, to run

21   concurrently.

22           I think that's reasonable, under the

23   circumstances, and carries out the purposes of our

24   sentencing statutes, but not more than it should be.

25           Along with that sentence, if you'll bear

1   with me, is a term of supervised release.  Let me

2   get my notes here.

3           A mandatory special assessment of $100 on

4   each count; restitution in the amount of $31,881.75,

5   payable to the Carrell Clinic, attention Thomas

6   Blair; $26,468.75, United Surgical Partners

7   International, attention Robin Shaw; $4,413; and

8   finally, the Cirrus Group, attention Jason Todd,

9   $1,000.

10          The term of supervised release will be

11  three years.  The conditions of supervised release

12  are as follows, and there will be no fine that I'm

13  going to order in this case.  Two years supervised

14  release on each count, to run concurrently, with the

15  following conditions.

16          The defendant shall not commit another

17  federal, state or local crime.

18          The defendant shall not illegally possess

19  a controlled substance.

20          The defendant shall cooperate in the

21  collection of DNA, as directed by Probation.

22          The defendant shall not possess a firearm,

23  ammunition, destructive device or any other

24  dangerous weapon.

25          The defendant shall report in person to

136

1   U.S. Probation in the district to which he is

2   released within 72 hours of release from custody.

3             The mandatory drug testing condition is

4   suspended in this instance.

5             The defendant shall provide to Probation

6   any requested financial information.

7             The defendant shall pay any remaining

8   balance of restitution in the amount of the

9   $31,881.75, as set out in the judgment.

10            The defendant shall participate in

11  workforce development programs and services

12  involving activities relating to occupational and

13  career development, including but not limited to

14  assessments and testing, educational instruction,

15  training classes, career guidance, counseling, case

16  management and job search and retention services as

17  directed by Probation.

18            Ten, the defendant shall participate and

19  comply with the requirements of the Computer and

20  Internet Monitoring Program, contributing to the

21  cost of the monitoring in an amount not to exceed

22  $40 per month.

23            The defendant shall consent to the

24  probation officers conducting ongoing monitoring on

25  his or her computer.  The monitoring may include the

1    installation of hardware or software systems that

2    allow the evaluation of computer use.

3              The defendant shall not remove, tamper

4    with, reverse engineer or circumvent the software

5    any way.

6              The defendant shall only use authorized

7    computer systems that are compatible with the

8    software and/or hardware used by the computer

9    Internet monitoring program.

10             The defendant shall permit Probation to

11   conduct a preliminary computer search prior to the

12   installation of software.  The monitoring software

13   may be disabled or removed at the time during the

14   term of supervision at the discretion of Probation.

15             The defendant shall submit to periodic,

16   unannounced examinations of his or her computer,

17   storage media and/or other electronic or Internet

18   capable devices performed by Probation at a

19   reasonable time and in a reasonable matter, based

20   upon reasonable suspicion of contraband evidence of

21   a violation of supervision.  This may include the

22   retrieval and copying of any prohibited data and/or

23   the removal of such systems for the purpose of

24   conducting a more thorough inspection.

25             The defendant shall provide written

1   authorization for release of information from his

2   Internet service provider.

3          The defendant shall not use any computer

4   other than the one he is authorized to use without

5   approval.

6          The defendant shall not use any software

7   program or device designed to hide, alter or delete

8   records or logs of his computer use, Internet

9   activities or files stored on his computer.

10          The defendant shall not use any computer

11   or computer-related equipment owned by his or her

12   employer, except for the strict benefit of his

13   employer in the performance of his or her

14   job-related duties.

15          The defendant shall provide the probation

16   officer with accurate information about his entire

17   computer system, and his e-mail shall only be

18   accessed through preapproved applications.

19          The defendant shall not install new

20   hardware, software, perform upgrades or effect

21   repairs on his or her computer system without

22   receiving prior permission from Probation.

23          He shall not use any ISP, Internet service

24   provider, account or any other online service using

25   someone else's account, name, designation or alias.

1            The defendant shall not view, possess or

2     compose any material that describes or promotes the

3     unauthorized access to computer systems and shall

4     not purchase, download, possess or install software

5     applications whose primary purpose is to scan and

6     detect vulnerabilities in computer networks or to

7     cause damage.

8            Ms. Heath, did you have something you

9     wanted to add or are requesting?

10           MS. HEATH:  Yes.  With regard to while

11    he's in custody and serving the sentence, we would

12    request that he not be permitted by the Bureau of

13    Prisons to use computers within the Bureau of

14    Prisons unless he can be properly monitored by

15    prison personnel.

16           THE COURT:  All right.  I was going to add

17    something with regard to restrictions in prison that

18    would restrict the defendant's access to any kind of

19    computer access while he is in prison.  I'm not sure

20    exactly how to word that.

21           But Mr. Durden, I want to give a chance

22    for just your input on that.

23           MR. DURDEN:  My input would be, Your

24    Honor, that truly the access that the defendants

25    have to computers under BOP supervision is very well

```
 1    supervised and very restricted.

 2            Just briefly, they pointed out that he

 3    said something.  But there really was no evidence

 4    that he was able to do anything within the BOP

 5    computers, and I don't think he can.

 6            THE COURT:  I would like to at least add a

 7    condition that he be monitored in any type of

 8    computer access by the Bureau of Prisons.  I'm not

 9    sure how I'm going to word that.  But I think, given

10    the circumstances, that it's appropriate.  I will

11    put it in there.

12            If you all have objections to it, we can

13    talk about it at another point in time.  But I just

14    want to make sure that I put you on notice that I'm

15    going to put something like that in there.

16            MR. DURDEN:  Certainly, he should comply

17    with all their rules and regulations.

18            THE COURT:  Obviously, yes.  And I

19    mentioned a $100 special assessment on each count.

20            Are there any counts to dismiss?  I think

21    we have -- do we not have a superseding indictment

22    in this case that was not the one pled to?

23            MS. HEATH:  It's my understanding that his

24    guilty plea was to the original indictment.

25            THE COURT:  Yes.
```

1          MS. HEATH:  With regard to his guilty plea

2    and the sentence imposed, we will dismiss the

3    superseding indictment in this case.

4          THE COURT:  Okay.  Are there additional

5    counts in the original indictment?

6          MS. HEATH:  No, there are not.

7          THE COURT:  The superseding indictment

8    will be dismissed as motioned by the government,

9    with the order to be reflected in the minutes of

10   this case.

11         I'll talk to you in a minute about if you

12   have a request on location.  Do you have a request?

13         MR. DURDEN:  We do, Your Honor.  First, we

14   would request FCI-Fort Worth.  And then second, we

15   would request FCI-Seagoville.

16         THE COURT:  I'll make those

17   recommendations.

18         MR. DURDEN:  Thank you, Your Honor.

19         THE COURT:  Mr. McGraw, you have a right

20   to appeal this sentence.  You don't even have a plea

21   agreement.  So you can appeal, within the reasoning

22   of you and your counsel, your sentence.  Okay?

23         If you decide to appeal, you're entitled

24   to court-appointed counsel if you can't afford an

25   attorney.  But you will have to have your notice of

1    appeal filed, even if it's handwritten, within ten

2    days of the date of the Court's judgment.

3              Just for safety purposes, I've kind of

4    adopted a standard operating procedure where I ask

5    counsel at sentencing to please be responsible for

6    finding out if he wants to appeal and getting the

7    notice filed.

8              If you need to withdraw for any reason,

9    I'll consider it right away after that.

10             MR. DURDEN:  Thank you, Your Honor.

11             THE COURT:  If there's nothing else --

12   nothing else?

13             MS. HEATH:  No, Your Honor.

14             THE COURT:  -- Mr. McGraw is remanded to

15   custody, and we will be in recess.

16             (Court in recess at 5:59 p.m.)

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2            I, Shawnie Archuleta, CCR/CRR, certify

3    that the foregoing is a transcript from the record

4    of the proceedings in the foregoing entitled matter.

5            I further certify that the transcript fees

6    format comply with those prescribed by the Court and

7    the Judicial Conference of the United States.

8            This 20th day of May 2011.

9

10

11                        s/Shawnie Archuleta
                          _____
                          Shawnie Archuleta CCR No. 7533
12                        Official Court Reporter
                          The Northern District of Texas
13                        Dallas Division

14

15

16   My CSR license expires:  December 31, 2011

17   Business address:  1100 Commerce Street
                        Dallas, TX  75242
18   Telephone Number:  214.753.2747

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER − 214.753.2747**